**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Terre Haute Division**

| | | | |
|---|---|---|---|
| ROGER TODD, | ) | | |
| | ) | | |
| *Plaintiff*, | ) | | |
| | ) | | |
| v. | ) | **Case No.** | 2:19-cv-85-JMS-DLP |
| | ) | | |
| OCWEN LOAN SERVICING, INC., and | ) | | |
| DEUTSCHE BANK NATIONAL TRUST CO., as | ) | | |
| Trustee for NovaStar Mortgage Funding Trust, | ) | | |
| Series 2007-1 , | ) | | |
| | ) | | |
| *Defendants*. | ) | | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Roger Todd ("Todd"), by counsel, complains of Defendants, Ocwen Loan

Servicing, LLC. ("Ocwen") and Deutsche Bank National Trust Co., as Trustee for NovaStar

Mortgage Funding Trust, series 2007-1 ("Deutsche Bank"), as follows:

### INTRODUCTION

1.      Through no fault of his own, Todd lives in fear of losing his home despite making

over 87 consecutive timely and adequate monthly mortgage payments.  This is because the

recipient of the funds has and continues to hold him in a manufactured state of default.  In so

doing, and in abusively attempting to collect amounts Todd does not actually owe, Ocwen has

violated nearly every consumer protection statute in existence and blatantly disregarded Orders

and protections put in place by judges within this very district.

### PARTIES, JURISDICTION, AND VENUE

2.      Todd is the owner of real property and improvements located at and commonly

known as 8800 E. Washboard Road, Solsberry, Indiana 47459 (the "Home").

3.      Todd purchased the Home on or about April 16, 2002, as his primary residence and financed that purchase by a loan evidenced by a note (the "Note") and a mortgage allegedly securing the Note (the "Mortgage") (collectively, the "Loan").

4.      The Loan was originated by NovaStar Mortgage, Inc., ("NovaStar") and subsequently placed in a mortgage-backed security guaranteed by Fannie Mae.

5.      Ocwen has been a "servicer" of Todd's mortgage as that term is defined by 12 U.S.C. § 2605(i)(2).

6.      Ocwen is a wholly owned and operated subsidiary of Ocwen Financial Corporation and is a limited liability company incorporated under the laws of the State of Delaware.

7.      Ocwen is one of the largest non-bank mortgage servicers in the United States. Ocwen services mortgage loans in all 50 states, including Indiana.

8.      At all times relevant herein, Ocwen acted and acts as the agent of, and loan servicer for, Deutsche Bank.  As a loan servicer, Ocwen is a partial assignee of the Loan.

9.      Deutsche Bank is the trustee for NovaStar.  Deutsche Bank is a federally chartered National Bank with a primary business location of 60 Wall Street, New York, New York 10005.

10.      Jurisdiction of claims against Ocwen and Deutsche Bank are conferred by 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Real Estate Settlement Procedures Act, 12 U.S.C. §2601, *et seq*. (the "RESPA"), the Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq*. (the "FDCPA"), the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"), and the Truth In Lending Act, 15 U.S.C. § 1639 (the "TILA").  This action is specifically filed to enforce regulations

promulgated by the Consumer Finance Protection Bureau (the "CFPB"), which became effective on January 10, 2014, and specifically, 12 C.F.R. §1024.35 and §1024.36 of Regulation X.

11.     This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. §1367.

12.     Venue is proper pursuant to 28 U.S.C. § 1391 because the property that is the subject of the action, the Home, is located in this District.

## SUMMARY OF FEDERAL CLAIMS

### The RESPA & Reg. X

13.     RESPA, originally enacted in 1974, was designed to ensure consumers in real estate transactions receive timely information on the nature and costs of the loan settlement process and to protect them from abusive lending practices.

14.     The Cranston-Gonzalez National Affordable Housing Act of 1990 expanded the scope of RESPA by addressing mortgage servicer practices.

15.     In response to evidence of additional servicer abuses during the preceding mortgage crisis, RESPA was amended in 2010 by the Dodd-Frank Act to further expand on the aforementioned protections.

16.     RESPA's provisions relating to loan servicing are to be construed liberally so as to carry out the statue's remedial consumer protection purpose. *Medrano v. Flagstaff Bank*, 704 F.3d 661, 665 (9th Cir. 2012).

17.     In January of 2013, the CFPB issued several final rules concerning mortgage markets in the United States, pursuant to the Dodd-Frank Act, Public Law No. 111- 203, 124 Stat. 1376 (2010).

18. Specifically, the CFPB issued the RESPA Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

19. The Loan in the instant matter is a "federally related mortgage loan" as said term is defined by 12 C.F.R. §1024.2(b).

20. Ocwen is subject to the aforesaid regulations and does not qualify for the "small servicers" exception, as such term is defined in 12 C.F.R. §1026.41(e)(4), nor the exemption for a "qualified lender," as such term is defined in 12 C.F.R. §617.700.

21. Todd asserts a private right of action under RESPA pursuant to 12 U.S.C. §2605(f) for the claimed breaches of the specific rules set forth under Regulation X.

## The FDCPA

22. Congress enacted the FDCPA to prohibit the "[u]se of abusive, deceptive, and unfair debt collection practices." 15 U.S.C §1692a.

23. The FDCPA applies to debt collectors, not original creditors. Ocwen is a "debt collector" as defined by 15 U.S.C. § 1692a(6) as it obtained servicing rights to the Loan and began servicing the Loan after it was in default.

24. Todd is a "consumer" as defined by 15 U.SC. § 1692a(3), and the Loan is a debt as defined by 15 U.SC. § 1692A(4).

25. Todd asserts a private right of action under the FDCPA pursuant to 15 U.S.C. §1692k, for Ocwen's willful or deliberately indifferent conduct in connection with collection of the Loan.

## The FCRA

26.     United States Congress has found that the banking system is dependent on fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.  Congress enacted the FCRA to insure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

27.     The Consumer Data Industry Association (the "CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services.  The CDIA is active in both federal and  state legislative affairs, public relations, education, and the promulgation of industry standards.

28.     Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works to develop, maintain and enhance industry-standard reporting formats and guidelines.  In cooperation with Trans Union LLC, Experian Information Services, LLC, Experian Information Solutions, Inc., and Innovis Data Solutions, Inc., the CDIA publishes the Metro 2 reporting standards (the "Metro 2 Standards") to assist data furnishers like Ocwen with compliance requirements under the FCRA.  The CDIA's reporting products are used in more than nine billion transactions each year. *See* *http://www.cdiaonline.org/about/index.cfm?unItemNumber=515.*

29.     The uniform adoption and implementation of the Metro 2 Standards is the  primary vehicle by which Credit Reporting Agencies ("CRAs") and data furnishers ensure that they are following their duties to ensure that they maintain complete and accurate information under the FCRA.

30.     The Metro 2 Standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

31.     The major national CRAs – Trans Union LLC, Experian Information Services, LLC, and Experian Information Solutions, Inc., – also collaborated and developed a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting  information, and for furnishers to easily and quickly respond to such disputes following investigation.  The system is commonly referred to as e-OSCAR and was designed to  be Metro 2 compliant. *See* **[http://www.e-oscar.org/.](http://www.e-oscar.org/.)**

32.     The  e-OSCAR  system  primarily  supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

33.     ACDVs are notifications initiated by a CRA, and transmitted to a  furnisher, in response to a consumer dispute.  ACDVs are the primary method the CRAs use to fulfill their statutory obligation to notify furnishers of disputed information of consumers' disputes.

34.     One such entity that regularly reviews consumer reports, and uses the data contained therein, is the Fair Isaac Corporation.  The Fair Isaac Corporation credit risk scoring system, commonly referred to as FICO, is the leading credit risk scoring system, and utilizes data reported by credit reporting agencies and furnishers which are, ostensibly, in compliance with Metro 2 Standards.

35.     FICO scores are calculated from five main categories of credit data in a consumer's credit report.  Those categories, and their weighted values, are as follows:  payment history accounts for 35% of a consumer's FICO score; debt/amounts owed  accounts for 30% of a consumer's FICO score; age/length of credit history accounts  for 15% of a consumer's FICO

score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and, mix of accounts/types of credit accounts for 10% of a consumer's FICO score. *See* **www.myfico.com/credit-education/whats-in-your-credit-score/.**

36. The cost of credit (*e.g.,* interest rates, fees, *etc*.), the availability of credit, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's FICO score.

37. Inaccurate or incorrect credit reporting often results in a lower FICO score, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers. The improper reporting of a mortgage tradeline has a particularly adverse effect on a consumer like Todd's credit score as it represents the largest and oldest active debt obligation in his credit history.

38. Ocwen regularly and in the ordinary course of business furnished information to one or more consumer reporting agency about Todd's transactions and is therefore a "furnisher" as that term is used in 15 U.S.C.A. § 1681s-2.

39. Todd asserts a private right of action under the FCRA pursuant to 15 U.S.C.A. § 1681s-2(b) for Ocwen's willful or deliberately indifferent acts and omissions in reporting information regarding the Loan and in failing to conduct reasonable investigate disputed information.

<u>The TCPA</u>

40. The TCPA was enacted to protect individuals from the harassment, annoyance and abuse of unsolicited telephone calls made to their cellphones through the use of automatic telephone dialing systems ("ATDS") or automated/pre-recorded voices ("Robocalls").

41.     To accomplish this purpose, the TCPA authorizes a "person" to bring a private cause of action against callers who make "any call using an automatic telephone dialing system or prerecorded voice to any telephone number assigned to a ….cellular telephone..." *See* 47 U.S.C. §227(b)(1)(A)(iii).  The TCPA's definition of an automatic telephone dialing system includes a "predictive dialer." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012).

42.     According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.  The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.  Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003).

43.     On January 4, 2008, the FCC issued a Declaratory Ruling confirming that autodialed calls and calls using an artificial voice or pre-recorded message to a wireless number by a creditor or on behalf of a creditor are permitted only if the calls are made with the "prior express consent" of the called party.  In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 ("FCC Declaratory Ruling"), 23 F.C.C.R. 559, 23 FCC Rcd. 559, 43 Communications Reg. (P&F) 877, 2008 WL 65485 (F.C.C.) (2008).

44.     The FCC "emphasize[d] that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that the number was provided during the transaction that resulted in the debt owed."  FCC Declaratory Ruling, 23 F.C.C.R. at 564-65 (¶10).

45.     Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Ocwen to demonstrate that Todd gave his express consent to Ocwen to use an autodialer to call his cell phone within the meaning of the statute.  *See* FCC Declaratory Ruling, 23 F.C.C.R. at 565 (¶ 10). However, even when consent is determined to have been given, it can be revoked.

46.     Directly as well as through its subsidiaries, contractors and agents, Ocwen employs hundreds of persons at various call centers throughout the country.  These calling centers use automatic telephone dialing systems and computerized account information to track, record, and maintain the hundreds of thousands of debts collected by Ocwen.

47.     A significant portion of Ocwen's business operations are dedicated to servicing consumer loans that are in default, foreclosure, or were involved in a bankruptcy proceeding.

48.     Ocwen's regular business practices include making repeated phone calls, as well as sending notices, statements, bills, and other written correspondence to persons like Todd who it believes responsible for paying allegedly past due amounts.  Part of Ocwen's strategy for servicing consumer loans involves the use of an ATDS and/or Robocalls.

49.     Ocwen uses ATDS equipment and software that has the capacity to store or produce telephone numbers to be called and which includes auto-dialers and predictive dialers.

50.     Ocwen has made calls using an ATDS and/or Robocalls to Todd's cellular telephone even though he did not provide express prior consent to receive such calls, or Todd revoked any alleged consent thereafter.

<u>Todd's Chapter 13 Bankruptcy Proceeding</u>

51.     On March 4, 2011, Todd filed a bankruptcy case pursuant to Chapter 13 of the

United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Indiana, Case No. 11-80256-JJG-13 (the "Bankruptcy Case").

52.     Todd filed the Bankruptcy Case to cure all pre-petition defaults on the Loan.

53.     Shortly after filing, Todd proposed a Chapter 13 Plan (the "*Chapter 13 Plan*"), which was amended on April 19, 2011. [Filing No. 16].

54.     On September 13, 2011, the Bankruptcy Court entered an *Order Confirming Amended Chapter 13 Plan Filed April 19, 2011*. [Filing No. 40].

55.     Pursuant to the confirmed *Chapter 13 Plan*, Todd was to make regular monthly payments of $990.00 to the Chapter 13 Trustee, from which Ocwen would receive approximately $583.57 per month to maintain the monthly payments it was owed, plus an additional sum to address all arrearage (originally estimated by Todd to be $20,000.00).

56.     Ocwen appeared in the Bankruptcy Case and participated by means of the filing of its *Proof of Claim* (Claim No. 4 dated March 14, 2011) [Claim Filing No. 4-1] on behalf of Deutsche Bank.

57.     The *Proof of Claim* asserted a secured claim in the amount of $77,640.83 and an arrearage claim of $22,106.24 which included: (a) escrow charges of $324.65; (b) pre-petition attorney fees and costs of $2,205.28; (c) property preservation fees of $60.00; (d) inspection fees of $118.50; (e) appraisal fees of $120.00; and (f) a breach fee of $7.00.

58.     On November 16, 2011, Ocwen's predecessor in interest, Saxon Mortgage Services, Inc., filed a *Notice of Payment Change*. [Filing No. 42].

59.     This was the only Notice of Payment Change filed during the Bankruptcy Case.

60.     From March 4, 2011 to April 12, 2017, Todd made timely and adequate payments to the Trustee in accordance with the terms of the Chapter 13 Plan.

61.     A true and accurate copy of the Trustee's payment ledger reflecting the amounts and date of disbursements to Ocwen is attached hereto as "Exhibit A".

62.     On May 2, 2016, the Chapter 13 Trustee filed a *Notice of Final Cure Payment* [Doc. 123] pursuant to FRBP § 3002.1(f), stating the amount to cure the prepetition default ($22,106.24 in arrearage) had been paid in full and that Todd had completed all payments required under the Chapter 13 Plan.

63.     On May 13, 2016, Ocwen filed a *Response to Notice of Final Cure Payment* under Claim Number 8 on the Claims Register, "[agreeing] that the Debtor(s) have paid in full the amount required to cure the prepetition default on the creditor's claim."

64.     Also on May 13, 2016, Ocwen filed an *Addendum To Response To The Notice of Final Cure* stating, "once [payment in the amount of $486.04, written on check #280695, issued by the Trustee] has been received, Debtor will be due for his May 1, 2016 payment.

65.     Thus, under the penalties for perjury, Ocwen affirmed that upon receipt of the aforementioned payment Todd was current with all post-petition payments consistent with §1322(b)(5) of the Bankruptcy Code including all fees, charges, expenses, escrow, and costs.

66.     On May 6, 2016, by Personal Money Order No. 110848, Todd mailed payment of $574.00 to Ocwen for application to his May 1, 2016, installment payment as required and as described above.  The payment was accepted by Ocwen and applied to the Loan.

67.     A true and accurate copy of the Personal Money Orders paid to Ocwen by Todd for his May, June, and July of 2016 payment obligations are attached hereto as "Exhibit B".

68.     On July 23, 2016, an *Order of Discharge* was entered. [Filing No. 131].

69.     In accordance with the *Chapter 13 Plan*, *Order of Discharge*, *Notice of Final Cure Payment*, and *Response to Notice of Final Cure Payment*, the Loan was to be reinstated

according to the original terms and any right of Ocwen or Deutsche Bank to recover any amounts alleged to have arisen prior to filing was thereby extinguished.

70. Thereafter, Todd continued making timely and adequate monthly installments to Ocwen as obligated.

Ocwen's Servicing Misconduct – Fees

71. Sometime in June of 2018, Todd obtained an exact reproduction of the life of loan mortgage transactional history ("Life of Loan History") for the Loan from the system of record used by Ocwen. The Life of Loan History reflects the current mortgage balance, the date of receipt and application of all payments, the date of assessment for any late fees or charges, and the recording of any corporate advances for any legal fees or charges, including without limitation property inspection fees, legal fees, escrow fees, processing fees or any other collateral charges.

72. A review of the Life of Loan History reveals a myriad of unexplainable and errant servicing conduct.

73. A true and accurate copy of the current Life of Loan History is attached hereto as "Exhibit C".

74. During the course of the Bankruptcy Case, Ocwen assessed fees and expenses to the Loan.

75. The fees and expenses include without limitation a broker price opinion ("BPO") on October 24, 2014 ($121.00), attorney fees for the "Review of Plan/Notice of Appearance on June 6, 2013 ($150.00), and "Prior Servicer Fees" on June 6, 2014 ($1,471.71), July 8, 2014 ($519.82), and September 8, 2014 ($68.75).

76. Ocwen did not provide notice of these fees or expenses to the Bankruptcy Court as required by FRBP § 3002.1.

77. After the Bankruptcy Case and the entry of the *Order of Discharge*, Ocwen continued to assess expenses to the Loan despite Todd being legally and factually current. These expenses include, but are not limited to, the following:

| Provider | Description | Date of Service | Amount |
|---|---|---|---|
| Altisource | Ocwen BPO | 06/21/2016 | $110.00 |
| Altisource | No Contact Inspection | 8/3/2016 | $13.25 |
| Altisource | No Contact Inspection | 12/14/2016 | $13.25 |
| Altisource | No Contact Inspection | 12/27/2016 | $13.25 |
| Altisource | No Contact Inspection | 1/16/2016 | $13.25 |
| Altisource | Exterior Property Inspection | 2/14/2016 | $13.25 |
| Altisource | Exterior Property Inspection | 3/16/2016 | $13.25 |
| Altisource | Exterior Property Inspection | 4/18/2016 | $14.50 |
| Altisource | Exterior Property Inspection | 5/19/2016 | $14.50 |
| Altisource | Exterior Property Inspection | 6/19/2016 | $14.50 |
| Altisource | Exterior Property Inspection | 7/24/2016 | $14.50 |
| Altisource | Exterior Property Inspection | 8/3/2016 | $14.50 |
| Altisource | Exterior Property Inspection | 12/14/2016 | $14.50 |
| Altisource | Exterior Property Inspection | 12/27/2016 | $14.50 |
| Altisource | Exterior Property Inspection | 1/16/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 2/14/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 3/16/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 4/18/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 5/19/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 6/19/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 7/24/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 8/25/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 9/26/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 10/28/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 11/28/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 12/28/2017 | $14.50 |
| Altisource | Exterior Property Inspection | 1/29/2018 | $14.50 |
| Altisource | Exterior Property Inspection | 3/2/2018 | $14.50 |
| Altisource | Exterior Property Inspection | 4/2/2018 | $14.50 |
| Altisource | Ocwen BPO | 4/5/2018 | $110.00 |
| Altisource | Exterior Property Inspection | 4/30/2018 | $14.50 |
| Altisource | Exterior Property Inspection | 6/5/2018 | $14.50 |
| Altisource | Exterior Property Inspection | 7/10/2018 | $14.50 |
| Altisource | Exterior Property Inspection | 7/31/2018 | $14.50 |
| Altisource | Exterior Property Inspection | 9/4/2018 | $14.50 |

| Altisource | Exterior Property Inspection | 10/3/2018 | $14.50 |
| Altisource | Exterior Property Inspection | 11/9/2018 | $14.50 |

78.     A true and accurate copy of an Invoice for each service described above is attached hereto as "Exhibit D".

79.     By information and belief, the Exterior Property Inspection[s] described above were not actually performed.  Among other things, the Home is not accessible or visible from Washboard Road.

80.     Neither Ocwen nor Deutsche Bank provided Todd "notice at the time of or prior to any inspection specifying reasonable cause for the inspection" as set forth in the Mortgage.

81.     Ocwen has also assessed, and continues to assess, a "Certified Mail Cost" of $6.53 to the Loan for each Notice of Default it mails to Todd.

82.     As further detailed below, and despite his exhaustive efforts to get Ocwen to stop, it has mailed Todd a Notice of Default every month since November of 2016.

Ocwen's Servicing Misconduct – Misapplication of Payments & Missing Funds

83.     In addition to the fees described above, the Life of Loan History reflects that during the Bankruptcy Case and thereafter, Ocwen maintained a large surplus balance in Suspense.  The highest balances include $2,417.68 on or about November 7, 2012, $5,263.43 on or about May 6, 2013, $2,868.13 on or about February 9, 2015, $874.17 on or about July 5, 2016, $1,941.18 on or about August 29, 2016, and $26,975.16 on or about November 15, 2016.

84.     Each amount referenced in the immediately preceding paragraph exceeds any monthly payment obligation Todd has ever owed on his Loan.

85.     Ocwen's retention of funds in excess of a regular payment amount in Suspense, instead of properly applying these funds to principal, interest, and escrow as contractually and legally obligated, caused it to charge Todd with fees and additional interest without basis.

14

86. Ocwen's retention of funds in Suspense in excess of his regular monthly payment amount for extended periods of time deprived Todd of the time value of that money as Ocwen did not pay interest towards the balance.

87. On or about July 6, 2015, Ocwen reversed payments totaling $1,944.12 previously paid from Suspense.

88. However, the $1,944.12 was not returned to Suspense or applied elsewhere.

89. To date, Ocwen cannot account for the $1,944.12.

90. On or about July 22, 2015, Ocwen reversed payments totaling $972.06 previously paid from Suspense.

91. However, only $569.16 of the $972.06 was returned to Suspense. The remaining $402.90 was applied elsewhere.

92. To date, Ocwen cannot account for the missing $402.90.

93. On August 6, 2015, Ocwen performed a "BK Escrow Adjustment" resulting in the transfer of $569.16 from Suspense. The $569.16 was not transferred to Todd's escrow account, used to pay taxes or insurance, or returned to Suspense.

94. To date, Ocwen cannot account for the $569.16.

95. On August 2, 2016, Ocwen posted Todd's payment of $600.00 as a Suspense payment but his Suspense balance did not increase.

96. To date, Ocwen cannot account for the $600.00.

97. On January 4, 2017, Ocwen increase the principal balance of the Loan by $4,343.35.

98. To date, Ocwen has offered no explanation for why it increased the principal balance of the Loan.

99.     The Note does not contain language permitting a unilateral increase to the principal portion of the Loan.

100.     Todd did not agree to any increase to the principal balance of the Loan.

101.     Todd did not receive any notice of Ocwen's intent to unilaterally increase the principal balance of the Loan.

102.     Beginning on February 2, 2017, Ocwen increased the principal and interest portion of Todd's monthly payment obligation from $435.51 to $488.15.  This increase was not preceded or accompanied by a notice of payment change or increased interest rate.

103.     The Note does not contain language permitting an increase to the principal portion of Todd's month payment obligations.

104.     To date, Ocwen has offered no explanation for why it increased the principal and interest portion of Todd's monthly payment obligation.

### Ocwen's Servicing Misconduct – Mismanagement of Escrow Account

105.     At the time it assumed the servicing of the Loan, Ocwen was required to perform an audit of the loan history to verify its accuracy.

106.     Pursuant to the RESPA, if the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall notify the borrower not less than annually of any shortage of funds in the escrow account.  12 U.S.C. § 2609(b).

107.     During the Bankruptcy Case, Ocwen failed to perform an annual escrow analysis.

108.     During the Bankruptcy Case, Ocwen failed to notify Todd or the Trustee (at least once during the escrow account computation year) of any escrow shortage or deficiency. *See In re Laskowski*, 384 B.R. 518, 534 (Bankr. N.D. Ind. 2008).

109.     Ocwen also failed to perform an escrow analysis before seeking repayment of the deficiency. *See* 24 C.F.R. § 3500.17(f)(5).

110.     Pursuant to the RESPA, any servicer that has established or continued an escrow account in connection with a federally related mortgage loan shall submit to the borrower for which the escrow account has been established or continued a statement clearly itemizing, for each period not greater than every 12 months, the amount of the borrower's current monthly payment, the portion of the monthly payment being placed in the escrow account, the total amount paid into the escrow account during the period, the total amount paid out of the escrow account during the period for taxes, insurance premiums, and other charges (as separately identified), and the balance in the escrow account at the conclusion of the period. 12 U.S.C. § 2609(c)(2)(A)(B).

111.     Pursuant to Fed. R. Bankr. P. 3002.1(b), all mortgage servicers are required to file and serve on the debtor, debtor's counsel, and the trustee a notice of any change in the payment amount, including any change that results from an interest rate or escrow account adjustment. This "Notice of Mortgage Payment Change" is included in Official Form 410S1.

112.     One of the purposes of the notice requirements contained in 12 U.S.C. § 2609 and Fed. R. Bankr. P. 3002 is to prevent a servicer from "sand-bagging" a borrower with an unanticipated escrow arrearage or an increase in monthly escrow payment. This is particularly relevant in the context of borrowers in bankruptcy or who are otherwise experiencing financial hardship.

113.     From April of 2011 to November of 2011, Ocwen applied $163.64 to escrow from each payment it received from Todd (via the Trustee).

114.     Per its own *Proof of Claim* and the confirmed *Chapter 13 Plan*, $97.54 was to be applied to escrow.

115.     This escrow increase was not accompanied by a Notice of Payment Change or an escrow analysis suggestive of an increase to Todd's property taxes or other expense.

116.     From December of 2011 to August of 2012, Ocwen applied $163.64 to escrow from each payment it received from Todd (via the Trustee).  Per the Notice of Payment Change filed by Ocwen November 16, 2011, $0.01 was to be applied to escrow. [Doc. 42].

117.     Despite the foregoing escrow applications being in excess of what was mandated, the Life of Loan History reflects that Ocwen's illegal conduct nonetheless caused a negative escrow balance to exist almost continuously throughout the Bankruptcy Case and even after discharge.  The most negative balances include -$5,217.85 on or about October 6, 2012, -$7,124.90 on June 6, 2013, -$3,206.63 on or about May 9, 2016 (four days before Ocwen filed the *Response to Notice of Final Cure Payment*), and -$815.25 on or about January 4, 2017.

118.     The negative escrow balance would not have occurred, or could have been timely addressed, had Ocwen performed requisite escrow analyses or otherwise fulfilled its statutory notice requirements.

119.     An escrow account is a form of trust account.

120.     Ocwen had no right or authority to credit or debit funds from escrow outside the requirements of the Loan or without Todd's informed consent.

121.    By maintaining a negative escrow balance, Ocwen caused Todd to pay amounts he was not required to pay, depriving him of the time value of that money, and caused him to incur fees, penalties and/or interest that he would not have otherwise.

122.    In addition, by allowing and failing to disclose the negative escrow balance at and following the conclusion of the Bankruptcy Case, Ocwen violated the automatic stay and discharge injunction ordered therein, depriving Todd of the fresh start to which he was entitled.

### Ocwen's Attempts to Collect Amounts Not Owed – Written Correspondence

123.    On or about November 8, 2016, Ocwen forwarded a Mortgage Account Statement to Todd, seeking immediate payment of $14,256.83.

124.    A true and accurate copy of the Mortgage Account Statement described above is attached hereto as "Exhibit E".

125.    On November 8, 2016, Ocwen mailed to Todd a Delinquency Notice, claiming he was "798 days delinquent" and seeking immediate payment of $14,449.12.

126.    A true and accurate copy of the Delinquency Notice is attached hereto as "Exhibit F".

127.    On November 8, 2016, Todd was not 798 days delinquent.

128.    On or about December 14, 2016, Ocwen rejected Todd's monthly payment and directed correspondence to him titled "Funds Returned."

129.    A true and accurate copy of the correspondence titled "Funds Returned," dated December 14, 2016, is attached hereto as "Exhibit G".

130.    On January 6, 2017, Ocwen mailed Todd correspondence proclaiming him to be in default. The letter also stated that if Todd were to remain in default for thirty more days he could lose his home.

131.    Also on January 6, 2017, Ocwen mailed Todd a Notice of Default, seeking immediate payment of $1,951.93.

132.    On January 10, 2017, four days later, Ocwen mailed Todd a Delinquency Notice, seeking immediate payment of $2,624.20.

133.    Just fifteen days later, Ocwen mailed to Todd a Notice of Default, dated January 25, 2017, seeking immediate payment of $1,384.96 to avoid foreclosure.

134.    A true and accurate copy of the Notice of Default, dated January 25, 2017, is attached hereto as "Exhibit H".

135.    Ocwen mailed to Todd a Delinquency Notice, dated February 15, 2017, seeking immediate payment of $1,522.97.

136.    Ocwen mailed to Todd a Notice of Default, dated February 24, 2017, seeking immediate payment of $870.48.

137.    Ocwen directed correspondence to Todd, dated March 13, 2017, stating: "We have not received your 02/01/2017 through 03/01/2017 mortgage payments."

138.    Ocwen mailed to Todd a Delinquency Notice, dated March 20, 2017, seeking the immediate payment of $1,608.49.

139.    Ocwen mailed to Todd a Delinquency Notice, dated March 28, 2017, seeking the immediate payment of $956.00.

140.    Ocwen mailed to Todd a Delinquency Notice, dated April 18, 2017, seeking the immediate payment of $1,694.01.

141.    Ocwen mailed Todd a Pre-Foreclosure Notice, dated April 27, 2017, as required by Indiana law before the initiation of any foreclosure proceeding.

142.    A true and accurate copy of the Pre-Foreclosure Notice is attached hereto as "Exhibit I".

143.    Ocwen mailed to Todd a Notice of Default, dated April 27, 2017, seeking immediate payment of $1,041.52.

144.    Ocwen mailed to Todd a Delinquency Notice, dated May 22, 2017, seeking immediate payment of $1,770.01.

145.    Three days later, Ocwen mailed to Todd a Notice of Default, dated May 25, 2017, seeking immediate payment of $1,113.79.

146.    Ocwen mailed to Todd a Notice of Default, dated June 28, 2017, seeking immediate payment of $1,205.54.

147.    Ocwen mailed to Todd a Notice of Default, dated July 25, 2017, seeking immediate payment of $1,268.29.

148.    Ocwen mailed to Todd a Notice of Default, dated September 27, 2017, seeking immediate payment $1,402.61.

149.    Ocwen mailed to Todd a Notice of Default, dated October 25, 2017, seeking immediate payment of $1,465.72

150.    Ocwen mailed to Todd a Notice of Default, dated November 29, 2017, seeking immediate payment of $1,473.08

151.    Ocwen mailed to Todd a Notice of Default, dated December 27, 2017, seeking immediate payment of $1,439.00.

152.    Ocwen mailed correspondence to Todd, dated January 2, 2018, and titled "Assistance Options May Be Available," stating the account was past due for the November 1, 2017, through January 1, 2018, payments and that the total amount owed was $2,032.18.

153.    A true and accurate copy of the document titled "Assistance Options May Be Available," dated January 2, 2018, is attached hereto as "Exhibit J".

154.    Ocwen mailed correspondence to Todd, dated January 4, 2018, seeking the 11/1/2017 through 1/1/2018 payments.

155.    Ocwen mailed to Todd a Notice of Default, dated January 24, 2018, seeking immediate payment of $1,446.68.

156.    Ocwen mailed to Todd a Notice of Default, dated March 27, 2018, seeking immediate payment of $1,461.40.

157.    Ocwen mailed to Todd correspondence, dated April 24, 2018, and titled "Assistance Options May Be Available," claiming the account was past due for the March and April payments in the amount of $585.56 each.

158.    Ocwen mailed to Todd a Notice of Default, dated May 30, 2018, seeking immediate payment of $1,586.12.

159.    A true and accurate copy of the Notice of Default, dated May 30, 2018, is attached hereto as "Exhibit K".

160.    Ocwen mailed to Todd a Notice of Default, dated June 27, 2018, seeking immediate payment of $1,593.48.

161.    A true and accurate copy of the Notice of Default, dated June 27, 2018, is attached hereto as "Exhibit L".

162.    Ocwen mailed to Todd a Notice of Default, dated July 25, 2018, seeking immediate payment of $1,593.54 and stating: "In order to cure the default, payment for the entire total amount past due, plus any amount(s) becoming due in the interim, must be received on or before 08/31/2018, at the address listed on page four of this notice."

163.     A true and accurate copy of the Notice of Default, dated July 25, 2018, is attached hereto as "Exhibit M".

164.     Ocwen mailed to Todd correspondence, dated July 30, 2018, and titled "Assistance Options May Be Available," stating the account was due for 6/1/2018 through 7/1/2018, in the amount of $585.56 each. The total amount due as of the date of the letter was $1,593.54.

165.     Ocwen mailed to Todd a Notice of Default, dated August 24, 2018, seeking immediate payment of $1,593.31.

166.     A true and accurate copy of the Notice of Default, dated August 24, 2018, is attached hereto as "Exhibit N".

167.     Ocwen mailed to Todd a Notice of Default, dated September 25, 2018, seeking immediate payment of $1,593.08.

168.     A true and accurate copy of the Notice of Default, dated September 25, 2018, is attached hereto as "Exhibit O".

169.     Ocwen mailed to Todd a Notice of Default, dated October 26, 2018, seeking immediate payment of $1,592.85.

170.     A true and accurate copy of the Notice of Default, dated October 26, 2018, is attached hereto as "Exhibit P".

171.     Ocwen mailed to Todd a Notice of Default, dated December 12, 2018, seeking immediate payment of $2,177.89 and stating, "Failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by the Security, foreclosure by judicial proceeding and sale of the Property."

172.     A true and accurate copy of the Notice of Default, dated December 12, 2018, is attached hereto as "Exhibit Q".

173.     Ocwen mailed to Todd a Notice of Default, dated On January 4, 2019, seeking immediate payment of $2,206.38 and stating: "Mortgage payments on the above referenced account are past due, which has cause a default under the terms of the Mortgage or Deed of Trust.

174.     A true and accurate copy of the Notice of Default, dated January 4, 2019, is attached hereto as "Exhibit R".

175.     Each Notice of Default and Delinquency Notice set forth above sought immediate payment of amounts Todd did not owe and threatened foreclosure.

176.     Each Notice of Default and Delinquency Notice set forth above contained false and misleading statements in that Todd was not in default or even delinquent.

177.     Many of the notices described above occurred after Ocwen had been notified, on numerous occasions, of its errors and despite Todd's pleas for the letters to stop.

178.     Each Notice of Default and Delinquency Notice exacerbated the emotional distress caused to Todd by Ocwen's servicing errors and failure to correct said errors.

179.     Each Notice of Default set forth above was sent via certified mail, the cost of which was assessed to the Loan.

<u>Ocwen's Attempts to Collect Amounts Not Owed – Calls</u>

180.     From January to December of 2018, Ocwen or its agents caused collection calls to be made to Todd's cellphone including, but not limited to, the following:

- On January 31, 2018 at approximately 6:12 p.m. EST;
- On February 13, 2018 at approximately 2:24 p.m. EST;
- On February 16, 2018 at approximately 3:04 p.m. EST;
- On March 2, 2018 at approximately 5:29 p.m. EST;

- On March 9, 2018 at approximately 12:52 p.m. EST;
- On March 15, 2018 at approximately 4:12 p.m. EST;
- On March 22, 2018 at approximately 9:32 p.m. EST;
- On March 27, 2018 at approximately 6:56 p.m. EST;
- On April 3, 2018 at approximately 12:26 p.m. EST;
- On April 6, 2018 at approximately 2:56 p.m. EST;
- On April 11, 2018 at approximately 12:55 p.m. EST;
- On April 19, 2018 at approximately 2:20 p.m. EST;
- On April 23, 2018 at approximately 2:58 p.m. EST;
- On April 24, 2018 at approximately 12:26 p.m. EST;
- On April 25, 2018 at approximately 11:37 a.m. EST;
- On April 26, 2018 at approximately 10:06 a.m. EST;
- On April 27, 2018 at approximately 10:41 a.m. EST;
- On May 2, 2018 at approximately 11:38 a.m. EST;
- On May 3, 2018 at approximately 10:27 a.m. EST;
- On May 4, 2018 at approximately 11:00 p.m. EST;
- On May 5, 2018 at approximately 4:26 p.m. EST;
- On May 10, 2018 at approximately 10:30 a.m. EST;
- On May 11, 2018 at approximately 11:38 a.m. EST;
- On May 15, 2018 at approximately 9:39 a.m. EST;
- On May 19, 2018 at approximately 10:40 a.m. EST;
- On May 26, 2018 at approximately 9:48 a.m.;
- On June 8, 2018 at approximately 11:43 a.m. EST;
- On June 12, 2018 at approximately 11:44 a.m. EST;
- On June 15, 2018 at approximately 11:45 a.m. EST;
- On June 19, 2018 at approximately 3:28 p.m. EST;
- On June 22, 2018 at approximately 11:34 p.m. EST;
- On June 26, 2018 at approximately 5:54 p.m. EST;
- On July 2, 2018 at approximately 5:54 p.m. EST;
- On July 9, 2018 at approximately 11:55 a.m. EST;
- On July 12, 2018 at approximately 11:12 a.m. EST;
- On July 16, 2018 at approximately 1:56 p.m. EST;
- On July 19, 2018 at approximately 12:54 p.m. EST;
- On July 24, 2018 at approximately 11:11 a.m. EST;
- On July 27, 2018 at approximately 12:24 p.m. EST;
- On August 9, 2018 at approximately 9:26 a.m. EST;
- On August 16, 2018 at approximately 10:06 a.m. EST;
- On August 21, 2018 at approximately 10:19 a.m. EST;
- On August 24, 2018 at approximately 10:04 a.m. EST;
- On August 28, 2018 at approximately 11:32 a.m. EST;
- On August 31, 2018 at approximately 5:24 p.m. EST;
- On September 5, 2018 at approximately 11:42 a.m. EST;
- On September 10, 2018 at approximately 12:30 p.m. EST;
- On September 13, 2018 at approximately 10:46 a.m. EST;

- On September 19, 2018 at approximately 12:28 p.m. EST;
- On September 24, 2018 at approximately 3:22 p.m. EST;
- On September 27, 2018 at approximately 12:28 p.m. EST;
- On October 2, 2018 at approximately 12:51 p.m. EST;
- On October 5, 2018 at approximately 12:47 p.m. EST;
- On October 10, 2018 at approximately 4:34 p.m. EST;
- On October 15, 2018 at approximately 12:40 p.m. EST;
- On October 18, 2018 at approximately 11:22 p.m. EST;
- On October 23, 2018 at approximately 1:07 p.m. EST;
- On October 26, 2018 at approximately 11:50 a.m. EST;
- On October 31, 2018 at approximately 12:11 p.m. EST;
- On November 6, 2018 at approximately 12:39 p.m. EST;
- On November 13, 2018 at approximately 11:54 p.m. EST;
- On December 10, 2018 at approximately 12:52 p.m. EST;

181. Ocwen did not have Todd's consent to use an automatic telephone dialing system and/or artificial or prerecorded voice in making the calls to his cellphone set forth above.

182. Ocwen placed, or cause to be placed, calls to Todd on his cellphone using an artificial and/or pre-recorded voice. When Todd answered the phone, he heard a message stating that the call was intended to reach him about "an important business matter" or some other purposes and inviting him to press one of the enumerated digits before connecting him to an Ocwen representative.

183. On many occasions, Todd notified Ocwen of its error in treating him as if he was in default and requested that Ocwen cease calling his cellphone.

184. Each call set forth above was designed to collect upon amounts Todd did not owe to Ocwen.

185. Each call set forth above exacerbated the emotional distress caused to Todd by Ocwen's servicing errors and failure to correct said errors.

Todd's Efforts to Seek Information from Ocwen and have Errors Corrected

186.     In July and August of 2017, Todd communicated many if not all of the errors and described herein to Ocwen.

187.     By letter dated August 24, 2017, Ocwen responded to Todd's Notice of Error by "de-escrowing the loan for insurance" yet continued to earmark $106.93 of his monthly installment payments to escrow despite a surplus of approximately $3,582.00.

188.     A true and accurate copy of Ocwen's response, dated August 24, 2017, bearing Todd's contemporaneous notes and highlighted for ease of reference, is attached hereto as "Exhibit S".

189.     Had Ocwen conducted a reasonable investigation into the errors previously identified by Todd, it would have ceased applying additional funds to escrow and/or relinquished the aforementioned surplus to Todd.

190.     Had Ocwen conducted a reasonable investigation into the errors previously identified by Todd, or taken reasonable action in response thereto, it would not have continued to maintain "Lenders Placed Insurance" on the Home let alone attempt to pass the costs of "Lenders Placed Insurance" on to Todd despite the fact he maintained his own policy of insurance on the Home.

191.     Ocwen's failure to conduct a reasonable investigation or take action to address the errors identified by Todd, caused him emotional distress, and deprived him of access to, and the time-value of, the surplus escrow funds.  It also caused Todd to expend additional time and resources attempting to get the errors corrected.

192.     In or around August of 2017, Todd provided Ocwen with information and documents sufficient to form the basis of a Notice of Error.

193.    Specifically, Todd notified Ocwen of errors with his unpaid principal balance, the property inspection and other fees being charged to the Loan, the amount of funds being earmarked and applied from his monthly installment payments towards taxes and insurance, and with the its placed of the Loan in a delinquency/default status.

194.    In addition, Todd asked Ocwen to investigate those errors, correct them, and provide an explanation of its findings and/or changes.

195.    Ocwen responded to Todd's Notice of Error by letter dated September 26, 2017.

196.    A true and accurate copy of Ocwen's correspondence, dated September 26, 2017, is attached hereto as "Exhibit T".

197.    Within the response, Ocwen partially addressed the errors related to the Lender Placed Insurance by again claiming the account had been "updated as non-escrow" (the same thing Todd was told a month earlier), but did nothing to address the errors relative to the false default/delinquent status of the Loan, the incorrect unpaid principal balance, the ongoing fees being assessed to the Loan, or the amount of funds still be earmarked to taxes and insurance from his monthly payments.

198.    For instance, Ocwen acknowledged an escrow surplus of $3,582.05 yet: i) refused to refund any portion of it to Todd because it alleged he had not made his August 2017 or September 2017 payments; *ie.*, that the Loan was delinquent, and ii) continued to earmark $106.93 of each Todd's monthly payments to escrow despite the large surplus and despite acknowledging that Todd's 2016 property tax obligation was only $634.87.

199.    In addition, Ocwen continued to contend the property inspection fees and certified mail cost fees "are valid on the loan."

200.     Other parts of Ocwen's response were contradictory.  For example, the response implies Ocwen took action in response to Todd's notice of errors, but very plainly states the necessary corrections it took, following an investigation, occurred "on 01/04/2017" and, therefore, despite the fact the balance "was" reflecting inaccurately "as of this date the unpaid principal balance on the loan is $46,966.94 which is valid."

201.     In sum, Ocwen conducted no further investigation into nor took any action to correct Todd's issues with the principal balance of the Loan, instead opting to rely upon actions taken in excess of seven months *before* it received Todd's correspondence in or around August of 2017.

202.     Had Ocwen conducted a reasonable investigation, or taken reasonable action, it would have corrected the false default/delinquency of the loan, ceased earmarking $106.93 from each of Todd's monthly payments towards escrow, ceased assessing the Loan property inspection fees, and refunded the surplus escrow balance.

203.     Ocwen's failure to conduct a reasonable investigation or take action to address the errors identified by Todd, caused him: i) emotional distress (particularly the alleged delinquency/default status) in the form of anxiety, frustration, and even anger; ii) deprived him of access and time-value of the surplus escrow funds; and iii) caused him to expend additional time and resources attempting get the aforementioned items corrected.

204.     Thereafter, Todd attempted on numerous occasions to get Ocwen to correct its errors, stop treating the Loan as if it were in default or delinquency, stop inundating him with collection calls, stop assessing the Loan with property inspection fees, and stop mishandling his escrow account, before finally contacting an attorney.

205.     Each attempt was unsuccessful and caused Todd additional emotional distress.

206.     By letter dated May 21, 2018, Todd directed correspondence captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 1") in hopes of obtaining documents necessary to ascertain the cause of his alleged default.

207.     A true and accurate copy of RFI No. 1 is attached hereto as "Exhibit U".

208.     Ocwen received RFI No. 1 on May 29, 2018, at the address it designated for receipt of such notices, as evidence by USPS Certified Mail Tracking No. 9414810699945031711943.

209.     In response to RFI No. 1, Ocwen sent correspondence dated June 7, 2018, acknowledging receipt and including a Payoff Quote.

210.     In response to RFI No. 1, Ocwen send correspondence dated June 8, 2018, including a copy of the Life of Loan History described above.

211.     Ocwen did not provide Todd with the requested copies of: (i) its servicing notes; (ii) an accurate payoff statement; or (iii) all credit reporting data and e-Oscar AUD's provided to any credit bureau.

212.     Ocwen's failure to provide the documents set forth above caused Todd an informational injury and caused him to expend addition time and resources preparing disputes and the correspondence detailed below.

213.     Specifically, if Todd had been provided the documents he requested and was legally entitled to receive, he would have been better able to respond to the alleged default by highlighting information contained therein and/or provide Ocwen with an even more detailed description of the errors it apparently could not identify itself.

214.     Following an initial review of the Life of Loan History, and in response to Ocwen's failure to provide documents or reasonably investigate Todd's previous notices of

errors, Todd directed correspondence titled "Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 1"), dated July 24, 2018, for: (i) failing to apply payments as contractually obligated, a defined error as set forth in 12 C.F.R. § 1024.35(b)(1); (ii) failing to provide a payoff statement within seven business days as required by 12 C.F.R. 1024.36(d)(2); (iii) failing to provide an accurate payoff statement (the statement's good until date had already expired *and* included improper and unreasonable fees) as required by 1026.36(c) of Reg. Z and 12 C.F.R. 1024.35(b)(6) ; and (iv) failing to adequately respond to an RFI within thirty business days when it failed to provide all information pertaining to the reporting of Todd's payments to any credit reporting agency.

215.     In the event it were to determine no error had occurred, NOE No.1 also requested that Ocwen provide all documents relied upon in reaching that determination as required by Reg. X, 12 C.F.R. §§ 1024.35(e)(1).

216.     A true and accurate copy of NOE No. 1 is attached hereto as "Exhibit V".

217.     By and through NOE No. 1, Todd's numerous communications with Ocwen representatives and previous submissions to them, Todd brought errors to Ocwen's attention and requested that the errors be investigated and corrected.

218.     Ocwen received NOE No. 1, at the address it designated for receipt of such notices, on July 28, 2018, as evidenced by USPS Certified Mail Tracking No. 9414810699945032996943.

219.     Ocwen did not acknowledge receipt of NOE No. 1 within five business days as required by 12 C.F.R. 1024.36(d)(2).

220.     Thereafter, Ocwen took no action to correct any of the distinct errors identified in NOE No. 1.  Instead, by letter dated August 13, 2018, Ocwen responded to NOE No. 1 with

largely boilerplate language, an incomplete history of its correspondence with Todd, a recitation of actions it claimed to have taken months and years previously (but that did not result in any corrective action), contradictory and false statements, and pages of information defining processes and items unrelated to the errors identified.

221.    A true and accurate copy of Ocwen's response to NOE No. 1 is attached hereto as "Exhibit W".

222.    For instance, Ocwen's response to NOE No.1 states, "[o]n 01/24/2017, we received payment of $600.00, which was placed in suspense account, as it was not sufficient to satisfy one contractual payment."

223.    Unless Ocwen unilaterally increased Todd's monthly payment obligation without basis or notice, the quotation contained in immediately preceding paragraph is false.

224.    A payment of $600.00 *exceeded* Todd's contractual payment for January or February of 2017.

225.    Ocwen's response also does not entail any explanation for why a payment dated on December, 31, 2016, and mailed immediately thereafter, was not "received" or applied until January 24, 2017.

226.    Any reasonable investigation into the errors alleged by and through NOE No.1 would have uncovered the errors alleged therein and resulted in some action being taken to address them.

227.    Thereafter, Ocwen did not provide the documents or information it relied on in reaching its determination within fifteen business as required by Reg. X, 12 C.F.R. § 1024.36(e)(4).

228. Because of Ocwen's failure to reasonably investigate or correct the errors identified in NOE No.1 and following a more thorough review of the Life of Loan History, Todd directed correspondence to Ocwen titled "Second Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 2"), dated November 8, 2018, for: (i) failing to apply payments as contractually obligated, a defined error as set forth in 12 C.F.R. § 1024.35(b)(2); (ii) failing to perform an escrow analysis in violation of 12 C.F.R. § 1024.17(c) and 12 U.S.C. § 2609(a); (iii) imposing improper and unreasonable fees, a defined error as set forth in 12 C.F.R. § 1024.35(B)(5); (iv) failing to adequately investigate or respond to NOE No. 1, or correct errors in violation of 12 C.F.R. § 1024.35(e); (v) failing to adequately respond to RFI No. 1 when it failed to provide the requested information pertaining to the reporting of Todd's payments to credit reporting agencies; and (vi) failing to acknowledge receipt of NOE No. 1 within five business days as required by 12 C.F.R. § 1024.36(d)(2).

229. A true and accurate copy of NOE No. 2 is attached hereto as "Exhibit X".

230. In the event it determined no error had occurred, NOE No. 2 also requested Ocwen provide all documents relied upon in reaching that determination pursuant to Reg. X, 12 C.F.R. § 1024.35(e)(1).

231. In addition, NOE No. 2 requested Ocwen: (i) acknowledge in writing the Loan is current with no outstanding amounts; (ii) refund to Todd any charges and fees not approved in the Bankruptcy Case; (iii) fix the errors with Todd's escrow account and perform a new escrow analysis; (iv) produce copies of all documents or screenshots relative to the alleged property inspections charged to the Loan; and (v) provide a copy all credit reporting data and/or e-Oscar AUD's provided to or received from any credit reporting agency with regard to the loan.

232.     Ocwen received NOE No. 2 on November 12, 2018, at the address it designated for receipt of such notices, as evidenced by USPS Certified Mail Tracking No. 70172620000078866530.

233.     Ocwen did not acknowledge receipt of NOE No. 2 within five business days as required by 12 C.F.R. 1024.36(d)(2), nor notify Todd that the errors identified therein had been corrected.

234.     Ocwen took no action to correct any of the distinct errors identified in NOE No. 2.

235.     Instead, by letter dated December 10, 2018, Ocwen responded to NOE No. 2 by stating: (i) "On 11/16/2018, we performed Bankruptcy reconciliation and it was determined that all payments received during active bankruptcy are applied correctly and the account *was* current"; (ii) "Currently, fees and expenses of $581.50 are outstanding on the loan, which are valid"; and (iii) "The surplus funds of $3,552.44 were not refunded as the account was contractually delinquent."

236.     If Ocwen had performed a "Bankruptcy reconciliation" it would have determined the account was *and is* current.

237.     Likewise, if Ocwen had determined the account *was* current it should have refunded the surplus escrow funds and acknowledged error in not doing so.

238.     The rest of Ocwen's' response to NOE No.2 was largely a template containing boilerplate language not responsive to the specific notices of error.  *See Lage v. Ocwen Loan Servicing, LLC.,* 2015 WL 7294854, at *13 (S.D. Fla. Nov. 19, 2015) ("The sending of a template or form letter which fails to substantively address concerns raised by the borrower's

inquiry does not satisfy the servicer's obligations under Regulation X's error resolution procedures").

239. A true and accurate copy of Ocwen's response to NOE No. 2 is attached hereto as "Exhibit Y".

240. Each of the statements quoted in Paragraph 204 are false.

241. Ocwen's response to NOE No. 2 is contradicted by its Notices of Default and the Life of Loan History it provided in response to RFI No. 1. *See Guccione v. JPMorgan Chase Bank*, 2015 WL 1968114 (N.D. Cal. May 1, 2015)(servicer's response that there was no error with escrow account contradicted by three documents sent to the borrower each stating that a different escrow amount was owed.); *see, also, Wilson v. Bank of Am.*, 48 F. Supp. 3d 787 (E.D. Pa. 2014)(Plaintiff sufficiently alleged that servicer did not conduct a reasonable investigation of her notices of error where the servicer sent her response with contradictory explanations for why the actions she requested were not taken).

242. Any reasonable investigation into the errors alleged in NOE No. 2 would have uncovered the alleged errors and resulted in some action being taken to address them.

243. Thereafter, Ocwen did not provide the requested documents or information it relied upon in reaching its apparent determination that no error occurred within fifteen business as required by Reg. X, 12 C.F.R. § 1024.36(e)(4).

244. By letter dated December 5, 2018, Todd directed correspondence to Ocwen captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 3") seeking: (i) copies of all notices of payment change; (ii) copies of all notes created by Ocwen personnel reflecting communications with the Borrower; and (iii) copies of all information or documents in accordance with a notice of error provided from Borrower to Ocwen.

245.     A true and accurate copy of RFI No. 3 is attached hereto as "Exhibit Z".

246.     Ocwen received RFI No. 3 on December 11, 2018, at the address it designated for receipt of such notices, as evidence by USPS Certified Mail Tracking No. 70172620000078861344.

247.     On December 10, 2018, Todd directed correspondence to Ocwen titled "Third Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 3"), notifying Ocwen of errors including: (i) failing to promptly credit other payments made by Todd (during and after bankruptcy) not identified previously, instead placing them in suspense for extended periods of time, in violation of Reg. Z, 12 C.F.R. § 1026.36(c)(1) and/or 15 U.S.C. § 1639f; (ii) improperly imposing *additional* fees not previously identified, in violation of 12 C.F.R. § 1024.35(b); (iii) failing to send Interest Rate and/or Payment Change Notices in violation of Reg. Z, 12 C.F.R. 1026.20(c) & (d); and (iv) failing to acknowledge receipt of NOE No. 2 within five business days as required by 12 C.F.R. § 1024.36(d)(2).

248.     A true and accurate copy of NOE No. 3 is attached hereto as "Exhibit AA".

249.     In the event it determined no error had occurred, NOE No. 3 also requested that Ocwen provide all documents relied upon in reaching that determination pursuant to Reg. X, 12 C.F.R. § 1024.35(e)(1).

250.     In addition, NOE No. 3 specifically disputed that Todd is, or has ever been, delinquent since his discharge from bankruptcy.

251.     In addition, NOE No. 3 requested Ocwen: (i) credit Todd's loan account the improper charges identified therein; (ii) properly credit Todd's payments and refund any improper interest incurred/assessed as a result of those errors; and (iii) cause all credit reporting agencies to change their reporting of the Loan reflect it as current starting in March of 2015.

252.     Ocwen received NOE No. 3 on December 13, 2018, at the address it designated for receipt of such notices, as evidence by USPS Certified Mail Tracking No. 70172620000078861368.

253.     Ocwen did not acknowledge receipt of NOE No. 3 within five business days as required by 12 C.F.R. 1024.36(d)(2) nor did it take any action to correct the distinct errors identified therein.

254.     Thereafter, Ocwen did not provide any of the documents it relied upon in concluding no error had occurred.

255.     Instead, by letter dated December 31, 2018, Ocwen responded to NOE No. 3 (and presumably RFI No. 3) by restating the information it provided in response to NOE No. 2, including additional boilerplate language not responsive to the errors identified in NOE No. 3, and containing contradictory terms.

256.     Ocwen did not and has not produced copies of all notes created by its personnel reflecting communications with Todd about the Loan.

257.     Any reasonable investigation into the errors alleged by and through NOE No. 3 would have uncovered the errors alleged therein and resulted in some action being taken to address them.

258.     A true and accurate copy of Ocwen's response to NOE No. 3 and is attached hereto as "Exhibit BB".

259.     Finally, having tried resolve the issues identified herein for over two years,  Todd directed correspondence to Ocwen captioned "Fourth Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 4"), dated January 29, 2019, for: (i) failing to accept a timely and adequate payments as contractually obligated when it rejected Todd's December 2018 payment;

(ii) increasing his principal balance; (iii) failing to appropriately investigate the errors identified in NOE No. 1 and NOE No. 2; (iv) assessing impermissible and unreasonable fees; and (v) mismanaging his escrow account.

260.    A true and accurate copy of NOE No. 4 is attached hereto as "Exhibit CC".

261.    Ocwen received NOE No. 4 on February 4, 2019, at the address it designated for receipt of such notices, as evidenced by USPS Certified Mail Tracking No. 70172620000078861504.

262.    To date, Ocwen has failed to provide a sufficient response to RFI No. 1 or RFI No. 3, and has failed to reasonably investigate or correct the errors identified in NOE No. 1, NOE No. 2, NOE No. 3, or NOE No. 4.

263.    Any reasonable investigation into the errors alleged by and through NOE No. 1, NOE No. 2, NOE No. 3, or NOE No. 4 would have uncovered the errors alleged therein and resulted in some action being taken to address them.

264.    Each failure exacerbated the emotional distress caused to Todd by Ocwen.

265.    By failing to acknowledge or provide information requested by Todd, failing to adequately investigate his notices of errors or take action to address them, and refusing to stop its collection attempts, Ocwen has and continues to violate 12 C.F.R. § 1024.35(e).

<u>Impact On, And Damage To, Todd</u>

266.    Due to the actions of Ocwen, before and after receipt of actual notice on numerous occasions, Todd remains in a false and worsening "default" status, continues to receive false and harassing communications, and is still suffering from a wrongfully suppressed FICO score. He cannot obtain credit at rates relative to his real credit risk and cannot refinance his home.

267.     Ocwen's unlawful and wrongful acts and omissions have caused Todd to suffer emotionally, financially, and even physically.  He has experienced loss of sleep, anxiety, and frustration over Ocwen's refusal to correct the problems described herein and its continued threat of foreclosure.  *See Johnston v. Bank of America*, NA., 173 F. Supp. 2d 809 (N.D. Ill. 2001) (possibility of wrongful foreclosure sufficient to state emotional distress damages); *see, also*, *Parks v. Wells Fargo Home Mortgage, Inc.*, 398 F.3d 937, 941 (7th Cir. 2005) ("We have no doubt that anyone would suffer emotional harm from losing his or her home, or even from facing such a possibility").

268.     The aforementioned emotional distress was magnified by the events described herein having occurred over such an extended period of time, and with such repetition, despite Todd's earnest attempts to have the errors and omissions addressed and following what he believed was to be a fresh start following the conclusion of his bankruptcy proceedings.

269.     Furthermore, Ocwen's refusal to correct the problems described herein, or cease its collection efforts, after receipt of actual notice of its errant conduct on numerous occasions, caused Todd to incur additional actual damage in the form of time away from work, travel expenses, loss of time while on the phone with Ocwen representatives, and costs associated with the investigation and preparation of Notices of Errors, follow-up Requests for Information, and other dispute letters.

270.     In addition, because of the false "default" status on the Loan, Ocwen has imposed and continues to impose unwarranted fees.   Eventually, the combination will very likely snowball into a foreclosure proceeding.  This further exacerbates the emotional distress Ocwen has forced upon Todd.

<u>Ocwen's Pattern & Practice of Illegal Conduct</u>

271. Ocwen has engaged in a pattern and practice of mistreating mortgage loan borrowers and violating provisions of RESPA and Regulation X.

272. Herein, that pattern and practice entails dozens of servicing errors, abusive and unjustified collection practices, and a continued refusal to correct the servicing errors.

273. In addition, at the time of the filing of this Complaint, Ocwen has had at least 11,075 consumer complaints lodged against it nationally, specifically concerning the issue identified on the CFPB's consumer complaint database as "loan modification, collection, foreclosure" related to mortgage products. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database, which can be located at the following hyperlink: http://www.consumerfinance.gov/complaintdatabase/.

274. On April 20, 2017, the CFPB filed suit against Ocwen in the Federal District Court for the Southern District of Florida (Case No. 9:17-cv-80495) ("CFPB Lawsuit").

275. Paragraph 33 of the CFPB contains a possible explanation for Ocwen's pattern and practice of unlawful behavior:

"As set forth in greater detail below, Ocwen has serviced loans and collected upon debts based on inaccurate and incomplete borrower loan information. Ocwen has often input inaccurate and incomplete information, or failed to input accurate or complete information, about borrowers' loans into its REALServicing system of record. Even when the information in REALServicing has been accurate, REALServicing has generated inaccurate information about borrowers' loans due to system deficiencies. Because of these system deficiencies, Ocwen has had to rely upon manual processes and workarounds that have themselves resulted in errors in borrowers' loan information."

276. Paragraph 69 of the CFPB Complaint is further suggestive of a pattern and practice of unlawful behavior:

"Ocwen's use of inaccurate and incomplete information resulting from its boarding of inaccurate and incomplete information into REALServicing, REALServicing's deficiencies, and Ocwen's error-prone manual processes has caused or is likely to have caused borrowers substantial harm, and resulted in

Ocwen communicating, orally and in writing, information to borrowers that it knew or had a reason to know was inaccurate."

277.    On February 5, 2015, Ocwen was sued by Monette E. Saccameno in the United States District Court for the Northern District of Illinois (Case No. 1:15-cv-01164) under nearly identical facts as set forth herein. That case, concluded on June 21, 2018, resulted in punitive damages being assessed against Ocwen for its abhorrent and continued pattern of conduct.

278.    On October 27, 2014, Ocwen was sued by Keith Snyder in the United States District Court for the Northern District of Illinois (Case No. 1:14-cv-08461) for widespread violations of the TCPA, pre-dating the allegations contained herein.  Though the terms were recently rejected by the Court, the parties had reached a tentative settlement agreement involving calls made to approximately 1,685,757 different cellphone numbers using auto-dialers and/or pre-recorded messages.

### COUNTS I: Breach of Contract
### (Against Deutsche Bank)

279.    Todd incorporates by reference and restates as though fully set forth herein all previous allegations of the Complaint.

280.    The Loan is an enforceable contract between Todd and Deutsche Bank, and Ocwen as the servicer of the loan acted as the agent of Deutsche Bank.

281.    A true and accurate copy of the Note and Mortgage are attached hereto as "Exhibit DD".

282.    Deutsche Bank, by its own acts and omissions and by the acts and omissions of its agent, Ocwen, is in material breach of the Loan in the following respects: (i) Failure to accept Todd's mortgage payments; (ii) failure to credit and apply Todd's payments as contractually

obligated; (iii) assessment of unauthorized and unreasonable late fees, legal fees, costs, and property inspection fees; (iv) placing the loan in default and inaccurately reporting the same to credit reporting agencies; and (v) their general failure to conduct their affairs in good faith.

283.    Todd has fully performed his obligations pursuant to the Loan.

284.    Todd has not excused or waived Deutsche Bank's obligations to perform pursuant to the Loan.

285.    Deutsche Bank, by its own acts and omissions and by the acts and omissions of its agent, Ocwen, has failed to exercise due care in the servicing of the Loan and owed Todd a duty to handle escrow properly, to adjust payments to recover escrow shortage and to provide him notice of any such shortage.  Deutsche Bank, by its own acts and omissions and by the acts and omissions of its agent, Ocwen, breached that duty to Todd and acted in an oppressive and abusive manner by declining to apply Todd's tender of payments unfairly, in bad faith and without reason and by otherwise misapplying those payments.

286.    Deutsche Bank's acts and omissions have caused Todd concrete actual damage and injury as set forth the preceding allegations.

## COUNT II: Violations of the TCPA
### (Against Ocwen)

287.    Todd incorporates by reference and restates as though fully set forth herein all previous allegations of the Complaint.

288.    Ocwen and/or its affiliates, agents, and/or other persons or entities acting on its behalf, placed non-emergency phone calls to Todd's cellphone using an automatic telephone dialing system, and/or pre-recorded or artificial voice in violation of 47 U.S.C. § 227 (b)(1)(A)(iii).

289.    These calls occurred on or after October 7, 2017, and continued through December of 2018.

290.    Ocwen and/or its affiliates, agents, and/or other persons or entities acting on its behalf, made these calls despite having knowledge that no consent had been given.

291.    In addition, or in the alternative, Ocwen and/or its affiliates, agents, and/or other persons or entities acting on its behalf, continued placing these calls despite Todd's demand they stop and despite his revocation of any alleged consent.

292.    As a result of the foregoing acts and violations, Todd is entitled to an award of $500.00 in statutory damages for each and every call placed in violation of 47 U.S.C. § 227 (b)(1)(A)(iii) pursuant to 47 U.S.C. § 227(b)(3)(B).

293.    In the alternative, as result of the foregoing willful and knowing violations of the TCPA, Todd is entitled to an award of up to $1,500.00 in statutory damages for each and every call placed in violation of 47 U.S.C. § 227 (b)(1)(A)(iii) pursuant to U.S.C. § 227(b)(3).

### COUNT III: Violations of the RESPA
### (Against Ocwen)

294.    Todd incorporates by reference and restates as though fully set forth herein all previous allegations of the Complaint.

295.    By its acts and omissions, Ocwen has numerous times and in numerous different ways violated the RESPA with respect to the Loan, including, but in no way limited to, those of which it was notified, each time it did any of the following:  (i) failed to apply payments as contractually obligated as set forth in 12 C.F.R. § 1024.35(b)(1); (ii) failed to provide a payoff statement within seven business days as required by 12 C.F.R. 1024.36(d)(2); (iii) failed to provide an accurate payoff statement as required by 1026.36(c) of Reg. Z and 12 C.F.R. 1024.35(b)(6); (iv) failed to perform an escrow analysis in violation of 12 C.F.R. § 1024.17(c)

and 12 U.S.C. § 2609(a); (v) imposed improper and unreasonable fees as set forth in 12 C.F.R. § 1024.35(B)(5); (vi) failed to adequately investigate or respond to NOE No. 1, or correct errors in violation of 12 C.F.R. § 1024.35(e); (vii) failed to adequately respond to RFI No. 1; (viii) failed to acknowledge receipt of NOE No. 1 within five business days as required by 12 C.F.R. § 1024.36(d)(2); (ix) failed to promptly credit payments made by Todd (during and after bankruptcy), instead placing them in suspense for extended periods of time, in violation of Reg. Z, 12 C.F.R. § 1026.36(c)(1) and/or 15 U.S.C. § 1639f; (x) failed to send Interest Rate and/or Payment Change Notices in violation of Reg. Z, 12 C.F.R. 1026.20(c) & (d); (xi) failed to acknowledge receipt of NOE No. 2 within five business days as required by 12 C.F.R. § 1024.36(d)(2); (xii) increased Todd's principal balance; (xiii) failed to appropriately investigate the errors identified in NOE No. 1 and NOE No. 2; and (xiv) mismanaged Todd's escrow account.

296.     12 C.F.R. § 1024.35(a) provides that a "servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

297.     Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. §1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

298.     12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a

reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

299. Ocwen failed to correct specifically detailed errors or conduct a reasonable investigation.

300. NOE No. 1, NOE No. 2, NOE No. 3, and NOE No. 4, each meet the requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a).

301. Todd has alleged by and through NOE No. 1, NOE No. 2, NOE No. 3, and NOE No. 4, that Ocwen has committed in numerous distinct errors pursuant to 12 C.F.R. §1024.35(b)(2) by failing to provide all of the information and/or documentation requested by and through the Requests for Information submitted and its failure to investigate or correct the multiple servicing errors raised.

302. Ocwen's actions are a pattern and practice of behavior in conscious disregard for the rule of law and Todd's rights.

## COUNT IV: Violation of the FDCPA, 15 U.S.C. §1692k
### (Against Ocwen)

303. Todd incorporates by reference and restates as though fully set forth herein all previous allegations of the Complaint.

304. Todd is a "consumer" as defined by 15 U.S.C. § 1692a(3).

305.     Ocwen took the actions described above in an attempt to collect a debt represented by the Loan.

306.     Ocwen violated 15 U.S.C. §1692(e)(2) when they repeatedly misrepresented the character, amount, or legal status of the Loan.  Ocwen misrepresented to Todd that he was in default on the Loan and that he was obligated to maintain an escrow account for the Loan in an incorrect amount that Ocwen knew or had reason to know was in contravention of the terms of the Loan.

307.     Ocwen violated 15 U.S.C. §1692(e)(5) by threatening to take an action – commence foreclosure proceedings against Todd – that cannot legally be taken as Todd has fully satisfied any and all obligations under the terms of the Loan.

308.     Ocwen violated 15 U.S.C. §1692(e)(10) when they used false representations, through false Loan statements that the Loan was past-due and in default and deceptive means to attempt to collect the Loan.

309.     Ocwen violated 15 U.S.C. §1692f(1) by attempting to collect and collecting amounts (including interest, fees, charges, or expenses incidental to the principal obligation) that were not expressly authorized by the Loan or permitted by law via the Bankruptcy Case or Chapter 13 Discharge by (i) misrepresenting the status of the debt; (ii) attempting to collect fees and costs for which notice was not provided in the Bankruptcy Case; (iii) misrepresenting amounts owed for escrow; (iv) declaring the loan in delinquent or default status; (v) threatening foreclosure; (vi) assessing improper fees; (vii) assessing escrow overdraft charges and improper corporate advances in restatement letters and payoff letters; and (viii) reporting false information by reporting the loan delinquent to the credit bureaus.

310. Ocwen violated 15 U.S.C. §1692(d) by employing an unfair and unconscionable means to collect the subject debt including but not limited to its harassing calls and letters.

311. Todd has been harmed by, and continues to suffer from harm resulting from, the unfair and deceptive practices of Ocwen in wrongfully breaching the Loan and in making misrepresentations to further effectuate their wrongdoing.

**COUNT V:    Violation of the Fair Credit Report Act, 15 U.S.C.A. § 1681c-1**
**(Against Ocwen)**

312. Todd incorporates by reference and restates as though fully set forth herein all previous allegations of the Complaint.

313. Sometime in August of 2018, Todd obtained a copy of his consumer credit report as published by Experian.

314. The report contained inaccurate information provided by Ocwen. Specifically, the Experian credit report reflected that the Loan was past due in the amount of $993, that the term of the Loan was "31 years" and that its balance as of July 2018 was $46,959.00.

315. Ocwen's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 Standards.

316. Failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). *See Gillespie v. Experian Info. Servs., LLC.*, No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

317. In a letter dated August 27, 2018, Todd disputed the inaccurate and misleading information to Experian and advised Experian of the specific facts that rendered the reporting inaccurate and misleading. A copy of the dispute letter is attached hereto as "Exhibit EE".

318. Todd also disputed the inaccurate and misleading information in NOE No.1.

319.     Pursuant to 15 U.S.C. § 1681i, Experian had a duty to notify Ocwen of Todd's dispute within five business days of receiving Todd's dispute, to forward all relevant information and any documents included with Todd's dispute for Ocwen to review, to conduct a reasonable reinvestigation of the disputed information, and to thereafter correct the tradeline or delete it from Todd's consumer file.

320.     Experian timely notified Ocwen of Todd's dispute in accordance with 15 U.S.C.A. § 1681i .

321.     In response, within a document dated September 6, 2018, Experian advised Todd that it had researched his dispute, obtained additional information from Ocwen, and that per Ocwen the status was being reporting correctly.  However, Experian provided a copy of the tradeline as reported that reproduced the errors identified by Todd in his original dispute letter.  Specifically, the tradeline still failed to indicate that the Loan was and is current and with no arrears. A copy of the Experian reinvestigation report is attached as "Exhibit FF".

322.     Ocwen had a duty to investigate the dispute and accurately report their findings to Experian.

323.     In addition, following its receipt of NOE No. 1, Ocwen was not to report adverse payment information to any credit reporting agency pursuant to 12 C.F.R. § 1024.35(i).

324.     As a result of the foregoing, Ocwen willfully violated 15 U.S.C.A. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Todd's dispute directly and from Experian, and/or by failing to review all relevant information provided by the consumer reporting agencies, and/or by failing to appropriately report the results of its investigations, and/or by failing to appropriately modify, and/or delete the inaccurate information.

325.     As a result of Ocwen's violation of 15 U.S.C.A. § 1681s-2(b), Todd has suffered actual damage including but not limited to emotional distress (including aggravation, anxiety, and loss of rest), the continued suppression of his FICO credit score, loss of time, loss of credit opportunity, an informational injury, certain out of pocket expenses incurred while trying to obtain corrections after his initial dispute, and a guarantee of further future financial harm if the information is not corrected.  Therefore, Todd is entitled to recover actual damages under 15 U.S.C.A. § 1681n and 1681o.

326.     Ocwen's actions and omissions were willful, and caused Todd concrete injury as set forth above, rendering it liable for punitive damages and statutory damages pursuant to 15 U.S.C.A. § 1681n.

### COUNTS VI, VII, & VIII: Violation of the Discharge Injunction, 11 U.S.C. § 524(i), Automatic Stay, & Fed. R. Bankr. P. Rule 3002.1(G)

327.     Todd incorporates by reference and restates as though fully set forth herein all previous allegations of the Complaint.

328.     As evidence by the Life of Loan History, and despite its attestations to the contrary, Ocwen seeks to collect upon alleged escrow deficiencies, charges, or other amounts existing previous to discharge.

329.     Where, as here, a debtor performs under a confirmed Chapter 13 Plan and makes all required post-petition payments, said debtor must be current – unless there has been a misapplication of payments or other error committed by the secured creditor.

330.     Todd fully performed under his confirmed Chapter 13 Plan and made all post-petition payments as required.

331.     Despite Todd having fulfilled all obligations of the Bankruptcy Case,

Ocwen has collected, and continues to seek to collect upon, alleged debt obligations predating and in contravention of the *Order of Discharge*.

332.    Any alleged escrow deficiency, fees, or amounts claimed to be due, is the result of Ocwen's own failure to perform an annual escrow analysis, apply payments as contractually and legally obligated, or provide notice to the Trustee during the Bankruptcy Case as required by Fed. R. Bankr. P. Rule 3002.1(g).

333.    Ocwen's actions are a willful and ongoing attempt to collect a discharged debt and otherwise frustrate the purpose of the *Order of Discharge*.

334.    Ocwen's conduct constitutes a gross violation of the discharge injunction as it had actual knowledge that Todd was previously involved in bankruptcy, was to be deemed contractually current, that certain fees were disallowed, and thereafter protected from any direct or indirect collection actions for discharged debts. *See* <u>*Ridley v. M & T Bank*</u> *(In re Ridley)*, 572 B.R. 352 (Bankr. E.D. Okla. 2017).

335.    Ocwen's actions were willfull and caused Todd concrete injury as set forth above, rendering it liable for punitive damages. This Court has authority to enter sanctions for such conduct. *See, e.g. Romanucci & Blandin, LLC. v. Lempesis*, 2017 WL 4402643, at 6-7 (N.D. Ill. May 4, 2017); *see, also,* 3 William L. Norton Jr. & William L. Norton III, Norton Bankrutpcy Law and Practice § 58:2 (3d ed. 2017) ("A majority of courts also allow punitive damages in appropriate cases for a violation of the discharge injunction although, unlike the statue governing violations of the automatic stay, punitive damages are not specifically mentioned in Code § 524.6").

336.    Todd alleges that in order to carry out this provision of the Bankruptcy Code and maintain its integrity, vital to the protection of Chapter 13 debtors who have paid as required, this Court must permit a punitive damage instruction and impose other sanctions against Ocwen for its

willful, blatant, and continued disregard for the rule of law and the authority of the United States Bankruptcy Court.

### COUNT IX: Violation of the Truth In Lending Act, 15 U.S.C. §1601, *et seq*
### (Against Deutsche Bank)

337.    Todd incorporates by reference and restates as though fully set forth herein all previous allegations of the Complaint.

338.    Todd asserts a private right of action under 15 U.S.C. § 1640(a) for: i) Deutsche Bank's breach of its duty to send interest rate and payment change notices pursuant to 15 U.S.C. § 1638a  and Reg. Z, 12 C.F.R. § 1026.20(c) and (d); ii) Deutsche Bank's breach of its duty to promptly credit payments pursuant to 15 U.S.C. § 1639f and Reg. Z, 12 C.F.R. § 1026.36(c)(1); and iii) Deutsche Bank's breach of its duty to send periodic mortgage statements pursuant to 15 U.S.C. § 1638(f) and Reg. Z, 12 C.F.R. § 1026.41.

#### Failure to Provide Accurate Periodic Mortgage Statements

339.    12 C.F.R. §1026.41(a) requires that a servicer must provide the consumer a periodic statement meeting the requirements of 12 C.F.R. §1026.41 for each billing cycle of the transaction.

340.    12 C.F.R. §1026.41(d) provides that the required periodic billing statements shall include information including the amount due, an explanation of the amount due, delinquency information, and account information including the current outstanding principal balance and interest rate.

341.    From approximately November of 2017 through today, Ocwen acting on behalf of Deutsche Bank, failed to provide accurate periodic billing statements to Todd in violation of 15 U.S.C. § 1639f .

342. The knowing failure to transmit accurate information through the periodic billing statements wholly defeated the purpose of such statements, that is, to properly provide accurate disclosures to Todd of his obligation on the Loan.

343. Deutsche Bank's actions in causing or otherwise facilitating these monthly statements to be sent out with facially inaccurate information are a violation of TILA.

<u>Failure to Promptly Credit Payments</u>

344. 15 U.S.C. § 1639f (a) provides that, "[i]n connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall fail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer."

345. Ocwen, acting on behalf of Deutsche Bank, has failed to credit payments (made directly and via disbursements made by the Trustee) to the Loan as of the date of receipt and the its delay in crediting those payments has resulted in charges to Todd.

346. 12 C.F.R. §1026.36(c)(1)(ii) provides that if a servicer retains a partial payment in a suspense or unapplied funds account (rather than credits or returns it), then the servicer must (1) disclose on the periodic statement the total amount retained in such suspense or unapplied funds account and (2) when sufficient funds accumulate to cover a full payment, promptly credit the retained funds to the oldest outstanding payment

347. Ocwen, acting on behalf of Deutsche Bank, has failed to properly disclose amounts held in suspense or, when sufficient funds accumulated to cover one of his full payments, promptly credit the retained funds to the oldest outstanding payment.

348. The Loan was deemed current by an order of the bankruptcy court in his prior bankruptcy case, Todd has made every payment after that, yet Ocwen has refused to

acknowledge that his loan is current or appropriately apply his payments. "[Todd has] also

alleged that the amounts that [Ocwen] told him would cure his 'defaults' ranged from

[$3,345.95] in October of [2017] to [$7,000] as of August of [2018]." *In re Cawood*, 577 B.R.

538 (Bankr. E.D. Tenn., Sept. 29, 2017).

<u>Failure to Send Payment Change and Interest Rate Notices</u>

349.    15 U.S.C.A. § 1638b states, "During the 1-month period that ends 6 months

before the date on which the interest rate in effect during the introductory period of a hybrid

adjustable rate mortgage adjusts or resets to a variable interest rate or, in the case of such an

adjustment or resetting that occurs within the first 6 months after consummation of such loan, at

consummation, the creditor or servicer of such loan shall provide a written notice, separate and

distinct from all other correspondence to the consumer, that includes the following: (1) Any

index or formula used in making adjustments to or resetting the interest rate and a source of

information about the index or formula; (2) an explanation of how the new interest rate and

payment would be determined, including an explanation of how the index was adjusted, such as

by the addition of a margin; (3) a good faith estimate, based on accepted industry standards, of

the creditor or servicer of the amount of the monthly payment that will apply after the date of the

adjustment or reset, and the assumptions on which this estimate is based; (4) a list of alternatives

consumers may pursue before the date of adjustment or reset, and descriptions of the actions

consumers must take to pursue these alternatives, including – (A) refinancing, (B) renegotiation

of loan terms, (C) payment forbearances, and (D) pre-foreclosure sales; (5) the names, addresses,

telephone numbers, and Internet addresses of counseling agencies or programs reasonably

available to the consumer that have been certified or approved and made publicly available by

the Secretary of Housing and Urban Development or a State housing finance authority (as

defined in section 1441a-1 of Title 12); and (6) the address, telephone number, and Internet address for the State housing finance authority (as so defined) for the State in which the consumer resides.

350.    12 C.F.R. § 1026.20(c) requires that a creditor, assignee, or servicer of an adjustable-rate mortgage shall provide consumers with disclosures, as described in this paragraph (c), in connection with the adjustment of interest rates pursuant to the loan contract that results in a corresponding adjustment to the payment.

351.    Section 1026.20(c)(1)(i) defines an adjustable rate mortgage as, "a closed-end consumer credit transaction secured by the consumer's principal dwelling in which the annual percentage rate may increase after consummation."

352.    The Home is Todd's principal dwelling.

353.    The Loan is an adjustable rate mortgage.

354.    Deutsche Bank, via its agent Ocwen, failed to provide Todd with notice before making changes to the principal and interest portions of his monthly payment obligations as further described herein.

355.    Deutsche Bank's actions are a pattern and practice in conscious disregard of the rule of law and Todd's rights as a borrower.

356.    Deutsche Bank's failure to provide notice caused Todd emotional distress, including but not limited to confusion, an informational injury, and deprived him of the benefit of portions of his monthly payments made in excess of what was owed to pay down his principal balance.

**COUNT X: Violation of Indiana's Crime Victim's Relief Act § 34-24-3-1(Conversion)**
**(Against Ocwen)**

357.     Todd incorporates by reference and restates as though fully set forth herein all previous allegations of the Complaint.

358.     The Indiana Crime Victim's Relief Act ("ICVRA") provides relief to persons who suffer a pecuniary loss based on violation(s) of the provisions of Article 43 of Indiana's Criminal Code.  A criminal conviction is not necessary to maintain an action under the ICVRA; rather, the plaintiff need only prove a violation of the relevant criminal prohibition by a preponderance of evidence in order to pursue civil penalties against the defendant under the act. *See Meridian Financial Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1060 (S.D. Ind. 2011).

359.     "A person who knowingly or intentionally exerts unauthorized control over property of another person" commits Conversion under Indiana Code § 35-43-4-2(b).

360.     Ocwen has knowingly or intentionally exerted unauthorized control over funds rightfully belonging to Todd in the amounts of: (i) $1,944.12 (on July 6, 2015); and (ii) $402.90 (on July 22, 2015).

361.     Ocwen had no legal right or claim to the amounts described above nor can it account for them.

362.     Ocwen has failed or refused to return the funds to Todd or apply them to the Loan.

363.     As a result of Ocwen's conversion, Todd was damaged and seeks an award of actual damages, treble damages, costs and attorney's fees as set forth by the Indiana Crime Victim's Act, Indiana Code § 34-24-3-1.

**COUNT XI: Violation of the Ind. Deceptive Consumer Sales Act, I.C. § 14-5-0.5, *et seq*
(Against Ocwen)**

364.     Todd incorporates by reference and restates as though fully set forth herein all previous allegations of the Complaint.

365.    The Indiana Deceptive Consumer Sales Act ("DCSA") is a consumer protection s statute designed to "protect consumers from suppliers who commit deceptive and unconscionable acts."

366.    Todd is a consumer, the Loan and servicing of the Loan is a consumer transaction, and Ocwen is a supplier as defined by I.C. 24-5-0.5-3(A)(3), I.C. 24-5-0.5-2(a)(1), and I.C. 24-5-0.5-2(a)(1)(A)-(C).

367.    Ocwen has contractual privity with Todd as a partial assignee of the Loan. It has been assigned and has agreed to undertake obligations for servicing the Loan.

368.    Ocwen has committed willful unfair and deceptive acts, both uncured and incurable, via the conduct alleged herein including but not limited to claiming amounts to be due which were not, by assessing fees and charges improperly, and by declaring a default and initiating the Foreclosure Case when there was not a legitimate basis to do so.

369.    Ocwen provided notice to Ocwen of its willful unfair and deceptive acts via NOE No. 1, NOE No. 2, NOE No. 3, NOE No. 4, and his various other attempts to have Ocwen correct the issued identified herein.

370.    Ocwen has failed to cure its willful unfair and deceptive acts despite receiving notice, as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Todd prays for the entry of judgment in his favor and against Defendants for the following:

a.      For an Order of Contempt;

b.      For actual damages, including emotional distress, interest, plus all costs and reasonable attorney fees against Ocwen for the allegations contained in Counts II, III, IV, V, VI, VII, and VIII;

c.      For actual damages, including emotional distress, interest, plus costs and reasonable attorney fees against Deutsche Bank for the allegations contained in Counts I and IX.

d.      For treble damages against Ocwen relative to the converted funds ($1,944.12 and $402.90) described in Count X.

e.      For statutory damages of $2,000.00 against Ocwen for each and every violation contained in Count III;

f.      For statutory damages of $1,000.00 against Ocwen for each and every violation contained in Count IV;

g.      For statutory damages of $4,000.00 against Deutsche Bank for each and every violation contained in Count IX;

h.      For statutory damages of $1,000.00 against Ocwen for each and every violation contained in Count V;

i.      For statutory damages of no less than $500.00 but no greater than $1,500.00 against Ocwen for each and every violation contained in Count II;

j.      For punitive damages against Ocwen for the violations set forth in Counts V, VI, VII, and VIII;

k.      For three times actual damages against Ocwen for the violations set forth in Count XI;

l.      For all other relief deemed just and proper.

## JURY DEMAND

Plaintiff, Roger Todd, by counsel, hereby respectfully demands a trial by jury on all such claims that may be so tried.

Respectfully submitted,

/s/Travis W. Cohron
Mike Maxwell, No. 10875-49
Travis W. Cohron, No. 29562-30
**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
mmaxwell@clarkquinnlaw.com
tcohron@clarkquinnlaw.com
*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

David M. Schultz
Joseph D. Kern
**HINSHAW & CULBERTSON**
dshultz@hinshawlaw.com
dkern@hinshawlaw.com
*Counsel for Defendants*

/s/ Travis W. Cohron
Mike Maxwell, No. 10875-49
Travis W. Cohron, No. 29562-30

**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
mmaxwell@clarkquinnlaw.com
tcohron@clarkquinnlaw.com