UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Terre Haute Division

| | | | |
|---|---|---|---|
| ROGER TODD, | ) | | |
| | ) | | |
| *Plaintiff*, | ) | | |
| | ) | | |
| v. | ) | **Case No.** | 2:19-cv-85-JMS-DLP |
| | ) | | |
| OCWEN LOAN SERVICING, LLC., and | ) | | |
| DEUTSCHE BANK NATIONAL TRUST CO., as | ) | | |
| Trustee for NovaStar Mortgage Funding Trust, | ) | | |
| Series 2007-1, | ) | | |
| | ) | | |
| *Defendants* | ) | | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
OCWEN LOAN SERVICING, LLC's  MOTION TO QUASH**

Plaintiff, Roger Todd ("Todd"), by and through undersigned counsel, respectfully submits this Response In Opposition to Defendant Ocwen Loan Servicing, LLC.'s Motion to Quash the Subpoena for Ronald M. Faris' Deposition and For Protective Order ("Motion to Quash"). For the reasons set forth below, Todd respectfully requests the Court deny the Motion to Quash in all respects.

**INTRODUCTION**

In support of its Motion to Quash, Ocwen offers two notable truths:  Mr. Faris is the *former* CEO of Ocwen Financial Corporation and he was not involved in the day-to-day servicing of Todd's mortgage loan. But what it withholds is much more compelling. From 1998 to June of this year, Mr. Faris continuously held a series of high level positions at Ocwen. This tenure is unique not just because of its length, but also because it overlaps with all critical junctures of Ocwen's operations related to its former mortgage servicing platform RealServicing. Mr. Faris was uniquely placed at Ocwen when it began utilizing RealServicing, when it first

1

identified systematic flaws with RealServicing, when it came under regulatory scrutiny and action related to its practices and use of Real Servicing, and when corrective action was or should have been taken to address them. He is also credited with shepherding Ocwen away from RealServicing. With regard to the regulatory actions, Mr. Faris was intimately involved in and personally executed a number of the consent decrees and orders requiring the implementation of policies and systems to address systematic servicing errors identical to those at issue herein. For instance:

1) Mr. Faris was CEO of Ocwen on December 16, 2013, when Ocwen executed the Consent Judgment in *Consumer Financial Protection Bureau, et al. v. Ocwen Financial Corporation and Ocwen Loan Servicing, LLC*, United States District Court, District of Columbia, Case No. 1:13-cv-02025-RMC (filed February 26, 2014) (the "Ocwen National Mortgage Settlement").

2) Mr. Faris was CEO of Ocwen on December 19, 2013 when Ocwen executed the Settlement Agreement and Consent Order for *In Re: Ocwen Financial Corporation and Ocwen Loan Servicing, LLC*, Administrative Case No.: C-13-1153; Order No.: C-13-1153-14-CO01.

3) On December 19, 2014, Mr. Faris executed the Consent Order Pursuant to New York Banking Law § 44 in *In the matter of Ocwen Loan Servicing, LLC*, New York State Department of Financial Services (the "2014 Consent Order").

4) Mr. Faris was CEO of Ocwen on March 27, 2017 when Ocwen executed the Consent Order Pursuant to New York Banking Law § 44 in *In the matter of*

>    *Ocwen Loan Servicing, LLC*, New York State Department of Financial Services (the "2017 Consent Order").
>
> 5) Mr. Faris was CEO of Ocwen on April 14, 2017 when Ocwen was sued by the Consumer Financial Protection Bureau (the "CFPB") in a lawsuit captioned, *Consumer Financial Protection Bureau vs. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC*, United States District Court, Southern District of Florida, West Palm Beach Division, Case No. 9:17-VC-80495.
>
> 6) Mr. Faris was CEO of Ocwen on September 28, 2017 when Ocwen entered into Consent Orders with the States who had filed cease and desist orders. Those agreements generally imposed the same or similar obligations on Ocwen's conduct going forward.

Thus, Mr. Faris was positioned to obtain a rare perspective and first-hand knowledge of issues including a complete timeline of events as related to RealServicing, corporate knowledge and complicity regarding systematic defects with RealServicing and the lack of compliance mechanisms likely to result in the misapplication of payments and manufactured states of default, efforts to address those issues, and the commitments with regulators undertaken by Ocwen to cure them. He can also speak to the state of mind of Ocwen's Board of Directors during relevant periods of time, cost benefit analyses considered, and his understanding of the existence of relevant compliance efforts.

With regard to Ocwen's allegation that Mr. Faris' deposition is being sought to inflict hardship upon him or as an abusive litigation tactic, nothing could be further from the truth. In an effort to minimize any inconvenience or annoyance, Todd noticed the deposition a short distance

from Mr. Faris' home and has already agreed to reschedule it to a date more convenient to him. Likewise, Todd also has no interest in wasting Mr. Faris' time or anyone else's in search of information obtainable elsewhere or without calculable benefit. Plainly, his deposition is sought because of the unique knowledge he possesses and because as the retired and former CEO of Ocwen, his testimony will not disrupt the daily operations of the company.

## LEGAL STANDARD

Federal Rule of Civil Procedure 45 governs the issuance of subpoenas. The breadth of discoverable material via subpoena parallels the liberal scope permitted under Rule 26(b) so long as the material sought is relevant, and not privileged. *Graham v. Casey's General Stores*, 206 F.R.D. 251, 253–54 (S.D. Ind. 2002). A court must grant a motion to quash or modify a subpoena that "requires disclosure of privileged or other protected matter ... or subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv). The party seeking to quash a subpoena bears the burden of establishing its objections. *Jackson v. Brinker*, 147 F.R.D. 189, 194 (S.D. Ind. 1993) (citing *Holifield v. United States*, 909 F.2d 201, 2014 (7th Cir. 1990)). The decision of whether to quash a subpoena falls within the district court's discretion. *See Ott v. City of Milwaukee*, 682 F.3d 552, 556 (7th Cir. 2012).

When analyzing whether to permit the deposition of a high level executive, the most important question to be answered is whether the individual possesses unique personal knowledge or perspective of relevant topics and issues. *See In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 205 F.R.D. 535 (S.D. Ind. 2002) (permitting the deposition of then CEO of Ford, William Clay Ford, Jr.); *Broadway Gate Master Fund, LTD. v. Ocwen Financial Corporation*, Case 9:16-cv-80056-WPD (S.D. Fla. Nov. 15, 2017) (permitting the deposition of

then CEO and CFO of Ocwen, Ronald Faris and Ravi S. Parthasarathy); *Six West Retail Acquisition v. Sony Theatre Management,* 203 F.R.D. 98 (S.D.N.Y. 2001).

## ARGUMENT

### I.   Ocwen has Failed to Articulate, Let Alone Establish, A "Personal Right or Privilege" or "Legitimate Interest."

Preliminarily, Ocwen seeks to quash a subpoena served upon another, a former employee, without articulating a specific "legitimate interest" or "privilege" for doing so. Generally, only the subject of a subpoena may move to quash; however, if a party has a "personal right or privilege" or "legitimate interests," that party may object to the subpoena. *Kyner v. Loveridge*, No. 2:17-cv-00373-JPH-MJD, 2019 WL 1778663 (S.D. Ind. Apr. 23, 2019) (J. Dinsmore) (citing *Brady v. Cent. Indiana Reg'l Blood Ctr. Inc.*, No. 1:99-MC-19, 1999 WL 33912610, at *1 (N.D. Ind. Oct. 6, 1999)); *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 306 (S.D. Ind. 2016).

### II.   Faris Is No Longer Ocwen's CEO and The Seventh Circuit Has Not Adopted the "Apex Doctrine."

Ocwen's various arguments are each founded upon analysis under the "apex doctrine" - a doctrine that has not been formally adopted by the Seventh Circuit (or any court within this District) - and case law discussing the deposition of a current executive. *See, e.g.*, *Naylor Farms, Inc. v. Anadarko OGC Co.*, Civil Action No. 11-cv-01528-REB-KLM, 2011 U.S. Dist. LEXIS 68940 (D. Colo. June 27, 2011) (evaluating a Motion to Quash Subpoena and for Protective Order for a current company President and Chief Executive Officer); *Murillo v. Kohl's Corp.*, No. 16-CV-196-JPS, 2016 U.S. Dist. LEXIS 144053 (E.D. Wis. Oct. 18, 2016) (granting a protective order for a current high-level executive of a national retail chain); *Salter v. Upjohn Co.*, 593 F.2d 649 (5th Cir. 1979) (refusing to allow the deposition of a prescription drug

manufacturer's current president); *Baine v. General Motors Corp.*, 141 F.R.D. 332 (M.D. Ala. 1991) (refusing to allow the deposition of a current vice president of a national vehicle manufacturer); *Earthy, LLC v. BB&HC, LLC*, No. 16 CV 4934, 2017 U.S. Dist. LEXIS 167200 (N.D. Ill. Oct. 10, 2017) (granting an organization's Motion to Quash the subpoena of one of its current high-ranking executives). The reliance on the apex doctrine and cases discussing depositions of current executives is misplaced. Mr. Faris' deposition cannot be shown to inconvenience the executive management of Ocwen in any way.

As noted above, the Seventh Circuit has not formally adopted the apex doctrine. *Nucap Indus. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 U.S. Dist. LEXIS 201458, 2017 WL 6059770, at *5 (N.D. Ill. Dec. 7, 2017). Rather than adopting the stringent requirements of the apex doctrine, the Seventh Circuit has instead adopted an approach wherein the court, when deciding whether to limit discovery, considers "'the totality of the circumstances, weighing the value of the material sought against the burden of providing it,' and taking into account society's interest in furthering 'the truth-seeking function' in the particular case before the court." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002) (internal citations omitted). Thus, the court should consider all relevant factors in determining whether to limit discovery related to "apex" figures of an entity, and factors considered under the apex doctrine, such as an employee's "apex" position and whether less burdensome alternatives are available, are merely used as guideposts in such a totality-of-the-circumstances-inquiry. *See Nucap Indus.,* 2017 U.S. Dist. LEXIS 201458, 2017 WL 6059770, at *6; *Patterson*, 281 F.3d 676.

Notwithstanding the foregoing, the issue before the Court is very similar to that confronted by Hon. Judge Barker in *In re Bridgestone/Firestone, Inc., Tires Products Liability Litig.*, 205 F.R.D. 535, 536 (S.D. Ind. 2002). In Bridgestone, the court considered Ford Motor

6

Company's ("Ford") Objections to the Magistrate Judge's Entry, which required Ford to produce for deposition William Clay Ford, Jr., the then-Chairman of the Board of Ford. Ford argued that Judge Shield's Entry was clearly erroneous and contrary to law, and therefore should be set aside pursuant to Federal Rule of Civil Procedure 72(a). In support, Ford maintained that "federal courts require, as a prerequisite to taking the deposition of an 'apex' official, a showing that he or she has 'unique personal knowledge' of relevant matters." Ford argued that the plaintiffs failed to make such a showing with respect to Mr. Ford, and further argued that Judge Shields erred in allowing the deposition. In concluding Magistrate Judge Shield's decision was appropriate, and allowing the plaintiffs to proceed with taking Mr. Ford's deposition, the court relied upon several factors in reaching its decision.

First, the court found that "the plaintiffs did present evidence that Mr. Ford has referred to his personal knowledge of and involvement in certain relevant matters, including the Firestone tire recall, Explorer safety issues, and Ford's response to the tire and Explorer issues." *Id.* In so finding, the court noted that "[f]ederal courts have permitted the depositions of high level executives when conduct and knowledge at the highest corporate levels of the defendant are relevant in the case." *Id.* (citing *Six West Retail Acquisition v. Sony Theatre Management*, 203 F.R.D. 98 (S.D.N.Y. 2001); *Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140 (D. Mass. 1987)).

Second, the court found that "the cases upon which Ford relies for its position that courts impose a burden on the proponent of the deposition to demonstrate the 'apex' official's unique personal knowledge *stop well short of establishing a rigid rule applicable in all cases*." *Id.* (emphasis added). The court noted that nearly every case cited by Ford involved an individual personal injury, employment, or contract dispute with which the "apex" official had no personal

involvement or relevant knowledge. The court noted that in such cases, the courts' rationale for barring those depositions absent the required showing is that high level executives are vulnerable to numerous, repetitive, harassing, and abusive depositions, and therefore need some measure of protection from the courts. However, the court in *In re Bridgestone* found that under the "quite different" circumstances of this case, "the rationale for the severe limitations on the right to depose a high level executive [was] not compelling." This is because (1) the conduct and knowledge at Ford's highest corporate levels may well be relevant to the issues presented in this litigation and (2) the plaintiffs sought to depose Mr. Ford not for the purposes of a single personal injury case, but to depose him *once* for all of the hundreds of personal injury cases pending in the MDL, the MDL class action, and many state court cases. Accordingly, the court found that "the coordinated deposition procedures outlined by Magistrate Judge Shields will serve to discourage numerous, repetitive, harassing, or abusive depositions of Mr. Ford."

Third, the court cited the limitations imposed on the deposition in the Entry. The Magistrate Judge's Entry required Ford to produce Mr. Ford at Ford's Corporate Headquarters for deposition according to a schedule that allots state court attorneys seven hours, MDL attorneys three hours, and Firestone's attorneys one hour for questions. Additionally, the Entry gives Ford one hour for cross-examination and all plaintiff's two hours for any redirect examination. Further, the court in *In re Bridgestone* imposed additional requirements on the plaintiffs: one week before the depositions, plaintiffs were required to file under seal with the court (but not serve) a list of subjects to be covered in Mr. Ford's deposition.

Here, there is a clear presumption that Mr. Faris has unique knowledge and conduct and knowledge at the highest corporate levels are relevant to the issues in this case, as established in the Introduction herein. Further, also like the case of *In re Bridgestone*, the rationale for the

8

severe limitations of the apex doctrine is not compelling under these circumstances. Mr. Faris is the *former* CEO of Ocwen and thus, there is no risk that his deposition would be disruptive to the day-to-day management and operation of Ocwen. Further, there is no risk here of some undue burden or hardship. Todd has already agreed to limit the deposition to 6 hours, within mere miles of Mr. Faris' home, and even on a date to better accommodate his schedule. Moreover, Todd is willing to impose even more reasonable limitations upon Mr. Faris' deposition to accommodate Mr. Faris and alleviate any concerns of abuse. For example, like in *In re Bridgestone*, Todd is willing file under seal a list of all subjects to be covered so to aid the Court in preparing to rule on any disputes that may arise and to promote adherence to a range of subject the propriety of which they are prepared to defend.

Accordingly, because the facts and the issue before the Court here are so similar to those of *In re Bridgestone*, Todd respectfully suggests that this Court similarly permit the deposition of Mr. Faris subject to reasonable limitations like those discussed above.

### III. Ocwen Bears the Heavy Burden of Showing Why Mr. Faris' Deposition Should Not Be Taken.

Moving beyond hard doctrinal requirements, Ocwen bears the heavy burden of establishing a proper reason that the deposition should not be taken. Professed lack of knowledge is generally not a sufficient reason and would not be credible in this case anyway in light of the regulatory agreements executed by Mr. Faris. "When a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president is subject to deposition. Further, the general rule provides that a claimed lack of knowledge does not provide sufficient grounds for a protective order." *Digital Equip. Corp. v. System Indus.,* 108 F.R.D. 742, 744 (D. Mass. 1986) (citation omitted); *see also Alexander v. FBI,* 186 F.R.D. 60, 64 (D.D.C. 1998) (denying motion to quash subpoena) ("A professed lack of knowledge typically does not constitute good

cause and is insufficient to warrant the quashing of a deposition."); *Naftchi v. New York Univ. Med. Ctr.,* 172 F.R.D. 130, 132 (S.D.N.Y. 1997) (denying protective order barring deposition) ("Nor, in ordinary circumstances, does it matter that the proposed witness is a busy person or professes a lack of knowledge of the matters at issue, as the party seeking the discovery is entitled to test the asserted lack of knowledge.").

Here, Ocwen has only offered conclusory allegations of Faris' lacks relevant knowledge. This is simply not sufficient to carry its burden. "The party requesting a protective order must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one." *Alexander,* 186 F.R.D. at 64. Indeed, one court has denied a protective order in a similar challenge where there was no affidavit from the proposed deponent. *See Steadfast Insurance Co. v. Auto Marketing Network, Inc.,* No. 97 C 5696, 1999 U.S. Dist. LEXIS 6897 at *5 (N.D. Ill. Apr. 29, 1999).

### IV. Faris Has Personal Knowledge of Facts at Issue.

As stated, Ocwen proclaims that Mr. Faris has no unique personal knowledge without so much as attaching an affidavit in support. In addition to this proclamation being legally insufficient it is patently false. As detailed above and below, it is inconceivable Mr. Faris would not possess an unrivaled wealth of unique knowledge relevant to some of the most important aspects of this case (ie., willful indifference, knowledge, notice, lack of mistake). In fact, examples of his public comments further this point:

- In addition, Mr. Faris is cited by the CFPB as receiving certain emails regarding Ocwen's system of record that are relevant to Ocwen's notice. One such email sent to Mr. Faris in 2014 from Ocwen's Head of Servicing described RealServicing as:

10

> An absolute train wreck. I know there's no shot in hell, but if I could change systems tomorrow I would. I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling. I'm not talking about differentiators here. I'm talking about getting system to stay online, escrow analysis to work, letters to print, etc. It's ridiculous.

The 2017 Consent Order.

- In a 2015 earnings call with investors, Mr. Faris told investors that Ocwen was "committed to correcting any deficiencies, remediating any borrower harm, and improving our compliance management systems and customer service." And although Faris acknowledged that Ocwen would incur an expected $50 million in regulatory monitoring costs for the year, he also assured investors that "over time, as we demonstrate ongoing compliance and as the monitors roll off, we should see these expenses decline." Complaint, *Karen A. Carvelli et al. v. Ocwen Fin. Corp. et al.*, 2018 WL 4941110, No.: 9:17-cv-80500-RLR (S.D. Fla. Apr. 30, 2018).

- In March 2013, Ocwen announced that it had established a Compliance Committee to provide assistance to Ocwen's Board of Directors with oversight of Ocwen's compliance with applicable laws, rules and regulations. Mr. Faris was a member of the Compliance Committee because, according to Ocwen, "the Compliance Committee benefits from his deep knowledge of industry regulation and compliance practices as well as his many years of experience working with industry regulators." Securities & Exch. Comm'n, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934: Ocwen Financial Corporation (2014). https://www.sec.gov/Archives/edgar/data/873860/000144530514001400/ocn_def14a.htm

- In July 2016, Ocwen's Second Quarter Form 10-Q reported that "[w]e believe[] [our] significant investments in servicing operations [and] risk and compliance infrastructure

11

over recent years will position us favorably relative to our peers." And in a conference call that same month, Faris said that "[a]s a Company we continue to make progress in resolving our legacy issues" and that "this legal spend is now largely behind us." He also stated that Ocwen "remain[ed] focused on compliance, risk management, and service excellence" and was "striving to regain approvals to be able to acquire [mortgage-servicing rights] again" and to "resolve [its] remaining legacy, regulatory, and legal concerns." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1315 (11th Cir. 2019).

- "I like to find out first-hand what our customers are experiencing when they interact with us. I try to spend time each month listening in on customer phone calls and calling our customer service number myself." Kim Miller, *Ocwen Financial President Ron Faris: Trying to make mortgages work*, The Palm Beach Post (Mar. 31, 2012, 9:12 PM), https://www.palmbeachpost.com/business/ocwen-financial-president-ron-faris-trying-make-mortgages-work/3yPyow2UCZ1PyHMpM5TWNL/.

- "I have employees tell me all the time how much they enjoy helping families who are struggling to stay in their home." *Id.*

## V. Mr. Faris Has Personal Knowledge And A Unique Perspective Of Relevant Matters.

Ocwen also contends Mr. Faris should not be deposed because he lacks any unique knowledge of items at issue. In support, Ocwen relies on *Berning v. UAW Local 2209*, 242 F.R.D. 510 (N.D. Ind. 2007). However, this argument relies on a self-serving and narrow view of the scope of this matter and, again, an entirely unsupported assessment of Mr. Faris's knowledge of relevant issues.

In *Berning*, the *pro se* plaintiff sought to depose the current president of her union

concerning "many issues" surrounding her termination before submitting any written discovery. In denying this, the court highlighted how the union president did not have any personal knowledge concerning the plaintiff or items at issue because he was not involved in the appeal process. The court also noted that it would be unduly burdensome to subject the union president to a deposition because he supervised more than 600 full-time UAW staff members who handled hundreds of grievances. In further support, the court in *Berning* also made note of how the defendant offered to allow the plaintiff to depose three staff members who had personal knowledge of her grievance and why this was a reasonable alternative because the staff members had direct knowledge.

*Berning* is irrelevant to this analysis because Mr. Faris is not a current executive and has no day-to-day management obligations for Ocwen. Faris also has significant relevant personal knowledge and involvement in the matters at issue here with respect to Ocwen's efforts to resolve systemic deficiencies with RealServicing that led to Todd's injuries. Further, Todd does not seek to depose Mr. Faris about "many issues" or the day-to-day servicing of his loan. Todd seeks Faris' testimony on matters he is uniquely positioned to testify upon, including prior knowledge, notice, corporate complicity and Ocwen's efforts to resolve systemic failings of RealServicing.

As touched on above, Mr. Faris' unique perspective on these matters is due in part to his long tenure and employment history at Ocwen. From March 1991 to July 1994, Mr. Faris served as Controller for a subsidiary of Ocwen. From June 1995 to May 1997, he served as Vice President and Chief Accounting Officer of Ocwen. From May 1997 to May 1998, he served as Senior Vice President of Ocwen. From May of 1998 to March 2001m he served as Executive Vice President of Ocwen. In March of 2001, he became President of Ocwen. Additionally, he

became a Director of Ocwen beginning in May of 2003 before becoming Chief Executive Officer in October of 2010. Additionally, Mr. Faris served as the President of Ocwen from March 2001, as a Director of Ocwen since May 2003, and as Chief Executive Officer from October 2010. Thus, his tenure spanned the duration of the regulatory enforcement actions and Ocwen's acquisition of PHH. Given his position it is also reasonable to infer he was intimately involved in the facts and circumstances surrounding the consent decrees and any plan of action to address the deficiencies alleged therein. Thus, given Mr. Faris' position of control during all relevant times, and intimate knowledge of relevant matters including mortgage servicing requirements, unsupported assertions of the lack of any unique personal knowledge should be summarily rejected.

**VI. The Deposition Will Not Cause Any Hardship to Faris And He Has No Ongoing Obligations To Ocwen.**

Ocwen also seeks to prevent Todd from deposing Mr. Faris on grounds it would cause a great and undue hardship. At present, Mr. Faris is to appear for deposition on the morning of December 17, 2019. Mr. Faris is retired and Todd has already agreed to reschedule his deposition to ensure it does not conflict with any travel plans. Ocwen has represented that Mr. Faris had such a conflict on the date originally noticed for his deposition in November. The location is only a few minutes from his home and is not expected to take more than six hours.

**VII. The Information Sought Cannot Be Obtained From Other Witnesses**

No current employee of Ocwen is likely to possess the same breadth of knowledge as Mr. Faris. Aside from founder Bill Erbey, no former employee of Ocwen possesses the same breadth of unique knowledge as Mr. Faris. Moreover, if such a current employee did exist, their deposition would undoubtedly be objected to on the basis it would place a hardship upon Ocwen's daily management and affairs.

In addition, undersigned counsel has been down this road with Ocwen before. In *Saccameno v. Ocwen Loan Servicing, LLC.,* Ocwen's designated "30(b)(6) witness" attested to having no knowledge of the various regulatory enforcement actions detailed above. Ocwen also took the position on appeal that there was no evidence of corporate knowledge or complicity to support the punitive damages awarded in *Saccameno.*

## VIII. Insofar As It Is Relevant, Todd Has Exhausted Less-Intrusive Means to Obtain Information He Seeks From Faris.

Ocwen also references the "apex-doctrine" in seeking to prevent Todd from deposing Mr. Faris on the basis that less-intrusive means are available for obtaining the same information. In support, Ocwen primarily relies on *Nucap Indus. v. Robert Bosch, LLC.*, No. 15 CV 2207, 2017 U.S. Dist. LEXIS 201458 (N.D. Ill. Dec. 7, 2017) to argue that Todd should first take a 30(b)(6) deposition. This argument is misguided and relies on a flawed reading of a factually distinct case. In addition, Ocwen ignores the substantial, unique and highly probative first-hand knowledge Mr. Faris possesses with regard to the larger issues in dispute.

Ocwen next asserts that the plaintiff has not "fully utilized" written discovery, again relying on *Nucap.* This would seemingly imply that written discovery may be served upon Faris--rather, the language of Federal Rule of Civil Procedure 33 is clear: "Unless otherwise stipulated or ordered by the court, a *party* may serve on *any other party* no more than 25 written interrogatories[.]" Because Faris is not a party, written discovery cannot properly be tendered to Faris. Thus, Plaintiff seeks deposition testimony. Plaintiff anticipates Defendant's likely position that the requested discovery could be accomplished through non-deposition means. However, "an oral deposition (which allows follow-up questions and requires spontaneous responses) is often superior to other means of discovery [and] the burden that such a deposition imposes on the

15

deponent is not sufficient to warrant a protective order." *Van Den Eng v. Coleman Co.,* 2005 U.S. Dist. LEXIS 41748 at *9 (E.D. Wisc. 2005) (denying protective order for a Senior Vice President and refusing to accept the argument of the party resisting deposition that the discovery should be taken by interrogatories or a deposition upon written questions) (citing *Goldberg v. Raleigh Mfrs., Inc.,* 28 F.Supp 975 (D. Mass. 1939)). In addition, contrary to Ocwen's assertion, to the degree it is relevant given the need for information unique to Mr. Faris, Todd has served Requests for Admission, Interrogatories, and Requests for the Production of Documents on Ocwen. These written discovery devices were all met with a reflexive invocation of boilerplate and largely baseless objections. In addition, on November 11, 2019, Todd submitted to Ocwen a set of proposed stipulations of fact that would substantially narrow the scope of any deposition of Mr. Faris.

Finally, Todd would be greatly prejudiced by a requirement that discovery proceed in a set order, mode, or sequence of witnesses.

## CONCLUSION

For the reasons identified herein, Plaintiff, Roger Todd respectfully requests the Court deny Defendant Ocwen Loan Servicing, LLC.'s Motion to Quash and Order Mr. Ronald Faris to appear for deposition on December 17, 2019. There is no justification for further delay. To the contrary, the gravity of the allegations and impending discovery deadline warrants taking Mr. Faris' deposition on an expedited basis, and Todd asks that he be allowed to do so.

Respectfully submitted,

/s/ *Travis W. Cohron*
Mike Maxwell, No. 10875-49
Travis W. Cohron, No. 29562-30
**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
tcohron@clarkquinnlaw.com
*Counsel for the Plaintiff*

*/s/ Nick Wooten*
Nick Wooten
**NICK WOOTEN, LLC**
5125 Burnt Pine Drive
Conway, Arkansas 72034
nick@nickwooten.com
*Counsel for the Plaintiff*

## **CERTIFICATE OF SERVICE**

        I hereby certify that on November 15, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

David M. Schultz
Joseph D. Kern
**HINSHAW & CULBERTSON**
dshultz@hinshawlaw.com
dkern@hinshawlaw.com
*Attorneys for Ocwen Loan Servicing, Inc.*

                                          */s/ Travis W. Cohron*
                                          Travis W. Cohron, No. 29562-30

**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
tcohron@clarkquinnlaw.com
mmaxwell@clarkquinnlaw.com