UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Terre Haute Division

| | |
|---|---|
| ROGER TODD, | ) |
| | ) |
|     *Plaintiff*, | ) |
| | ) |
| v. | )    **Case No.**     2:19-cv-85-JMS-DLP |
| | ) |
| OCWEN LOAN SERVICING, LLC., and | ) |
| DEUTSCHE BANK NATIONAL TRUST CO., as | ) |
| Trustee for NovaStar Mortgage Funding Trust, | ) |
| Series 2007-1, | ) |
| | ) |
|     *Defendants*. | ) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL
AND FOR AN ORDER IMPOSING SANCTIONS**

Plaintiff Roger Todd ("Todd") moves this Court for an order compelling discovery responses and imposing sanctions against Defendant Ocwen Loan Servicing, LLC. ("Ocwen") for their noncompliance with Federal Rules of Civil Procedure 26 and 37, as well as the reasons set forth below:

**Introduction**

Ocwen is a financial-services company primarily focused on mortgage servicing. To manage the considerable amount of information required to administer its loans, Ocwen used a software based servicing system called REALServicing. Unfortunately, REALServicing "lacked necessary automation and functionality," and thus required constant manual workarounds prone to human error. These shortcomings, coupled with an absence of institutional control, caused Ocwen to systematically fail to timely and accurately apply borrower payments and maintain accurate account statements, to charge unnecessary and unauthorized fees, to report inaccurate information to credit reporting agencies, and to initiate wrongful collection activities including

1

foreclosure actions. Ocwen has long known of these deficiencies yet continued to utilize REALServicing to service loans. In turn, these problems were identified by regulators and were to be corrected pursuant to the terms of various regulatory enforcement actions. Todd contends Ocwen has acted willfully in failing to take sufficient corrective action to address the aforementioned failures generally and with respect to his loan specifically, despite having full and complete knowledge of the harm it would cause borrowers like himself.

Per the Consumer Finance Protection Bureau, Ocwen tracks its regulatory violations, risk areas, and other failures in spreadsheets called "Risk Convergence Reports." Each regulatory violation, risk item, or failure identified in the report includes a description of the issue, *the date Ocwen identified the issue*, *the status of any technology fix or other operational remediation*, and other information. The items in the Risk Convergence Reports largely revolve around REALServicing failures and system limitations including without limitation the handling of loans involved in a Chapter 13 bankruptcy, the investigation and correction of consumer credit reporting disputes, payment misapplications, and the assessment of inappropriate fees and costs. Ocwen has never challenged the CFPB's description of these reports and does not deny these reports were created before the various regulatory actions and continued to be created until long after the conclusion of the same.

Thus, Todd seeks the Risk Convergence Reports, and email correspondence containing reference to specific issues identified with them, as they contain information relevant and vital to establishing Ocwen's knowledge, willful indifference, or deliberate violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. 1681n , the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, the Indiana Deceptive Consumer Sales Act ("IDCSA"), Ind. Code § 24-5-0.5-2, the Indiana Crime Victims' Relief Act ("ICVRA"), Ind. Code § 34-24-3-

1, the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, and the bankruptcy discharge, 11 U.S.C. § 524. *See*, e.g. *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241(11th Cir. 2016). In sum, this case is not merely about Todd's loan or an unforeseeable error that could not have been avoided – it involves a knowing "pattern and practice" of mortgage servicing misconduct, Ocwen's refusal to address both curable and incurable deficiencies known to exist with regard to REALServicing and having the effect of creating manufactured states of default generally and with regard to Todd's loan specifically and, thus, willfully indifferent conduct.

## History of Discovery Dispute & Compliance with Local Rule 37-1(a)

On May 16, 2019, Todd served Requests for the Production of Documents ("RFP's") upon Ocwen, a copy of which is attached hereto as **Exhibit A**. In those RFP's, Todd sought, without limitation, emails and other documents referring or relating to Ocwen's: (1) responses to Todd's alleged Notices of Errors (RFP's No. 28, 29, 30, and 31); (2) policies or directives regarding the treatment of loans and mortgage accounts of debtors involved in a Chapter 13 bankruptcy (RFP's No. 38); (3) policies or directives regarding collection efforts on loans and mortgage accounts involved in a Chapter 13 bankruptcy (RFP No. 39); (4) calls to Todd (RFP No. 22); and (5) general servicing functions and specific transactions relative to Todd's loan (RFP's No. 1-30).

On or about June 27, 2019, Ocwen responded to the RFP's, a copy of which is attached hereto as **Exhibit B**. However, Ocwen failed to include even a single email and objected to each RFP with an abundance of repetitive boilerplate objections. Todd contends these objections are insufficient and are reflective of a failure by Ocwen to adhere to the standards for responding to discovery requests. Fed. R. Civ. P. 26(b) (1).

Since late-September, through both written and verbal communications, Todd has attempted to resolve this discovery dispute with Ocwen. Specifically, Todd and Ocwen exchanged emails on, but not limited to: (1) September 20, 2019; (2) October 2, 2019 (3) October 14, 2019; (4) October 16, 2019; (5) October 21, 2019; (6) October 22, 2019; (7) October 24, 2019; and, (8) November 5, 2019. (*See* **Exhibits C – G**). In addition, Todd and Ocwen conducted telephonic "meet and confers" on but not limited to: (1) September 24, 2019; (2) October 10, 2019; (3) October 24, 2019; (4) October 25, 2019; (5) October 31, 2019; and, (6) November 5, 2019.

On October 3, 2019, the Court conducted a telephonic status conference to discuss requested changes to the Case Management Plan. During the call, Todd raised specific concerns about Ocwen's failure to produce Risk Convergence Reports or any email correspondence responsive to his RFP's. Thereafter, the Parties agreed to "meet and confer" again about these two items specifically and maintain the previously calendared telephonic status conference on October 10, 2019 to follow-up with the Court.

On October 10, 2019, the Court conducted a Discovery Conference to follow-up on the issues raised during the call on October 3, 2019. During the call, Todd represented the Parties were at an impasse with regard to the Risk Convergence Reports and email correspondence. Ocwen had neither agreed to produce the documents nor provide a specific basis for them being withheld.

On October 14, 2019, following a telephonic "meet and confer," Todd provided Ocwen with an even more detailed description of the 'Risk Convergence Reports'" and email correspondence be believed should have been provided in response to his RFP's. *See* **Exhibit E.**

4

On October 23, 2019, Todd agreed to narrow the scope of his requests relative to the email correspondence to those emails reflected in the servicing notes and all other emails responsive to the following [non-exact] search terms: (1) Roger Todd; (2) 8800 East Washboard Road; (3) Loan No. 711045244; (4) Metric Remediation; (5) Metric 1.A; (6) Metric 2.A; (7) Metric 2.B; (8) Metric 2.C; (9) Metric 4.C; (10) Metric 5.E; (11) Metric 5.A; (12) Metric Failure; (13) QWR Responses; (14) IRG Testing Results; and (15) Bankruptcy Compliance. Further limiting the scope of his request, Todd has agree to limit the period of time subject to this request to emails generated from Jan. 1, 2013 to today (hereinafter, "Email Correspondence"). For purposes of this Motion to Compel only search terms numbered (4) through (15) are at issue. Todd awaits Court approval to Compel the production of emails responsive to search terms numbered (1) through (3). A copy of the correspondence setting forth the above referenced search terms and limiting language is attached hereto as "**Exhibit H**."

On October 25, 2019, Todd again emailed Ocwen requesting an update or response relative to Ocwen's position with regard to the Risk Convergence Reports (Control Reports). A true and accurate copy of this email is attached hereto as "**Exhibit I**."

On or about October 25, 2019, at the Court's direction, Todd circulated a Position Statement reflecting the nature of this dispute. A true and accurate copy of Todd's Position Statement, dated October 25, 2019, is attached hereto as "**Exhibit J**."

On October 30, 2019, the Court commenced and concluded a Discovery Conference. [Doc. 56] During the call, in response to Ocwen's contention the RFP's did not require the production of the Risk Convergence Reports as no specific request sufficiently encompassed them, the Court instructed Todd to immediately issue a supplemental Request for the Production singularly and specifically requesting the Risk Convergence Reports. In addition, the Court

instructed Ocwen to provide a formal response to said request on or before the Discovery Conference simultaneously calendared for November 7, 2019.

On October 31, 2019, Todd directed the supplemental Request for Production to Ocwen. A true and accurate copy of the RFP is attached hereto as "**Exhibit K**."

On the morning of November 7, 2019, Ocwen circulated a Position Statement setting forth its specific objections to the supplemental Request for Production regarding the Risk Convergence Reports. A true and accurate copy of Ocwen's Position Statement dated November 7, 2019 is attached hereto as "**Exhibit L**." Also on November 7, 2019, Todd submitted his own Position Statement. A true and accurate copy of Todd's Position Statement dated November 7, 2019 is attached hereto as "**Exhibit M**."

Also on November 7, 2019, Todd provided the Court with further detail about the Risk Convergence Reports. A true and accurate copy of Todd's submission containing a detailed description of the Risk Convergence Reports is attached hereto as "**Exhibit N**."

During the Discovery Conference on November 7, 2019 [Doc. 59], the Court authorized Todd to proceed with filing a motion to compel with regard to the sought after Risk Convergence Reports and Email Correspondence responsive to search terms No. 4-15.

**Legal Standard**

Federal Rule of Civil Procedure 26(a)(1) requires, generally, that parties identify discoverable information and make available by category documents in their possession. Fed. R. Civ. P. 26(a)(1)(A)(i)-(ii). Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties relative access to relevant information, the parties'

resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Relevant discovery includes "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978).

A party may seek an order to compel discovery when an opposing party fails to respond to discovery requests or provides evasive or incomplete responses. Fed. R. Civ. P. 37(a)(2)-(3). "The burden rests upon the objecting party to show *precisely* why a request is improper." *Meyer v. S. Pac. Lines*, 199 F.R.D. 610, 612 (N.D. Ill. 2001). "General objections to discovery requests that merely recite boilerplate language without explanation do not meet this burden, and courts within the Seventh Circuit consistently overrule them or entirely disregard them." *Odongo v. City of Indianapolis*, 2015 WL 420110 (S.D. Ind. Jan. 30, 2015).

## Argument

### A. The Risk Convergence Reports and Email Correspondence Are Relevant to the Claims In This Matter.

Ocwen argues the Risk Convergence Reports and Email Correspondence are not relevant. Todd contends the information is relevant to establishing Ocwen's knowledge of systematic problems with its servicing platform REALServicing and the wholesale absence of procedures necessary to ensure compliance with the federal consumer protection laws implicated herein. Todd further contends the Risk Convergence Reports and Email Correspondence will identify "other incidents of the same type" and the "discovery of admissible evidence related to the willful issue." *See Dalton v. Capital Associated Indus., Inc*., 257 F.3d 409, 418 (4th Cir. 2001).

Here, similar to the willfulness issue explored in *Dalton*, the Risk Convergence Reports and Email Correspondence are relevant and vital to the establishment of requisite elements of Todd's claims for violation of the FCRA, 15 U.S.C. 1681n,[1] the RESPA, 12 U.S.C. § 2601 *et seq.*,[2] the IDCSA, Ind. Code § 24-5-0.5-2,[3] the ICVRA, Ind. Code § 34-24-3-1,[4] the discharge injunction and automatic stay, 11 U.S.C. § 524,[5] and the TCPA, 47 U.S.C. § 227 *et seq.*[6] Instructive on this issue is the analysis recently provided by Judge Brookman in [*O'Gara v. Equifax Information Services, LLC*., No., 2018 WL 513535 (S.D. Ind. Jan. 23, 2018)](#).

In *O'Gara*, the plaintiff sought, among other things discussed below, internal records and reports "prepared, maintained, or otherwise circulated within [Equifax] relating to the number of mixed files [Equifax] 'confirmed' (according to [Equifax's] criteria for identifying and confirming mixed files) in each of the previous five years." *Id.* at *6. Equifax objected to the request as overbroad, irrelevant, seeking confidential, proprietary, and/or trade secret information, the attorney-client privilege, the attorney work-product doctrine, or "any other applicable privilege or protection." *Id.* In reply, the plaintiff argued the records and reports were

---

[1] Todd contents Ocwen has acted "willfully" by taking actions entailing "an unjustifiably high risk of harm that [was] either known or so obvious that it should be known." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 70-71 (2007); *see also Graham v. CSC Credit Servcs.*, 306 F.Supp.2d 873, 880-81 & n.1 (D. Minn. 2004); (An "intentional policy decision" not to change its system in the face of changing times or clear need raises a question of willfulness.).

[2] In order to recover statutory damages, the plaintiff must show "a *pattern or practice* of noncompliance." 12 U.S.C. § 2605(f)(1)(B). "Pattern or practice" is not defined by a specific number of offenses; rather, the term suggests a routine and knowing manner of operating. However, "pattern and practice" may entail allegations and analysis into similar servicing misconduct affecting other borrowers. *See, e.g. Quimby v. Caliber Home Loans,* 2015 WL 3751511, at *2 (S.D. Ind. Apr. 22, 2015); *see, also Obazee v. Bank of NY Mellon*, 2015 WL 8479677 (N.D. Tex. Dec. 10, 2015).

[3] "Incurable deceptive act" means a deceptive act done by a supplier as part of a scheme, artifice, or device with *intent to defraud or mislead*.

[4] "A person who *knowingly* or *intentionally* exerts unauthorized control over property of another person" commits Conversion under Ind. Code § 35-43-4-2(b).

[5] "To prove that a discharge injunction has been violated, "the debtor must show that the creditor acted intentionally, *with knowledge* that his act would be in violation of the automatic stay [or injunction].'" *Romanucci & Blandin, LLC v. Lempesis*, 2017 U.S. Dist. LEXIS 71526, at *12 (N.D. Ill. May 4, 2017).

[6] Damages may be trebled to $1,500 per violation upon a finding of a *knowing or willfull* violation of the TCPA. 47 U.S.C. § 227(b)(3)(C).

relevant to show that Equifax knew of its systemic problems and failed to take remedial measures, ie., willfulness. *Id.* In granting the plaintiff's Motion to Compel with regard to the internal records and reports, the Court rejected both Equifax's narrow position about their relevancy as their use of generalized objections. *Id.*

The *O'Gara* plaintiff also sought information related to the identity of analogous cases that Equifax had defended, the number of "mixed files" it had investigated, and the number of "mixed files" it had confirmed. The plaintiff argued that he was entitled to know what Equifax knew about mixed files and when it knew it—to wit, that if Equifax had never encountered a mixed file before, the standard of care to prevent or correct such an error would be much different than if Equifax had ample knowledge of the type of error but failed to take remedial measures. *Id* at *8. By in large another variation of the willfulness issue. In ordering Equifax to answer the interrogatories seeking this information, the court noted: "[t]he Comments to Fed. R. Civ. P. Rule 26 [sic] are also clear that relevancy is [sic] to a parties' claims or defenses is broader than being relevant to the subject matter of the suit." *Id.* at *9. The court also made reference to the fact that "[o]ther courts [had] granted similar discovery requests." *O'Gara,* 2018 WL 513535 at *9.

Finally, the *O'Gara* plaintiff sought information from Equifax related to a New York Attorney General ("NYAG") investigation, settlement, and Equifax's subsequent compliance with the settlement. In order Equifax to produce the information, the court reasoned the NYAG settlement and information pertaining to Equifax's subsequent compliance was also relevant to the "willful" issue. *Id.* at *13. ("The fact that only a small number of mixed files occur through the CRA's matching information processes does not negate the relevancy of the evidence related to the NYAG Settlement Agreement and the March 13, 2017 Press Release.").

9

Here, Todd seeks the same type of information and for the same purpose as the plaintiff in *O'Gara.* The Risk Convergence Reports and Email Correspondence are relevant to issues of knowledge and "willfulness" (and various of willfulness) inherent to claims under the FCRA, TCPA, and others.

This issue was also confronted in [*Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 647 (N.D. Ill. 2019)](). In *Saccameno,* Ocwen resisted the introduction of relevant portions of certain regulatory consent orders and decrees on similar grounds. Ocwen sought to have these documents excluded from use at trial. The trial court overruled the objections and allowed certain portions of those documents to be offered as exhibits at the trial. After the jury returned a verdict in Saccameno's favor, Ocwen renewed its opposition to the exhibits post-trial. But once again, the trial court rejected Ocwen's arguments holding "The CFPB consent judgment's allegations are relevant to the issue of notice regardless of whether Ocwen disputes their truth. Put differently, even if Ocwen believed that the state regulators' findings were mistaken, the consent orders nonetheless show that the regulators had made Ocwen aware of their concerns." *Id*. "Like the CFPB consent judgment, the NYSDFS consent order arose out of the broader multistate investigation into Ocwen's loan servicing practices. As a result, the NYSDFS consent order makes reference to many of the same general problems noted in the CFPB consent judgment. *See* Ex. P44 at 3 ("In 2010 and 2011, the Department participated in a multistate examination of Ocwen [that] ... identified, among other things, deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including ... failure to properly maintain books and records."). Notwithstanding its emphasis on New York, therefore, Exhibit P44 is relevant to showing Ocwen's notice of regulators' concerns with its loan servicing practices." *Id.* at 648.

B. **Production of the Risk Convergence Reports and Email Correspondence Is Not Barred by the Self-Critical Analysis Privilege or the Work-Product Doctrine.**

Ocwen argues the self-critical analysis privilege and work-product doctrine bar production of the Risk Convergence Reports and Email Correspondence. In support of its position regarding the self-critical analysis privilege, Ocwen cites to *Tice v. American Airlines, Inc.*, 192 F.R.D. 270 (N.D. Ill. 2000) ("The parameters of the privilege, like the privilege itself, are rather vague.") But what is most interesting about *Tice* is that its holding, the very existence of the self-critical analysis privilege, was specifically disavowed in *Lund v. City of Rockford*, 2017 WL 5891186 (N.D. Ill. 2017), a case wherein it was sought by Hinshaw & Culbertson--the same firm representing Ocwen in this case. In *Lund*, the District Court for the Northern District of Illinois considered, and ultimately destroyed, the viability of the self-critical analysis privilege. *Id*. at *6 ("This Court does more than just question the viability of the privilege; *instead, it pronounces the self-critical analysis privilege dead . . . .*") (emphasis added). The court in *Lund* considered whether reason or experience supported the recognition of the self-critical analysis privilege. *Id.* at *5 ("Federal Rule of Evidence 501 directs that federal courts use both reason and experience in determining whether to recognize a privilege."). First, the court in *Lund* found that reason established multiple bases for not recognizing the privilege, primarily due to the holding of *University of Pennsylvania v. Equal Employment Opportunity Commission*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), unanimously refusing to recognize the peer-review privilege, the rationale for which is identical to the rationale for the self-critical analysis privilege. *Id.* at *6 ("Accordingly, if the rationale fails for one, then it necessarily fails for the other."). Accordingly, the court pronounced the self-critical analysis privilege dead in light of *University of Pennsylvania*. *Id.*

Second, the court in *Lund* found that experience similarly did not support recognition of the privilege. *Id.* at *8. The court reviewed the history of the privilege's application, which it

11

described as a "spotty history at best." *Id.* (citing *Lara v. Tri-State Drilling, Inc.*, 504 F. Supp. 2d 1323, 1326 (N.D. Ga. 2007); *Tice v. American Airlines, Inc.*, 192 F.R.D. 270, 272 (N.D. Ill. 2000)) (other internal citations omitted). The court completed a survey of circuit court and district court decisions, which "establishe[d] that no circuit court of appeals has recognized the self-critical analysis privilege and the district courts within the circuits have not consistently, let alone uniformly, recognized the privilege." *Lund*, 2017 WL 5891186 at *9. Accordingly, the court noted that "the Seventh Circuit, itself, has not recognized the self-critical analysis privilege." *Id.* at *11 (citing *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003); *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir. 1985)). Further, regarding Indiana's treatment of the privilege, the court made specific mention of how it was unable to "locate any case from the Southern District of Indiana addressing the self-critical analysis privilege" and that in the Northern District of Indiana, Magistrate Judge Martin refused to recognize the privilege. *Rogers v. Quality Carriers, Inc.*, Cause No. 4:15-CV-22-JD-JEM, 2016 WL 3413766 (N.D. Ind. June 21, 2016).

Based on the foregoing, the *Lund* court found that "[t]he reasoning behind and experience with the self-critical analysis privilege provides very little basis to overcome the strong disinclination to recognize a privilege that would shield relevant information from not only a litigant but also the ultimate trier of fact." *Id.* at *14 (citing *Nilavar v. Mercy Health Sys. – W. Ohio*, 210 F.R.D. 597, 606 (S.D. Ohio 2002)). Accordingly, the court refused to recognize the self-critical analysis privilege. *Id.* at *1.

With regard to Ocwen's contention that the Risk Convergence Reports and Email Correspondence are protected by the work-product doctrine, it is their burden to first establish that application is appropriate. Fed. R. Civ. P. 26(b)(3); *Sandra T.E. v. South Berwyn School*

*Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010) (citing *United States v. Nobles*, 422 U.S. 225, 238-39 (1975) ). Here, Ocwen cannot satisfy this burden as its position ignores an undeniable truth: the Risk Convergence Reports and Email Correspondence were prepared and kept in the ordinary course of business, not in anticipation of litigation. The documents were generated before, during, and after any particular proceeding. *See, e.g.*, *United States v. Adlam*, 134 F.3d 1194 (2d Cir. 1998) (Documents created as a result of the discovery opponent's ordinary course of business, as a result of a prior dispute, or that should have been created irrespective of litigation are not under the protection of the work product doctrine.); *See also Long v. Anderson University*, 204 F.R.D. 129 (S.D. Ind. 2001)( Not all documents generated from an internal investigation are protected by the work product doctrine "simply because a company's internal investigation is coexistent with a present or anticipated lawsuit that is the same subject matter of the litigation.") quoting *Caremark, Inc. v. Affiliated Computer Services, Inc.*, 195 F.R.D. 610 (N.D. Ill. 2000)).

In *Long*, a student-athlete plaintiff sought production of documents relating to Anderson University's ("Anderson") internal investigation of his sexual harassment complaint. *Long,* 204 F.R.D. at 136. Anderson refused, claiming the documents were protected by the work-product doctrine. In evaluating whether the documents were protected, the court first addressed the "threshold determination [of] 'whether the documents sought to be protected were prepared in anticipation of litigation or trial'" because "documents created as a result of the discovery opponent's ordinary course of business 'that would have been created irrespective of litigation are not under the protection of the work product doctrine.'" *Id.* (internal citations omitted). Notwithstanding, otherwise-protected materials may be discoverable if the party seeking production shows a substantial need for the materials and that it would suffer undue hardship in

13

procuring the materials another way. *Id.* In addition, "[t]o establish the protection of a privilege, descriptions of privileged documents must contain sufficient information for the court to ascertain the content of the documents; burden remains with the non-producing party to 'demarcate a set of documents clearly entitled [to the privilege] without further inquiry to confidential status.'" *See also Citizens First National Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999). The Long court ultimately ordered production of many of the requested documents because "[a]lthough counsel advised Defendants throughout the process of their investigation, it took place as a result of the university's harassment policy, thus as an ordinary and customary step in conducting its business." *Id.* at 137. Mere anticipation of litigation does not shield documents from production. *Id.* at 138.

Here, much like the case of *Long*, Todd seeks the production of documents relating to Ocwen's own efforts to evaluate the scope of its risk with respect to its servicing operations. The CFPB described the Risk Convergence Reports as follows:

"Since 2014, Ocwen has also tracked its regulatory violations, risk areas, and other failures in spreadsheets named "Risk Convergence Reports." Each regulatory violation, risk item, or failure identified in the report includes a description of the issue, the date Ocwen identified the issue, whether the issue is dependent on Altisource [the vendor who licensed RealServicing to Ocwen], the status of any technology fix or other operational remediation, and other information.

Each item in the Risk Convergence Reports is assigned a risk rating, ranging from "R1" to "R5." "R1" is the highest risk rating, which Ocwen defines as: "Potential adverse impact of over $5 million"; "Actual or high possibility for fraud, waste or abuse"; "Breach of company policy or procedures (frequent, repeat, or disregarding policy)"; "Noncompliance with the law or regulation"; or "Material errors or irregularities are a reasonable possibility."

According to Ocwen's list of items in the Risk Convergence Report, the items often resulted from and have continued due to REALServicing failures or system limitations. When, for example, Ocwen conducted its first on-site audit of Altisource and REALServicing in 2014, Ocwen auditors concluded that, although 70 percent of the items contained within the Risk Convergence Report related to "technology projects and enhancements" that Altisource was responsible for, little progress was being made to resolve the items due to Altisource's "lack of priority."

As of August 2015, Ocwen had catalogued 2,803 issues on its Risk Convergence Report. Of those 2,803 issues, Ocwen assigned the highest risk rating, "R1," to more than 550 issues, many of which resulted from REALServicing's deficiencies."

Ocwen has never challenged the CFPB's description of these reports as inaccurate. As this description clearly shows, these reports reveal Ocwen is tracking its own "regulatory violations, risk areas, and other failures" in spreadsheets. These reports were not required by the consent decrees. They were not prepared by attorneys. They were prepared in the ordinary course of Ocwen's business by its internal auditors and employees.

### C. **FRE 404 Does Not Prohibit Todd from Obtaining the Risk Convergence Reports or Email Correspondence.**

Ocwen states that "Plaintiff intends to use [the Risk Convergence Reports] as propensity evidence to cast Defendant as a 'bad actor' or as evidence to prove Plaintiff's claims in this case. Rule 404 of the Federal Rules of Evidence prohibits this." (internal citation omitted). This evidentiary objection is not a valid objection to discovery and is largely irrelevant. As detailed in *Edeh v. Equifax Info. Servs., LLC.*, Civil No. 11-CV-2671 (SRN/JSM), 2013 U.S. Dist. LEXIS 60421 (Minn. Apr. 29, 2013): "Discovery need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. Should Defendant consider the evidence inadmissible at trial, Defendant is free to bring a motion in limine at that time." Be that as it may, the purposes for which Todd seeks to use the Risk Convergence Reports and Email Correspondence are expressly permitted by the Federal Rules of Evidence.

First, Ocwen conflates 404(b)(1) with 404(b)(2). Rule 404(b)(1) provides as follows: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Conversely, 404(b)(2) provides that this evidence "may be admissible for

15

another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident … ." Fed. R. Evid. 404(b)(2). Here, Todd seeks to use the Risk Convergence Reports for some of the expressly named purposes—namely, opportunity and knowledge. In short, Defendant had the opportunity to correct the servicing issues it was apprised of in the Risk Convergence Reports and had knowledge of its potential to commit the type of errors the Plaintiff alleges in the case at bar.

D. **F.R.E. 408 Does Not Prohibit Todd from Obtaining the Risk Convergence Reports or Email Correspondence.**

Ocwen also argues that Todd's requests for the Risk Convergence Reports and Email Correspondence are improper as production would run afoul of F.R.E. 408. Here again, Ocwen raises an evidentiary objection - not a valid objection to discovery. See, *Edeh v. Equifax Info. Servs., LLC.*, Civil No. 11-CV-2671 (SRN/JSM), 2013 U.S. Dist. LEXIS 60421 (Minn. Apr. 29, 2013). In support of this proposition, Ocwen cites to *Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP*, No. 1:02-cv-1014-LJM-VSS, 2006 U.S. Dist. LEXIS 65840, *17-18 (S.D. Ind. Sept. 14, 2006).

However, the issue in *Paul Harris Stores, Inc.* was not whether items related to or included in consent decrees were *discoverable* but rather whether a consent decree (attached in its entirety in support of a motion in opposition to summary judgment) was *admissible*. Further, despite deeming the document in its entirety inadmissible, the court specifically noted how evidence that consent decrees were entered could be properly introduced into evidence.

E. **Todd's Requests for the Risk Convergence Reports and Email Correspondence Are Not Overly Broad.**

Ocwen also contends Todd's request for the Risk Convergence Reports and Email Correspondence are overly broad. This argument is also fatally flawed. For instance, given the

CFPB's description of Risk Convergence Reports, the limited number of spreadsheets at issue, and the ease of producing them electronically, the request simply can not be construed more narrowly. As for the Email Correspondence (search terms Nos. 4-13), the request is narrowly tailored to identify any internal management and executive communications regarding mortgage servicing standards set out in Ocwen identified "Metrics" that are directly relevant to the facts at issue in this case as well as any discussions of Bankruptcy compliance. Certainly, given that Todd has made detailed factual allegations touching upon these issues, it is reasonable for Ocwen to search for emails that touch upon these topics. Further, term searches are not difficult or expensive in the abstract. Unless of course a party contrives a byzantine system of archiving and maintaining records so to turn any such request into a burdensome or expensive proposition.

    F. **Todd's Requests for the Risk Convergence Reports and Email Correspondence Are Not Unduly Burdensome.**

Ocwen also contends Todd's requests for the Risk Convergence Reports and Email Correspondence is unduly burdensome. However, this naked assertion is as equally flawed as its previous argument. First, when a party objects to the production of documents as unduly burdensome, "it must adequately demonstrate the nature and extent of the claimed burden by making a specific showing as to how the disclosure of the requested documents and information would be particularly burdensome." *Perry v. City of Gary*, Ind., No. 2:08-CV-280-JVB-PRC, 2009 WL 2253157 *4 (N.D. Ind. July 27, 2009). Ocwen has failed to make specific showings whatsoever. Similarly, insofar as Ocwen now seeks to cure this deficiency by generally alluding to the amount of time to obtain and review these email correspondence, "the mere fact that a party will be required to expend a considerable amount of time or effort in answering a request is not a sufficient reason to preclude discovery." *In re Peregrine Fin. Grp. Customer Litig.*, No. 12 C 5546, 2015 WL 1344466 (N.D. Ill. Mar. 20, 2015).

17

Likewise, Ocwen's vague assertion that complying with Plaintiffs' requests would be an "enormous undertaking" is not specific enough to preclude discovery. Defendant's contentions would have more force if it had provided an estimate of the cost or hours involved in searching, compiling, and producing the requested information. *See, e.g.*, *Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum LLC*, No. 1:04–CV–477, 2007 WL 1164970, at *4 (N.D. Ind. Apr. 18, 2007) (denying discovery on the basis of affidavits demonstrating number of hours required to conduct search). Defendant, however, provided no affidavits or other evidence describing the monetary cost or time required to comply with Plaintiffs' requests; consequently it has not carried its burden. *See, e.g.*, *Boyer v. Gildea*, No. 1:05–CV–129, 2008 WL 4911267, at *5 (N.D. Ind. Nov. 13, 2008) (granting motion to compel where resisting party did not establish "the amount of time" or "the cost of producing" the documents); *Schaap*, 130 F.R.D. at 387 (requiring "affidavit or some other evidence" to support objection to motion to compel).

Notwithstanding the foregoing, to determine whether a particular request is unduly burdensome, a court must determine the proportionality of the request. Proportionality is determined by considering the importance of the issues at stake, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. It is Ocwen's burden to establish the disproportionality of the requests.

Here, a proportionality analysis favors production of the Risk Convergence Reports and Email Correspondence. Ocwen is a publicly traded company with a book value in the billions of dollars. Ocwen is the only party with access to the Risk Convergence Reports and Email Correspondence. The issues at stake, systematic mortgage servicing errors resulting in

manufactured states of default and wrongful foreclosure, could hardly be greater. As reflected in Todd's Settlement Demand dated June 18, 2019, and the 3.5 million dollar jury verdict in *Saccameno* - a case with strikingly eerily similar facts that was concluded *before* the errors and omissions herein, the amount in controversy is in the millions of dollars. The burden or expense of producing the discovery is minimal. The only way that this could become burdensome or expensive is if the corporate entity contrived an archaic system of records retention that created an unnecessary burden and expense in the hopes of thwarting discovery. Finally, the Risk Convergence Reports and Email Correspondence are not just important but are critical to resolving issues herein. Without them, Todd's ability to prosecute this case, establish knowledge and willfulness, as well as defend against assertions by Ocwen that the errors and omissions here were an unpreventable one time event (another "Marla's Mistake" ((D.E. 278, p. 46)), will be severely prejudiced.

## Conclusion

Todd has attempted in good faith to resolve this discovery dispute. The Risk Convergence Reports and Email Correspondence are relevant to claims at issue. Ocwen has known about the problems with REALServicing and its lack of institutional safeguards for almost a decade. Yet it continues to claim these problems, the cause of allegations at issue, are isolated, one in a million errors. Todd is entitled to a broader scope of discovery, and this information, to establish the truth. For all these reasons, Todd respectfully requests that this Court enter the accompanying Order compelling Ocwen to provide Todd with the Risk Convergence Reports and Email Correspondence, within ten (10) days of the Court's order on this motion.

Respectfully submitted,

/s/ *Travis W. Cohron*
Mike Maxwell, No. 10875-49
Travis W. Cohron, No. 29562-30
**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
tcohron@clarkquinnlaw.com
*Counsel for the Plaintiff*

*/s/ Nick Wooten*
Nick Wooten
**NICK WOOTEN, LLC**
5125 Burnt Pine Drive
Conway, Arkansas 72034
nick@nickwooten.com
*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

David M. Schultz
Joseph D. Kern
**HINSHAW & CULBERTSON**
dshultz@hinshawlaw.com
dkern@hinshawlaw.com
*Attorneys for Ocwen Loan Servicing, Inc.*

*/s/ Travis W. Cohron*
Travis W. Cohron, No. 29562-30

**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204