

Matthew R. Clark
Robert B. Scott
Charles R. Grahn
Frank D. Otte*
John "Bart" Herriman
William W. Gooden**
Michael P. Maxwell
Russell L. Brown*
Jennifer F. Perry
N. Davey Neal
Travis W. Cohron
Maggie L. Sadler
Kristin A. McIlwain

Senior Counsel
James C. Clark
Thomas Michael Quinn
John M. Moses

Land Use Consultant
Elizabeth Bentz Williams, AICP

Raymond J. Grahn (2015)
Alex M. Clark (1991)
Peter A. Pappas (1986)
Thomas M. Quinn (1973)
Joseph M. Howard (1964)

Also admitted in Montana
Also admitted in Kentucky
* Registered Civil Mediator

October 25, 2019

**_Via Email_**
Hon. Magistrate Judge Doris L. Pryor
mjpryor@insd.uscourts.gov

Mr. Joseph D. Kern
Hinshaw & Culbertson
151 North Franklin Street, Suite 2500
Chicago, IL 60606
JKern@hinshawlaw.com

   Re: Outline of Discovery Dispute
      *Roger Todd v. Ocwen Loan Servicing, LLC.* (Cause No. 2:19-cv-00085)

Hon Magistrate Judge Pryor:

  Per request dated October 22, 2019, Plaintiff Roger Todd ("Todd"), by and through undersigned counsel, submits the following setting out discovery items now in dispute, the Parties attempts to resolve this dispute, and Parties positions:

Introduction

  Todd served Requests for the Production of Documents ("RFP's") upon Ocwen on May 16, 2019. Ocwen responded to the RFP's on June 25, 2019. Since, counsel for Todd and counsel for Ocwen have exchanged dozens of emails and conducted no less than six (6) telephonic "meet and confers" attempting to come to an agreement about documents that were not produced. These exchanges almost always resulted in commitments by counsel for Ocwen to "speak with his client" and a subsequent email about what "exactly" was being sought. However, these exchanges never resulted in a firm commitment to produce the documents or a refusal to do so for a specific reason. Todd is concerned Ocwen is intentionally "slow-walking" its production in an effort to avoid full disclosure.

  On October 3, 2019, the Court conducted a telephonic Status Conference to discuss requested changes to the Case Management Plan. During the call, Todd raised concerns about Ocwen's failure to produce the Risk Convergence Reports and Email Correspondence detailed below. Following some discussion, the Parties agreed to maintain the previously calendared telephonic Status Conference to revisit the outstanding discovery items.

Exhibit J

On October 10, 2019, the Court conducted a telephonic Status Conference to follow-up on the discovery issues discussed on October 3, 2019 as noted above. During the call, Todd again raised concerns about Ocwen's failure to produce the Risk Convergence Reports and Email Correspondence detailed below. In response, Ocwen provided no specific basis or justification for not producing the documents.

At present, the deposition of Ocwen's corporate representative is calendared for November 26, 2019. Todd requires the documents and information in advance of said deposition to adequately prepare and examine the corporate representative. Given that fact discovery is to conclude on March 17, 2020 and the holiday season is approaching, it is imperative to complete written discovery quickly to avoid having to seek any further extension of the existing case management deadlines.

Specific Items In Dispute

Plaintiff Roger Todd seeks documents including without limitation "Risk Convergence Reports" and "Email Correspondence." As noted above and below, these are the same items addressed during the last two telephonic Status Conferences:

- **Risk Convergence Reports**

    Plaintiff's Position: By and through *Plaintiff's First Request for the Production of Documents* Nos. 20, 26, 28, 29, 35, 38, 39, 40, and 41 Todd has made document requests that should have resulted in the production of the "Risk Convergence Reports" or at least the reports or portions of the reports detailing the items at issue herein.

    Specifically, since 2014 – shortly after Todd filed for bankruptcy – Ocwen has tracked its risk areas and other failures with its mortgage servicing platform, RealServicing, to monitor its efforts to come into compliance with its legal obligations under various consent decrees Ocwen entered with numerous State and Federal Regulators. Some of the problems tracked in these reports are directly relevant to the issues in this case, i.e., significant and systemic problems managing the servicing of loans in a Ch. 13 Bankruptcy, the improper assessment of fees and charges, false default statuses, proper application of payments, proper calculation of amounts owed under the proof of claim, reconciliation between the amount computed under the proof of claim and the balances in RealServicing. Ocwen referred to these reports as "Risk Convergence Reports" and they are / were maintained on spreadsheets and distributed to management and executives of Ocwen. Each risk item or failure identified in the Risk Convergence Report includes a description of the issue, the date Ocwen identified the issue, the status of any technology fix and other operational remediation efforts. In turn, each item in the Risk Convergence Reports was assigned a risk rating based upon factors including "high possibility for fraud or abuse", "breach of company policy or procedures" (frequent, repeat, or disregarding policy), and "noncompliance with law." Internally, Ocwen also assessed its financial risk associated with each issue identified in an apparent effort to prioritize the significance of the identified issues. These reports are relevant to show Ocwen's notice of problems with its servicing platform, the extent of the problems, the severity of the problem from Ocwen's

Exhibit J

perspective, the efforts undertaken to resolve the problem and the length of time the problem or problems were allowed to persist while potentially harming consumers for whom Ocwen was their mortgage servicer. Further, the Risk Convergence Reports are discussed in detail in the CFPB's litigation against Ocwen initiated in April of 2017.

Thus, these reports are not only relevant but central to Todd's allegations that Ocwen has maintained a "pattern and practice" of regulatory noncompliance (Respa), had prior knowledge of systematic deficiencies with its RealServicing Platform that would result in the specific servicing related conduct at issue herein (e.g., problems related to loans involved in a Chapter 13 bankruptcy, misapplication of payments, manufactured default status, unlawful collection attempts, and inaccurate credit reporting), and that instead of correcting these problems Ocwen acted with "willful or deliberate indifference" in failing to address those problems generally and with regard to Mr. Todd's Loan despite his repeated efforts to have Ocwen rectify its mistakes. Further, the Risk Convergence Reports are not protected by any privilege, are proportional to the needs of this case, and would not cause any undue burden upon Ocwen to produce.

Defendant's Position: On October 24, 2019, Ocwen indicated a formal position would be provided justifying why the Risk Convergence Reports have still not been produced and/or would not be provided. Otherwise, Ocwen has at various times alluded to objections including the reports are not relevant or proportional to the needs of this case.

Potential Solutions: Unknown. Ocwen is seemingly unwilling to produce the reports or any portion of the reports despite various attempts by Todd to address its objections and concerns. The reports are readily available to Ocwen and bear directly upon Ocwen's knowledge, state of mind, scope and severity of the problems, length of time the problems have persisted and the number of consumers affected by the problems. All of this has great evidentiary value not only to proof of Todd's case in chief but for a jury's proper consideration when deliberating any appropriate punitive damages award in the case.

- **Email Correspondence**

Plaintiff's Position: By and through *Plaintiff's First Request for the Production of Documents* Nos. 27, 28, 29, 20, 31, 38, and 39, Todd has sought copies of all non-privileged email correspondence relative to the Loan from 2015 to today including those reflected in but not included with the produced Servicing Notes. Following numerous correspondence and calls between counsel, Todd agreed to provide a list of specific search terms (but not be solely used in an "exact match" search) to narrow the scope of the request. On October 23, 2019, Todd provided the following terms: 1) Roger Todd; 2) 8800 East Washboard Road; 3) Loan No. 7110452443; 4) Metric Remediation; 5) Metric 1.A; 6) Metric 2.A; 7) Metric 2.B; 8) Metric 2.C; 8) Metric 4.C; 9) Metric 5.E; 10) Metric 5.A; 11) Metric 6.A; 12) Bankruptcy Compliance; and, 13) Metric Failure.

The foregoing search terms are not only relevant but central to the Plaintiff's case. Search terms 1-3 are specific to the Plaintiff. Search terms 4-12 are designed to identify internal Ocwen email traffic discussing Ocwen's efforts to remediate issues with various "Metrics" Ocwen was

Exhibit J

October 25, 2019
Page 4 of 4

required to comply with in accordance with its obligations as set out in the various consent decrees. These Metrics specifically address servicing standards imposed on Ocwen and the various specific metrics are directly relevant to the issues in this case. Todd's counsel believes searches of these terms should yield relevant emails discussing any of these issues within Ocwen's management and executive hierarchy.

    Defendant's Position: Initially, Owen objected to Todd's various requests for email correspondence as overbroad, unduly burdensome, and irrelevant. Following various correspondence and an agreement to narrow the scope of the request to emails resulting from the use of the foregoing search terms, Ocwen has indicated a willingness to produce some emails and does not appear to have any objections to the first three search terms. However, Ocwen has not yet taken a formal position with regard to the remaining search terms.

    Potential Solutions: *Unknown.* Ocwen has yet to produce any email correspondence despite Todd's agreement to significantly reduce the scope of his request and its seeming lack of objection to the first three search terms.

Many thanks,

Travis W. Cohron

TWC|aad
Enclosure

Exhibit J

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[4] | Test Loan Population and Error Definition | Test Questions |
| **1. Outcome Creates Significant Negative Customer Impact** | | | | | |
| A. Foreclosure sale in error | Customer is in default, legal standing to foreclose, and the loan is not subject to active trial, or BK. | n/a | 1% | Population Definition: Foreclosure Sales that occurred in the review period.<br><br>A. Sample : # of Foreclosure Sales in the review period that were tested.<br><br>B. Error Definition: # of loans that went to foreclosure sale in error due to failure of any one of the test questions for this metric.<br><br>Error Rate = B/A | 1. Did the foreclosing party have legal standing to foreclose?<br>2. Was the borrower in an active trial period plan (unless the servicer took appropriate steps to postpone sale)?<br>3. Was the borrower offered a loan modification fewer than 14 days before the foreclosure sale date (unless the borrower declined the offer or the servicer took appropriate steps to postpone the sale)?<br>4. Was the borrower not in default (unless the default is cured to the satisfaction of the Servicer or Investor within 10 days before the foreclosure sale date and the Servicer took appropriate steps to postpone sale)?<br>5. Was the borrower protected from foreclosure by Bankruptcy (unless Servicer had notice of such protection fewer than 10 days before the foreclosure sale date and Servicer took appropriate steps to postpone sale)? |
| **2. Integrity of Critical Sworn Documents** | | | | | |
| A. Was AOI properly prepared | Based upon personal knowledge, properly notarized, amounts agree to system of record within tolerance if overstated. | Question 1, Y/N; Question 2, Amounts overstated (or, for question on Escrow Amounts, understated) by the greater of $99 or 1% of the Total Indebtedness Amount | 5% | Population Definition: Affidavits of indebtedness filed in the review period.<br><br>Error Definition: For question 1, yes; for question 2, the # of Loans where the sum of errors exceeds the allowable threshold. | 1. Taken as a whole and accounting for contrary evidence provided by the Servicer, does the sample indicate systemic issues with either affiants lacking personal knowledge or improper notarization?<br>2. Verify all the amounts outlined below against the system of record<br>  a. Was the correct principal balance used<br>    Was the correct interest amount (and per diem) used?<br>  b. Was the escrow balance correct?<br>  c. Were correct other fees used?<br>  d. Was the correct corporate advance balance used?<br>  e. Was the correct late charge balance used?<br>  f. Was the suspense balance correct?<br>  g. Was the total indebtedness amount on the Affidavit correct? |
| B. POC | Accurate statement of pre-petition arrearage to system of record. | Amounts over stated by the greater of $50 or 3% of the correct Pre-Petition Arrearage | 5% | Population Definition: POCs filed in the review period.<br><br>Error Definition: # of Loans where sum of errors exceeds the allowable threshold. | 1) Are the correct amounts set forth in the form, with respect to pre-petition missed payments, fees, expenses charges, and escrow shortages or deficiencies? |
| C. MRS Affidavits | Customer is in default and amount of arrearage is within tolerance. | Amounts overstated (or for escrows amounts, understated) by the greater of $50 or 3% of the correct Post Petition Total Balance | 5% | Population Definition: Affidavits supporting MRS's filed in the review period<br><br>Error Definition: # of Loans where the sum of errors exceeds the allowable threshold. | 1. Verify against the system of record. within tolerance if overstated:<br>  a. the post-petition default amount;<br>  b. the amount of fees or charges applied to such pre-petition default amount or post-petition amount since the later of the date of the petition or the preceding statement; and<br>  c. escrow shortages or deficiencies. |

Exhibit J

### 4. Accuracy and Timeliness of Payment Application and Appropriateness of Fees

| Metric | Description | Threshold | Tolerance | Population/Error Definition | Test Questions |
|---|---|---|---|---|---|
| A. Fees adhere to guidance (Preservation fees, Valuation fees and Attorney's fees) | Services rendered, consistent with loan instrument, within applicable requirements. | Amounts over stated by the greater of $50 or 3% of the Total Default Related Fees Collected | 5% | Population Definition: Defaulted loans (60+) with borrower payable default related fees* collected. Error Definition: # of loans where the sum of default related fee errors exceeds the threshold. *Default related fees are defined as any fee collected for a default-related service after the agreement date. | For fees collected in the test period: 1. Was the frequency of the fees collected (in excess of what is consistent with state guidelines or fee provisions in servicing standards? 2. Was amount of the fee collected higher than the amount allowable under the Servicer's Fee schedule and for which there was not a valid exception? |
| B. Adherence to customer payment processing | Payments posted timely (within 2 business days of receipt) and accurately. | Amounts understated by the greater $50.00 or 3% of the scheduled payment | 5% | Population Definition: All subject payments posted within review period. Error Definition: # of loans with an error in any one of the payment application test questions. | 1. Were payments posted to the right account number? 2. Were payments posted in the right amount? 3. Were properly identified conforming payments posted within 2 business days of receipt and credited as of the date of receipt? 4. Did servicer accept payments within $50.00 of the scheduled payment, including principal and interest and where applicable taxes and insurance as required by the servicing standards? 5. Were partial payments credited to the borrower's account as of the date that the funds cover a full payment? 6. Were payments posted to principal interest and escrow before fees and expenses? |
| C. Reconciliation of certain waived fees. (I.b.11.C) | Appropriately updating the Servicer's systems of record in connection with the reconciliation of payments as of the date of dismissal of a debtor's Chapter 13 bankruptcy case, entry of an order granting Servicer relief from the stay under Chapter 13, or entry of an order granting the debtor a discharge under Chapter 13, to reflect the waiver of any fee, expense or charge pursuant to paragraphs III.B.1.c.i or III.B.1.d of the Servicing Standards (within applicable tolerances). | Amounts over stated by the greater of $50 or 3% of the correct reconciliation amount | 5% | Population Definition: All accounts where in-line reconciliation routine is completed within review period. Error Definition: # of loans with an error in the reconciliation routine resulting in overstated amounts remaining on the borrower account. | 1. Were all required waivers of fees, expense or charges applied and/or corrected accurately as part of the reconciliation? |
| D. Late fees adhere to guidance | Late fees are collected only as permitted under the Servicing Standards (within applicable tolerances). | Y/N | 5% | Population Definition: All late fees collected within the review period. Error Definition: # of loans with an error on any one of the test questions. | 1. Was a late fee collected with respect to a delinquency attributable solely to late fees or delinquency charges assessed on an earlier payment? |

### 5. Policy/Process Implementation

| Metric | Description | Threshold | Tolerance | Population/Error Definition | Test Questions |
|---|---|---|---|---|---|
| A. Third Party Vendor Management | Is periodic third party review process in place? Is there evidence of remediation of identified issues? | Y/N | N | Quarterly review of a vendors providing Foreclosure Bankruptcy, Loss mitigation and other Mortgage services. Error Definition: Failure on any one of the test questions for this metric. | 1. Is there evidence of documented oversight policies and procedures demonstrating compliance with vendor oversight provisions: (i) adequate due diligence procedures, (ii) adequate enforcement procedures (iii) adequate vendor performance evaluation procedures (iv) adequate remediation procedures? 2. Is there evidence of periodic sampling and testing of foreclosure documents (including notices of default and letters of reinstatement) and bankruptcy documents prepared by vendors on behalf of the servicer? 3. Is there evidence of periodic sampling of fees and costs assessed by vendors to; (i) substantiate services were rendered (ii) fees are in compliance with servicer fee schedule (iii) Fees are compliant with state law and provisions of the servicing standards? 4. Is there evidence of vendor scorecards used to evaluate vendor performance that include quality metrics (error rate etc)? 5. Evidence of remediation for vendors who fail metrics set forth in vendor scorecards and/or QC sample tests consistent with the servicer policy and procedures? |

Exhibit J

| 6. Customer Experiences | | | | | | |
|---|---|---|---|---|---|---|
| A. Complaint response timeliness | Meet the requirements of Regulator complaint handling. | | N/A | 5% | Population Definition: Government submitted complaints and inquiries from individual borrowers who are in default and/or have applied for loan modifications received during the three months prior to 40 days prior to the review period. (To allow for response period to expire). Error Definition: # of loans that exceeded the required response timeline. | 1. Was written acknowledgment regarding complaint/inquires sent within 10 business days of complaint/inquiry receipt?** <br> 2. Was a written response ("Forward Progress") sent within 30 calendar days of complaint/inquiry receipt?** <br><br> **receipt= from the Attorney General, state financial regulators, the Executive Office for United States Trustees/regional offices of the United States Trustees, and the federal regulators and documented within the System of Record. |

Exhibit J