UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION


ROGER TODD　　　　　　　　　）
　　　　　　　　　　　　　　　）
　　　　　　　　Plaintiff, ）
　　　　　　　　　　　　　　　）
vs.　　　　　　　　　　　　　） CAUSE NO. 2:19-cv-00085-JMS-DLP
　　　　　　　　　　　　　　　）
OCWEN LOAN SERVICES, INC.　）
And DEUTSCHE BANK NATIONAL ）
TRUST CO., as Trustee for ） November 21, 2019
NovaStar Mortgage Funding　）
Trust Series 2007-1　　　　　）
　　　　　　　　　　　　　　　）
　　　　　　　　Defendants.）


Before the

HONORABLE DORIS L. PRYOR


TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE



COURT TRANSCRIBER:　　　　Jodie Franzen, RPR
　　　　　　　　　　　　　　United States District Court
　　　　　　　　　　　　　　46 East Ohio Street
　　　　　　　　　　　　　　Room 309
　　　　　　　　　　　　　　Indianapolis, Indiana 46204


PROCEEDINGS TAKEN BY ELECTRONIC SOUND RECORDING

APPEARANCES


FOR THE PLAINTIFF:


       Mr. Nicholas H. Wooten
       ATTORNEY AT LAW
       5125 Burnt Pine Drive
       Conway, Arkansas 72034
       nick@nickwooten.com


       Mr. Travis W. Cohron
       CLARK QUINN MOSES SCOTT & GRAHN, LLP
       320 North Meridian Street
       Suite 1100
       Indianapolis, Indiana 46204
       tchoron@clarkquinnlaw.com


FOR THE DEFENDANTS:


       Mr. Joseph D. Kern
       HINSHAW & CULBERTSON, LLP
       151 North Franklin
       Suite 2500
       Chicago, Illinois 60606
       jkern@hinshawlaw.com

1                          (In camera)

2              THE COURT:  We're here on Cause

3   No. 2:18-cv-85-JMS-DLP, Todd versus Ocwen Loan Servicing,

4   Inc. et. al.  We're here for a discovery dispute.

5   Today's date November 21st, 2019, 3:03 p.m.  The record

6   is electronic.  This is Doris L. Pryor, U.S. Magistrate

7   Judge.

8              Before we move forward, on behalf of

9   Mr. Todd, who do we have on the call?

10             MR. WOOTEN:  Your Honor, Nick Wooten.

11             THE COURT:  Thank you, Mr. Wooten.

12             MR. COHRON:  And Travis Cohron.

13             THE COURT:  Thank you, Mr. Cohron.

14             And on behalf of the defendant?

15             MR. KERN:  Joe Kern, Your Honor.

16             THE COURT:  All right.  Thank you so much

17  for calling in this afternoon.  As I understand

18  it -- let me get to my notes here -- this is a

19  continuation of our discovery conference that we had

20  on November 7th.  In our previous conference, one of

21  the things that the parties had talked through in

22  particular is the request for -- or the request to

23  file the motion to compel with respect to the risk

24  convergence reports, as well as emails that were

25  responsive to search terms, what I'm identifying as

```
 1    4 through 15.  What we had agreed to is email
 2    correspondence relating to search terms Number 1
 3    through 3, and those were later -- my understanding,
 4    from the correspondence from Mr. Wooten and
 5    Mr. Cohron, is that there have not -- these have not
 6    been exchanged.  Is that correct?
 7                MR. COHRON:  That is correct, Judge.
 8                THE COURT:  All right.  Mr. Kern?
 9                MR. KERN:  Yes, Your Honor.  One thing I
10    want to clarify -- and this has happened repeatedly
11    through this case -- is that Mr. Cohron or
12    Mr. Wooten, whoever is writing these submissions, is
13    misrepresenting certain things to the Court, and
14    it's been happening privately when the Court hasn't
15    been involved as well.  For example, in Mr. Cohron's
16    recent submission he indicated that I had committed
17    to either producing those documents or stating a
18    formal objection within 14 days.  In fact, I reread
19    the transcript, and I specifically said that I could
20    not commit to any deadline but that I would work
21    with Ocwen to determine the process for retrieving
22    such information.  So I wanted to clarify that.
23                But as to where things stand, I have
24    started working with Ocwen to determine how we can
25    retrieve these emails, and I am told that there is
```

```
 1   not a compository that just compiles all emails such
 2   that we can just put it in a search bar like you
 3   would a Google and say here is the loan number, here
 4   is Mr. Todd's name, here is the property, give me
 5   all email correspondence.  I'm told the way that it
 6   would need to be done is we would need to identify
 7   the individuals involved in this case, particularly
 8   probably the notices of error heir and the request
 9   for information, get those individuals' names, and
10   then search their email boxes for correspondence
11   with the three search terms.  So I haven't had a
12   chance to discuss this with Mr. Cohron and
13   Mr. Wooten, but I think that the next step here --
14   and we could do this expeditiously -- would be to
15   determine look at the servicing notes which he had
16   produced, identify the individuals involved, and
17   then go ahead and conduct a search for emails,
18   including using the search terms 1 through 3.  I
19   guess we can also -- we don't necessarily have to
20   take the servicing notes if Mr. Cohron would have
21   any other names they think -- or any other names of
22   people they may think have been involved, we can
23   certainly try to clear those names, but that is how
24   we need to start the search.  Obviously when we do
25   that, if we get back emails and there are names that
```

1    are revealed, perhaps we can conduct a search of any
2    names in those emails, so that's the way I'm told it
3    can be done.  So I don't know what their position or
4    the Court's position would be in that.
5              THE COURT:  In regards to the compromise,
6    Mr. Wooten, brought by Mr. Kern?
7              MR. WOOTEN:  Your Honor, I more or less
8    had expected this response ultimately down the road
9    with Ocwen on this issue, but this is a situation
10   where Owen creates a system that creates it's own
11   burden.  They obviously choose how they organize
12   their record retention and how burdensome and
13   difficult they make it.  They're in control of their
14   own IT.  They do operate off of a Microsoft email
15   server, at least as to the last technical
16   information I had from them.  They do retain records
17   based on email addresses and email in-boxes, as I
18   understand that.  Now, they do have the structure
19   that Mr. Kern just described, which does sound
20   burdensome and difficult, but again it is a system
21   that Ocwen constructed apparently in an effort to
22   make it difficult to basic electronic
23   communications.  So as to the offer of the search
24   for particular employees, Ocwen, again, is the
25   possessor of that information.  They know the

1    employees who were involved in servicing this loan.

2    They can compile that through a report of users from

3    the servicing records and make those searches.   In

4    fact, that could have been done at the outset of

5    this litigation or when the email request first came

6    up, whichever, you know, was prudent.

7            But there also is a second layer to this,

8    which is the difference between emails which may

9    actively be in a current employee's email in-box

10   versus employees', you know, archived emails, which

11   I think when we talk with Mr. Kern and he speaks

12   with Ocwen, we may find that they allege or are

13   representing another layer of difficulty if emails

14   are older than a certain period of time.   I think

15   the last time I faced this argument, I think they

16   said the retention policy was 24 months on emails,

17   but they have only recently began to publish these

18   policies.   In the past they had no published

19   retention policies, so that's -- that's where we are

20   on that.   From my perspective, the burden they have

21   described is a monster in their own making.

22            THE COURT:  Have the parties considered,

23   through ESI, reaching out to a third-party vendor to

24   conduct this search if it's too burdensome for Ocwen

25   to be able to do this in a timely manner?

1          MR. KERN:  We have not, Judge, but we
2    would be happy to do so, and I think that's a good
3    consideration given where things stand.
4          THE COURT:  My only concern is that the
5    Court has already found that this information is
6    relevant and proportional to the needs of this case.
7    The holder of the information at this point, until
8    that information is provided, I think it would be
9    impossible for Mr. Todd or his client, his -- I'm
10   sorry, his attorneys to be able to identify who or
11   who within the defendant's system would have access
12   or would have access or emails regarding Todd's
13   information or loan.
14         MR. COHORN:  Absolutely, Judge, I agree.
15   It's worrisome because, you know, this is a rabbit
16   hole that may have no end.  We don't know who those
17   individuals are.  It would be quite a process to
18   identify who they are.  And then, you know, the next
19   layer will be, like Mr. Wooten referenced, whether
20   they are archived, presently accessible, stored on
21   tapes, hard copies, and files.  I have never
22   encountered such difficulty in recovering emails
23   that are particularly relevant to the proceedings.
24         MR. KERN:  Your Honor, this is Mr. Kern.
25   I believe there needs to be some scope here.  Ocwen

1   has serviced this loan or did service this loan from

2   approximately April of 2012 to May of 2019.  I

3   believe they're seeking all email correspondence.

4   Essentially their request is that any person that

5   ever touched this loan over the course of almost

6   seven years, that we are to search every single

7   employee's email using the search terms.  Perhaps a

8   third-party vendor needs to be involved, but that

9   request is astronomical, if not impossible, to do,

10  which is why we suggested -- or why I suggested

11  potentially narrowing the names.  And perhaps we can

12  do that.  I can do that.  We can look through the

13  search servicing notes and start identifying names

14  and come to an agreement on the terms or the

15  individual's emails that we should be searching, but

16  to simply go and search every single employee that's

17  ever made a note on this loan, I don't know how

18  that's even possible.  There are 600 pages of

19  servicing notes.

20          MR. WOOTEN:  Your Honor, may I respond to

21  that?

22          THE COURT:  You may.

23          MR. WOOTEN:  So, as the Court is well

24  aware and Mr. Kern is well aware, I have extensive

25  history litigating with Ocwen.  The technology

 1   company which was a spin-off from Ocwen who hosts

 2   Real Servicing and who held Ocwen's IT licensing and

 3   rights until recently when Ocwen merged into PHH is

 4   Office Source.  Bill Erbey, who was the COO of

 5   Ocwen, spun off to the technology service provider

 6   to Ocwen several years ago, basically went in on a

 7   Monday and changed the names and badges from Ocwen

 8   to Office Source and declared it to be a new

 9   company.

10           Again, the core point of this about

11   difficulty and burden is I have deposed an Office

12   Source technology manager in a break-in case

13   regarding what information they could pull from an

14   Office Source hosted platform, and that testimony

15   was they could pull any data point, so one of those

16   data points are users servicing employees who made

17   entries and that is in the notes and so that is in

18   Real Servicing's raw data that is available as a

19   recordable data point for Ocwen.

20           We mention in our recent correspondence,

21   either in this case or in the framing case, Your

22   Honor -- they start to bleed together on some of

23   these arguments -- but I pulled from the SEC filings

24   that were in 2019 that Office Source continues to

25   allow Ocwen to maintain access for these types of

1    routine searches that they would have had need of

2    before converting over to their new servicing

3    platform with a different vendor.  So access to Real

4    Servicing is available, recording data point is

5    available.  So that is a starting point.

6              And again, as to the level of burden Ocwen

7    has imposed upon itself, I go back to the email

8    system and use is Microsoft Outlook, which is

9    foundationally based upon a Microsoft email server.

10   So with respect to the fact that there are maybe --

11   let's say if there is 500 servicing employees, all

12   of those emails would have of passed through the

13   server even if they're hosted within an independent

14   email in-box, so the layer of burden is again one of

15   process that's being created by Ocwen, certainly

16   should be no reason they could not identify their

17   email servers and search there across that spectrum.

18   And then it simply is a matter of performing a term

19   search similar to a Google search.  And so, again,

20   it is -- that is where Mr. Kern's client could

21   begin, is going to their email servers rather than,

22   you know, trying to hunt down 600 email in-boxes.

23             THE COURT:  Mr. Kern, I will give you an

24   opportunity to respond.

25             MR. KERN:  First, I don't even know -- the

1   reference to Real Servicing in this context is not
2   even relevant.  What is relevant is how to get these
3   emails.  And I'm glad Mr. Wooten sheds his light and
4   thinks he knows how Ocwen systems work.  I am told
5   from Ocwen that we cannot conduct the search in the
6   manner he is saying.  There is no way to just simply
7   put these terms in unless you would Google and hit
8   back every email.  The way that it needs to be done
9   is the way that I described.  So, you know, it, I --
10  I don't know how else to do this other than to
11  potentially seek a third-party vendor to determine
12  how this can be done in a cost efficient way, if
13  that's possible, or to work together, which I think
14  the rules require, to identify employees involved
15  and start searching those emails, which if new names
16  in those emails pop up, we can continue that search.
17          I just think it's a -- we're at a point
18  where it's maybe -- I don't know if it's a
19  technological impossible, but I'm certainly not a
20  tech person, and this is what the tech people are
21  telling me how it needs to be done, even if
22  Mr. Wooten thinks otherwise, but that's where we
23  stand on this.
24          THE COURT:  Give me one second.   (Pause)
25  If it's back with the Court, I don't feel as though

```
 1   the party is going to be able to work together to
 2   try to get this resolved.  I know that this is
 3   possible to obtain these email responses based on
 4   the correspondence we have.  I understand Ocwen is
 5   not able to do it.  The Court is going to give the
 6   parties an opportunity to confer on the issue,
 7   decide if they can figure out search terms or
 8   outsource it to a third-party vendor.  And the Court
 9   is requesting that the parties have that done -- I
10   know we're going to fall into our Thanksgiving week
11   next week, but I -- if possible, I would like this
12   to be resolved as to how to obtain this information,
13   how the parties are going to agree to obtain this
14   information.  I don't agree that this is
15   technologically impossible to do, but it sounds from
16   the representations from both sides that it is not
17   possible to be able to do this or be able to confer
18   and get it done together.
19            MR. WOOTEN:  And, Your Honor, if I may.
20            THE COURT:  Yes.
21            MR. WOOTEN:  This is Mr. Wooten.  I
22   certainly hope I did not give you the impression
23   that the plaintiffs' counsel are not willing to be
24   collegial and cooperative.  It is -- there is a
25   level of frustration on my end because I mean I have
```

1   been down the rabbit hole on this issue before and

2   we're starting at point one of the same song that I

3   heard about four years ago on this issue.  I am

4   really simply just trying to short circuit it and

5   get it, as the Court indicated, down to where the

6   rubber meets the road so we can make progress.  As

7   we indicated, you know, once we go beyond searching

8   live in-boxes, then there will be the archival issue

9   that will come up, and then there will be an issue

10   raised about searching tapes.

11          THE COURT:  Yes.

12          MR. WOOTEN:  So I do understand that there

13   is a big piece there to sort through, and I don't

14   want the Court to think that we're not willing to be

15   collegial and cooperative about that.  I just --

16   what I don't think is useful for us as professionals

17   for the time we impose on the Court to take at face

18   value things that we should reasonably know Fortune

19   500 companies should be expected to have available

20   without substantial cost and burden.

21          THE COURT:  No, and I didn't want neither

22   side to misread that, as far as -- no, no, that is

23   not the Court's intent, Mr. Wooten, so I appreciate

24   that.  What the Court is concerned about is that

25   this is not -- it's not moving forward, and so

1   that's why the Court is making the recommendation

2   either the parties meet and confer to see if they

3   can determine how best to move forward working with

4   their IT programs on both sides of the aisle or

5   agreeing to outsource this to a third-party vendor.

6              MR. WOOTEN:  Yes, ma'am.  Thank you, Your

7   Honor.  I just -- your clarification -- I'm in the

8   same place you are, so I think that clarification on

9   that will help us get to a resolution.

10             THE COURT:  I understand that -- and thank

11  you, Mr. Kern, for also providing your concern

12  regarding the email correspondence and being able to

13  tailor that down as to particular in-boxes that the

14  searches would be conducted within.  Unfortunately,

15  at this point the Court just doesn't have before it

16  the means to be able to do that, but the parties do

17  have a duty to meet and confer on that issue to see

18  if we can't narrowly tailor this down based on

19  information, I guess, that Ocwen would receive as to

20  who would have worked within or on this particular.

21             MR. KERN:  Yes, Your Honor.  And I mean if

22  Mr. Wooten, as I know he has tried a case against

23  Ocwen and if he has been down this rabbit hole, as

24  he suggests, I would suggest to him to let me know

25  what was done in that case.  It's not necessarily

1    that -- we can't presume the same people I'm talking

2    to are the same people that he may have dealt with

3    in that case.  If there was a third-party vendor

4    used in that case or he recalls what was done in

5    that case, I would be more than glad to consider

6    that.  I agree we're all looking for the best path

7    forward on this issue.  It's a matter of how to get

8    there, so I think we can, you know, maybe in the

9    next week or so have a quick call and meet and

10   confer on it and go from there and, you know, I

11   think maybe that's the best way forward.

12           THE COURT:  Okay.  Let's move to our

13   second issue, employee information.

14           MR. COHRON:  Your Honor, Mr. Cohron here.

15   One quick point.  Did I hear in there that we were

16   going to set a time next week to follow up on this,

17   or is that something you -- we can discuss later?

18           THE COURT:  We're going to do it at the

19   end.

20           MR. COHRON:  Okay.  Very good.

21           THE COURT:  Depending on how many issues

22   we have that determines our timing.  As I said, I

23   want to get through Thanksgiving, so I'm looking at

24   the week of December 2nd.  I just don't know how

25   much time we will need.

1           MR. COHRON:  Very good.

2           THE COURT:  I will loop back to that.  The

3    employee information, I am somewhat concerned,

4    Mr. Wooten and Mr. Cohron, as to the depth of

5    information that you are requesting of these

6    employees that would have worked with Ocwen in

7    regards to full name, date of hire, home address,

8    email address, date of termination, job titles, a

9    description of responsibilities required for each

10   position, as well as the address of the principal

11   office or work location, qualification, training

12   received, and so I wanted to just give you all an

13   opportunity to just establish the relevancy of this

14   information but also to -- I know we're using the

15   acronym ACDV.  Will you tell me quickly, what does

16   that stand for?

17          MR. COHRON:  Sure, Judge.  Travis Cohron

18   here.  The ACDV is an Automated Consumer Dispute

19   Verification, and it is a form that is sent by the

20   credit reporting agencies.  When they receive a

21   consumer dispute, a written dispute to them, they,

22   in turn, send the ACDV, which is a set of

23   information, and it also includes the consumer's

24   written dispute as well, to the furnisher of the

25   information.  So in this particular case it is

1   relevant because the SCRA, we raise what is called

2   an I claim and the I claim is only established upon

3   one showing that the furnisher received this ACDV

4   and that they failed to properly, you know,

5   investigate and respond to it.  So one of the things

6   that I want to be careful in crafting this, we're

7   not talking about just a consumer dispute to Ocwen

8   directly.  That in and of itself does not bear with

9   it any statutory obligations.  Mr. Todd here did

10  call Ocwen and dispute things, but there is -- Ocwen

11  had no statutory obligation under the FCRA to do

12  anything, and of course there was no penalty for not

13  doing anything.  But when he did dispute that

14  information through the credit reporting agencies

15  and the credit reporting agencies prepared that

16  information in the form of an ACDV, that triggered

17  the statutory responsibilities under the FCRA.  Very

18  unusual, but that's, that's the purpose behind that

19  acronym.

20              THE COURT:  Thank you.  That's Automatic

21  Consumer Dispute Verification?

22              MR. COHORN:  Automated, yes, Judge,

23  Automated Consumer Dispute Verification.

24              THE COURT:  Automated.  And just so I'm

25  comfortable in regards to the relevancy of the

1  employee information, you go ahead.

2          MR. COHRON:  Yeah, Judge, so the two

3  things that we have been trying to identify are who

4  are the people that Ocwen represents handled the

5  investigations.  And these investigations are

6  statutorily required by the Fair Credit Reporting

7  Act and the Real Estate Settlement Procedures Act.

8  Each of them, upon the FCRA receiving an ACDV, RESPA

9  upon receiving a notice of error, an appropriate

10  notice of error, bear with them statutory obligation

11  to conduct a reasonable investigation.  We are

12  trying to identify who conducted the investigations.

13  You know, one of our burdens here and what we allege

14  is that those investigations were inadequate and

15  insufficient, but we can't, you know, do that.  I

16  mean, we could, via a 30(B)(6) deponent, you know,

17  address the policies and procedures of what appears

18  to be there, but, you know, our intent -- our

19  contention is that we have the right and the ability

20  to find that, you know, appropriate fact witnesses,

21  the individuals who actually did it, and ask them

22  what was done.

23          THE COURT:  All right.  Mr. Kern?

24          Thank you very much, Mr. Cohorn.

25          MR. KERN:  One slight correction, I don't

1   mean to sound like I'm correcting Travis, but I

2   believe ACDV stands for Automated Credit Dispute

3   Verification, not Consumer.  Maybe it means both.  I

4   have always understood it to be Credit.

5              Anyway, as far as the request for the

6   employee -- the names, the home address, the dates

7   of hire, the email addresses, all of the positions

8   they have held, all of the training they have

9   received in each position, A, we find that intrusive

10  to the individual employees and not necessary for

11  the needs of this case.  In other words, every time

12  I have ever done consumer cases where we have always

13  begun on whether a response to a RESPA notice of

14  error or a request for information sent pursuant to

15  RESPA or a response to an ACDV was to start with the

16  30(B)(6) witness.  This is a corporate defendant.  I

17  believe the topics identified in the 30(B)(6) notice

18  have to do with how Ocwen handled, investigated, and

19  responded to the various correspondence that

20  Mr. Todd submitted.  We have always started with the

21  30(B)(6), and if they can adequately testify as to

22  what Ocwen did, how it handled it, how it

23  investigated, and how it responded, I think that

24  negates the need to dig further into these

25  employees' files and call them in for deposition if

1    the 30(B)(6) has already testified to it.  That's

2    part one.

3              Part two, it's not that they're just

4    asking for the names of the individuals.  If that

5    was the case, I believe all of the responses to the

6    alleged notice of errors or request for information,

7    when Ocwen has sent them out, there has been a

8    person's name identified on it who either prepared

9    the response, assisted in preparing the response, or

10   sent it out, so to the extent that they're looking

11   for names, I believe that they have those.  And as

12   to the rest, I mean there could have been 30 or 40

13   people involved in responding and investigating to

14   give descriptions of responsibilities for every job

15   they have ever held at Ocwen, every training they

16   have ever received at Ocwen, it just seems that that

17   is seeking information not relevant to the claims at

18   issue and also not proportional to the needs of the

19   case given any minimal value they would be able to

20   provide, that information would be able to provide.

21             THE COURT:  I do believe the information

22   is relevant.  The 30 or 40 employees are not

23   significant -- a significantly large number.  I

24   think it is highly relevant to this case who are the

25   people who actually handled the investigation.  The

1    Court tends to agree with Mr. Cohron that the full

2    name, position and job title, as well as work

3    location, would be relevant.  At this point the

4    Court is listening to Mr. Kern, does think it's

5    somewhat intrusive for the home address, email

6    address, date of termination, if applicable, at this

7    point because that -- if we're suggesting that they

8    were terminated for a reason that is relevant to

9    this case, but more importantly if they were not,

10   just opening up their personnel files at this point

11   is somewhat premature.

12            MR. KERN:  Just to clarify, your Honor,

13   what are you ordering Ocwen to provide in response

14   to this request?  Is it the name, the position, and

15   was it the date of -- the office location?

16            THE COURT:  I'm sorry, who is speaking?

17            MR. KERN:  That was Mr. Kern, Your Honor.

18            THE COURT:  Okay.  I haven't learned the

19   voices just yet, and so I apologize.

20            Yes, that is the Court's -- that is the

21   Court's finding as to the employee information.

22            MR. KERN:  The name, position, and work

23   location?

24            THE COURT:  That is name, position/job

25   title, as well as the work location.  One of the

1    questions that they had asked for is a description

2    of the responsibilities required for each position

3    for him for plaintiffs to be able to establish the

4    necessary workflow of how the complaint would have

5    gone through after it had been received from the

6    ACDV.  The Court does deem that to be relevant and

7    proportional to the needs of the case as well, so

8    those --

9              MR. KERN:  The description of

10   responsibilities?

11             THE COURT:  Yes, sir.

12             MR. WOOTEN:  And, Your Honor, the only

13   other topic that was addressed was qualifications or

14   training.  I think training would actually be --

15   qualifications is a subjective thing, but training

16   is objective.  We would like to get any training for

17   these employees that dealt with either a RESPA

18   notice or a SCRA notice.

19             THE COURT:  Could that be covered in the

20   30(B)(6) deposition?

21             MR. WOOTEN:  Well, I think, Your Honor,

22   from my perspective -- and this may be just a point

23   of clarification, Mr. Kern, he may be able to do so,

24   I was thinking more along normally there is what

25   Ocwen would term a learning module that would have

1    some written material that would have been -- it's

2    usually web-based, but they usually print it for us

3    in a litigation -- relative to what the training was

4    for those positions, so I think that material -- I

5    just want to make sure we can get that material.  I

6    don't necessarily have to have that material as to

7    the specific employee, other than a representation

8    that they were given or trained on this particular

9    written material on those issues.

10                THE COURT:  Mr. Kern, would you like to

11   respond?

12                MR. KERN:  Yeah.  I'm not sure I quite

13   follow what he is asking for.  We have produced 200

14   pages of policies and procedures in responding to

15   the notice of error and request to information, and

16   we're continuing to try to look for the policies and

17   procedures in place to respond to credit disputes.

18   I don't know if that is separate from what he is

19   looking for in terms of training, but maybe we need

20   to meet and confer about that.  This is the first

21   time I'm hearing of the learning module.  But, you

22   know, we could certainly go back and meet and confer

23   about it.  I don't -- I don't know -- to identify

24   all of the training each individual employee

25   received, it might be difficult, and I don't know

1    that -- I think we could possibly cover that in the

2    30(B)(6), but I just -- I'm not exactly clear what

3    Mr. Wooten is asking me to do here.

4         MR. WOOTEN:  Your Honor, Mr. Wooten again.

5    Give us the opportunity to speak with Mr. Kern about

6    that issue.  Let's just put that to the side.  We

7    don't need to stop any progress.  I feel confident

8    that we can work together with Mr. Kern to make sure

9    we're all singing from the same sheet of music on

10   that particular issue.

11        THE COURT:  If I could only get the choir

12   members to do the same thing at church, I would be

13   off to a good start.

14        So that will be -- in regards to that

15   training request, that will be the Court's -- the

16   Court will hold off on requiring that and give you

17   all an opportunity to meet and confer, in the words

18   of Mr. Wooten, singing off of the same sheet of

19   music.

20        Let's move to policy and procedure

21   manuals.  Mr. Kern, did you have any other issues in

22   regards to the employee information before we move

23   on?

24        MR. KERN:  No.

25        THE COURT:  Okay.  So the next one is the

1    policies and procedures manual.  In particular,

2    there is an allegation that Ocwen has, during the

3    handling and investigation of notice of errors and

4    consumer credit disputes, there were manuals that

5    seems -- what I'm calling quality analysts, so there

6    was a process that these employees would have had to

7    follow when this information had been received, and

8    there have been, according to Mr. Wooten and

9    Mr. Cohron, several meet and confers, but we have

10   not been able to resolve or locate any such manuals.

11   Mr. Kern, -- well, I'm sorry, let's let Mr. Wooten,

12   because it's their motion, let's let them speak to

13   that first.

14           MR. WOOTEN:  I'll let Mr. Cohron state

15   that.

16           MR. COHRON:  Judge, the issue at present,

17   Mr. Kern has in good faith has updated us and

18   attempted -- or his representatives -- has spoken

19   with Ocwen about the existence of these documents.

20   Our concern is that as of date there is no concrete

21   response.  I mean we contend that they exist, they

22   should exist, they have to exist.  If they don't

23   exist, that's fine.  But we're just trying to seek

24   some clarity here, you know, if we can't get a

25   representation that they don't exist, you know, to

1    move the ball forward.  We would like to be able to

2    include that, you know, in a motion to compel just

3    to get some clarity and eliminate that issue amongst

4    all of these others.

5              THE COURT:  Mr. Kern?

6              MR. KERN:  So, Your Honor, we have

7    produced policy and procedures that are called

8    Research Compliance.  And what those are is they do

9    set forth the steps that people investigating and

10   responding to notices of error and requests for

11   information follow.  We produced I think three or

12   four different versions for all of the relevant --

13   for the relevant time period here, consisting of

14   over 200 pages.  After we produced that, Mr. Wooten

15   and Mr. Cohron followed up in saying, well, we think

16   there is separate policies and procedures in place

17   that the quality analysts use.  Upon their

18   representation or belief that those exist and

19   requests for them, I have worked with Ocwen to try

20   to locate them.  We are -- and the way we're doing

21   this is to see if they have separate policies and

22   procedures in place.  To date, none -- Ocwen has not

23   been able to locate any such separate policies and

24   procedures.  That's where we are on that issue.  I

25   can continue to try to investigate that, but I think

1    we're getting to the point where the attempts to

2    locate it and the diligence that Ocwen has utilized

3    to try to do it, I think we're running on the -- I

4    think we are exhausting the search capabilities.  At

5    this point they have not located them, and given the

6    extensive efforts involved, something leads me to

7    believe they don't exist.  I can certainly continue

8    to follow up and press on the issue.  That is where

9    we stand on the quality analysts issue of whether

10   they have separate policies and procedures in place.

11          As to the Fair Credit Reporting Act

12   policies and procedures, meaning ones that Ocwen has

13   in place or presumably has in place to investigate

14   and respond to credit disputes or ACDVs, I just got

15   an update yesterday or the day before that those

16   should be forthcoming.  They didn't provide a

17   timeline.  But that's where we stand on those

18   procedures.

19          THE COURT:  All right.  And just so I'm

20   clear, Mr. Kern, for the record, you are

21   representing to the Court this afternoon that Ocwen

22   does not have quality control analysts or separate

23   policy and procedures that would have dictated to

24   quality control analysts how or how to move through

25   these investigations.  There is not a separate

1    policy and procedure manual that you have located to
2    date; is that correct?
3              MR. KERN:  Yes.  I can commit -- or I can
4    say that Ocwen has not been able to locate separate
5    policies and procedures to date, and I have been
6    working with them to try to locate them.  But
7    despite those efforts, they have not been able to
8    locate any to date.
9              THE COURT:  When I hear "locate", that
10   means they exist, but we don't know where they are.
11   So I just need to put a pin on it as to whether or
12   not they do exist, or do they not exist?
13             MR. KERN:  And, Your Honor, and I can't, I
14   can't commit to that because in the -- in the realm
15   of -- I can't definitively say whether they exist or
16   don't exist.  Sometimes documents could exist that
17   cannot be located, and I understand that.  I'm not
18   trying to be witty here, I just can't commit to
19   something that I know to not be an absolute truth.
20   And I know Your Honor is asking me to do that, but I
21   can't commit as counsel for Ocwen today.  What I can
22   certainly do is go back -- I can commit to going
23   back to Ocwen and saying, hey, we need a definitive
24   answer as to whether this these exist or don't.  And
25   if we want to place a timeline on that, I can do

1     that.

2              THE COURT:  Okay.

3              MR. KERN:  But I can't make that

4     representation.

5              THE COURT:  No, no, that's what I wanted

6     to know.

7              MR. KERN:  Yeah.  I wish I could.

8              THE COURT:  No, I understand.  And I just

9     wanted to make sure the record is clear as to what

10    the answer is.  We don't have a definitive answer at

11    this time, but we will put one in place before the

12    call is over today.  Okay?

13             MR. KERN:  Okay.

14             THE COURT:  Perfect.

15             In regards to the Fair Credit Reporting

16    Act procedure manuals for the ACDV complaints, my

17    understanding is that you recently have updated that

18    they are forthcoming.  Do we have a date as to when

19    those will be provided?

20             MR. KERN:  I don't have a specific date,

21    Your Honor.  Again, if we want to -- you know,

22    whatever deadline we want to set for the quality

23    analysts, you know, having an affirmative answer as

24    to whether they exist or don't --

25             THE COURT:  Yes.

1          MR. KERN:  -- and set the same deadline, I

2     can certainly relay that.

3          THE COURT:  All right.  Let's do that.

4     Okay.  Let's see, where are we?

5          In regard to the policies and procedures

6     manuals and items that we have already covered, is

7     there anything else on that issue?

8          MR. COHRON:  Nothing further from the

9     Judge.  Thank you -- not from the Judge, from the

10    plaintiff.  Thank you, Judge.

11         THE COURT:  I got confused on whose

12    role --

13         MR. COHRON:  Yeah.

14         THE COURT:  So nothing further on behalf

15    of Mr. Todd?

16         MR. COHRON:  Nothing further, Judge.

17         THE COURT:  All right.  All right.  And

18    defendant on that issue, we will loop back to give

19    us some dates that we can work forward on.

20         Items and issues not previously raised in

21    position statements, the next that was redacted,

22    policy and procedures manual.  Mr. Todd has

23    requested unredacted copies of previously produced

24    policy and procedure manuals and, so I will give you

25    an opportunity, Mr. Kern, to state your position.

```
 1              MR. KERN:  Yes, Your Honor.  These, I
 2    believe I referred to these before.  These are the
 3    approximately 200 pages of policies and procedures
 4    we have produced.  All 200 plus pages we made very,
 5    very, very, minimal redactions, and they were to
 6    things such as loans in Connecticut and Washington,
 7    Minnesota loans, New York loans, requests for lien
 8    change updates.
 9              THE COURT:  Did we lose Mr. Kern?  Oh,
10    there we are.
11              MR. KERN:  No, I'm here.  I'm sorry.  I
12    was just looking at my notes.  So the stuff that we
13    redacted has -- our position is it's not relevant to
14    this case.  But, for example, a Connecticut loan
15    would have nothing to do with this case, where it's
16    an Indiana loan, an Indiana property, an Indiana
17    residence, so what we did, rather than excluding
18    those pages as not relevant and noting the documents
19    we withheld, we made the redactions.  We thought
20    that was the best way to do it, but what we did is
21    we also kept the headings in there above the
22    redactions, and we also supplied the table of
23    contents which we thought would show that the
24    information being redacted was not relevant.  I
25    guess the other alternative we could have done is
```

 1   withhold that, withheld that part and then stated we

 2   are withholding this section of the policy as we do

 3   not believe that it is relevant to the claims.

 4           THE COURT:  And I guess where I'm

 5   concerned is it has been provided, the lack of

 6   support, the argument that counsel had made,

 7   Mr. Wooten, Mr. Cohron, is that in redacting

 8   allegedly irrelevant portions of discoverable

 9   documents breeds suspicion.  That's the case they

10   cited here actually from the Southern District of

11   New York, and so I was just concerned as to if the

12   redactions are irrelevant to the case, I guess I'm

13   just trying to make sure I understand is there going

14   to be coming forth a privilege log, or what would be

15   the basis for redacting the information?

16           MR. KERN:  Well, that's it, your Honor.

17   And I get that since something is redacted it may

18   breed suspicion, which is why we purposely left

19   available the headings in the table of contents to

20   show the information being redacted, to show what

21   type of information is being redacted, so I think we

22   have alleviated the -- any suspicion by doing that.

23   I don't know what to say other than I guess

24   alternatively, if we thought something was not

25   relevant, perhaps we should have not redacted it and

1      just noted that we are withholding, you know,

2      certain portions of the document.  I don't know that

3      that breeds any less suspicion than redacting, but

4      that's our position on the issue.  I mean some of

5      this stuff is just -- I don't think it's a stretch

6      to say that some policy regarding a loan in

7      Connecticut is relevant to this case.  I don't see

8      any relevance to this case.  So the stuff that we

9      redacted, it's not -- we're not trying to breed

10     suspicion, we're not trying to not give them

11     information that's relevant, it's just stuff that is

12     wholly not relevant, and that's the basis for

13     redacting the portions we did.

14              MR. WOOTEN:  Your Honor, this is

15     Mr. Wooten.  May I respond to that just very

16     briefly?

17              THE COURT:  I just want to tailor tear it

18     to, if we could, Mr. Wooten, your response.  I know

19     that you directed the Court's attention to 26(B)(5),

20     Rule 26(B5), in there.  When a party withholds

21     information otherwise discoverable by claiming that

22     the information is privileged or subject to

23     protection.  That's where you directed the Court's

24     attention to.  What I wanted to just kind of talk

25     through in particular is that argument that the

1    information that was redacted was not discoverable.

2          MR. WOOTEN:  Yes, ma'am.  My response on

3    this particular issue is this is a complete policy

4    and procedure manual, according to Ocwen's

5    representations to their counsel and to us.  And I

6    can immediately say why some of those items that

7    Mr. Kern says are not relevant could be relevant,

8    because state law in one state could represent a

9    best practice for consumers and Ocwen could be

10   making the active choice to only utilize that best

11   practice in a state that specifically required it

12   and that would go towards willfulness, deliberate

13   indifference, that type of issue.  But beyond that,

14   if it is just a policy and procedure manual, and

15   it's an internal Ocwen document that is protected by

16   a protective order from the Court, what is the harm

17   in providing the complete unredacted document?  It

18   would not be disseminated without us being subject

19   to sanctions.  But this is -- this is not a

20   privilege redaction, this is an opponent telling all

21   of us what is relevant to the case based on their

22   determination of relevancy, and that should -- and

23   that is, as you well know, an incredibly high burden

24   for a party to satisfy in discovery.

25         THE COURT:  Is there a protective order in

1   place in this case?

2           MR. KERN:  Yes, Judge.

3           THE COURT:  I will give you -- to your

4   objection, I will go ahead and give you the last

5   word, Mr. Kern.

6           MR. KERN:  Your Honor, I just -- some of

7   the topics, while he is claiming best practice may

8   go to deliberate indifference or willfulness, that's

9   one example.  But in terms of all of the other ones

10  redacted, such as requests from junior lienholders,

11  there is no junior lien on this case.  This is a

12  single mortgage.  This is the first mortgage.  There

13  is no second mortgage at issue.  So some of these

14  topics are not relevant and not discoverable and

15  that's our position on those.  And like I said, we

16  left -- we left the headings in the table of

17  contents there, which should provide context of the

18  information to be redacted.  We didn't just go

19  through it, maybe Mr. Wooten is suggesting, and just

20  conveniently redact what we didn't think was

21  relevant.  The headings are there.  They can see

22  what we have redacted in terms of the substance of

23  it, much like if you are redacting privilege

24  communication, you list the dates, you list the

25  time, you list the type of correspondence,

1    potentially the subject, and I think that's the

2    information we have left there.

3             THE COURT:  The Court is going to find,

4    with the protective order that is in place in case,

5    the policy and procedure manual be provided to

6    plaintiff's counsel unredacted with the

7    understanding that that would be enough to, with the

8    protective order in place, to preserve the concerns

9    raised by Mr. Kern in regards to the portions of the

10   document that the defense is arguing is irrelevant,

11   but the Court does find that that is relevant, that

12   it is discoverable, and to provide that in

13   unredacted copies.

14            MR. KERN:  And, Your Honor, if I may, and

15   if we are ordered to provide an unredacted copy, can

16   we get the Court to -- or perhaps we could do it by

17   agreement and maybe Mr. Wooten and Mr. Cohorn could

18   let me know now, but if we are going to produce that

19   unredacted, can we get the agreement they will not

20   challenge the designation that that is confidential

21   subject to the protective order?  Because I know

22   that Mr. Wooten and Mr. Cohron to have other Ocwen

23   cases.

24            THE COURT:  Understood.

25            MR. KERN:  And there are some

 1 | confidentiality concerns.

 2 |      THE COURT:  Okay.

 3 |      MR. WOOTEN:  Your Honor, I have no way to

 4 | make that agreement without looking at the document.

 5 | I don't -- I don't make random disputes over

 6 | discovery or confidentiality designations.  I mean

 7 | if it's truly confidential material, then I don't

 8 | have any reason to challenge it, you know.

 9 |      MR. KERN:  Your Honor, they're the ones

10 | who mentioned the protective order was in place.

11 |      THE COURT:  I tend to agree.

12 |      MR. WOOTEN:  And, Your Honor, from my

13 | perspective, in response to that, if the document is

14 | confidential, we certainly are not going to violate

15 | the Court's confidentiality order.  There is a

16 | specific methodology to challenge a claim of

17 | confidentiality on a specific document.  You know, I

18 | don't know what is in that document.  I haven't seen

19 | what he has redacted at this point.  The document

20 | itself, you know, it may be publically available,

21 | you know, once I actually can see the entire

22 | document and read it.  So just for me just to say I

23 | guarantee today I won't challenge confidentiality,

24 | that would be absurd if the document is already

25 | circulating publically.  So I am representing to my

1    opponent and to the Court in good faith that I don't

2    start this process with the idea that I'm going to

3    challenge confidentiality, but I also shouldn't be

4    concerned about confidentiality if the document is

5    widely circulated and easily accessed publically.

6              THE COURT:  Mr. Kern?

7              MR. KERN:  If it's easily accessible

8    publicly, then you would see -- you would have an

9    unredacted version.  The only level of concern I

10   have here is that the basis for you to overcome our

11   objection was that the protective order was in

12   place.  Now I'm simply asking for the protections of

13   the protective order -- and it seems you have

14   hesitation to that.  200 plus pages, you can see at

15   least 95 percent of the contents of the document, so

16   to say that you can't make a determination as to

17   whether you would challenge the disclosure I don't

18   think is appropriate.  If you were going to

19   challenge it, it should have been challenged

20   already, because this has been produced quite a

21   while ago.

22             MR. WOOTEN:  And, Your Honor, from my

23   perspective, if that's the case and there hasn't

24   been a challenge, then I think Mr. Kern already has

25   his answer.

1          THE COURT:  And what is that answer,

2    Mr. Wooten?

3          MR. WOOTEN:  As you are well aware, I have

4    only been in the case for a couple of months, but

5    Mr. Cohron has been in the case and he does a very

6    good job and if there were a reason to challenge

7    confidentiality on that point, he would have already

8    challenged it before I ever became involved, so I

9    think he already knows that.  And if that's his

10   basis for saying that it should have been challenged

11   months ago and it hasn't been, then there obviously

12   wouldn't be a challenge based on the last 5 percent

13   of the document, as he has represented.

14         MR. COHRON:  Joe is absolutely right.  We

15   don't contend there is any issue with the -- you

16   know, the unredacted portions.  I think the

17   uncertainty here is what are we committing to?  You

18   know, it's a -- it's a mixed bag.

19         THE COURT:  The unredacted portions would

20   not be given pursuant to the protective order, is

21   that what you are asking the Court?

22         MR. COHRON:  No, Judge.  What we are

23   saying is, you know, depending on what those

24   contents are, we don't want to waive the ability to

25   later on dispute whether or not it's actually

1  confidential.  I mean certainly, you know, the

2  documents would be covered otherwise, it's just

3  without knowing what is there --

4      MR. KERN:  Your Honor, maybe we can break

5  the impasse here.  So is it my understanding, Travis

6  and Nick -- and correct me if I'm wrong, I do not

7  want to put words in your mouth, it's the last thing

8  I want to do -- that given that you haven't

9  challenged the unredacted portion yet, that you will

10  not challenge the unredacted portion, but you

11  reserve the right to challenge the newly produced

12  unredacted portions if you deem necessary, is

13  that -- maybe that's the way we can agree to it.

14      MR. WOOTEN:  That's absolutely correct.

15      MR. KERN:  Okay.  So you will have --

16  whatever the protective order is, the deadline for

17  challenging a designation, you will either I suppose

18  challenge the unredacted substance within that time

19  period, otherwise the protective order will govern,

20  and it will be presumed or I guess --

21      MR. COHRON:  That's fair.  I think we can

22  do that.

23      THE COURT:  When will you be able to get

24  that policy manual over?

25      MR. KERN:  It should be -- I would say

1    tomorrow, certainly within a week, Your Honor,

2    probably less.  Probably early part of next week, if

3    I can have at least a week with the representation I

4    will try to get it over as soon as I can.

5            THE COURT:  Well, if you're not doing

6    anything next Thursday, I will go ahead and put it

7    down for November 28th.

8            MR. KERN:  Okay.

9            THE COURT:  All right.  The next issue

10   that we have is the redacted -- oh, these were not

11   previously raised.  Okay.  Have you all had an

12   opportunity to meet and confer on these issues for

13   Pages 4, 5 and -- 4 through 7?  I'm sorry.

14           MR. COHRON:  We have, Judge.  Well, with

15   regards to 4 through 5, I think that 6 through 7

16   bears a few further discussions, but...

17           THE COURT:  Okay.  All right.  I had only

18   allocated an hour for the conference, and I need to

19   start my next one at 4:00.  We can pick up on Page 4

20   of 7.  This is a good breaking point here.  Let me

21   look and see what I have.  4:30, 4:30 tomorrow.

22           MR. WOOTEN:  Your Honor, I can make myself

23   available.

24           THE COURT:  And we'll start on Page 4 of

25   7.  Does that work?

1        MR. KERN:  Yes, Your Honor.

2        MR. WOOTEN:  Yes, ma'am.

3        MR. KERN:  Your Honor, this is Mr. Kern,

4   and before you go, with maybe one quick issue --

5        THE COURT: Yes.

6        MR. KERN:  -- hopefully you can address.

7   You may not recall, but plaintiff has served a

8   subpoena on the former CEO of Ocwen Financial

9   Corporation.  We had a call with Your Honor.  We did

10  file our motion to quash.  Plaintiffs have filed

11  their opposition.  I know pursuant to local rule I

12  have seven days, which is tomorrow --

13       THE COURT:  Tomorrow.

14       MR. KERN:  -- but I have been under the

15  weather this week.  I have reached out to Mr. Cohron

16  and Mr. Wooten about asking if they would agree to

17  give me until Monday.  I have not heard back.  I

18  don't know if it's something that Your Honor can

19  grant me now, or if they have an objection to it,

20  but it is just, you know, one business day, and I

21  would appreciate it if I can just get that one extra

22  day.

23       MR. WOOTEN:  Your Honor, I don't have any

24  opposition -- this is Mr. Wooten.  We don't have a

25  problem with accommodating Mr. Kern's request.

1    Honestly I had just been in Chicago in hearings and

2    depositions and only getting back to my computer

3    this morning, so that's one of the reasons I had not

4    been able to respond.

5                THE COURT: Okay.

6                MR. KERN:  No problem, Nick.  Thank you.

7                THE COURT:  That will be the plan, to give

8    you until Monday to file your reply on those two

9    issues.  We will pick up on Page 4 of 7 tomorrow at

10   4:30.  Thank you, and we'll be able to provide dates

11   on tomorrow as well.  Take care.

12               MR. WOOTEN:  Thank you.

13               MR. KERN:  Thank you.

14                         (Adjourned.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF COURT TRANSCRIBER

      I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

s/s Jodie Franzen
Signature of Approved Transcriber            Date