**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Terre Haute Division**

| | | |
|---|---|---|
| ROGER TODD,<br><br>*Todd*,<br><br>v.<br><br>OCWEN LOAN SERVICING, LLC., and DEUTSCHE BANK NATIONAL TRUST CO., as Trustee for NovaStar Mortgage Funding Trust, Series 2007-1 ,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No.** 2:19-cv-85-JMS-DLP |

**MOTION FOR SANCTIONS**
**AGAINST DEFENDANT OCWEN LOAN SERVICING, LLC.**

Plaintiff Roger Todd ("Todd"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 37(e), and its inherent authority, respectfully requests this Court enter an order sanctioning Defendant Ocwen Loan Servicing, LLC ("Ocwen"). In support thereof, Todd states as follows:

## INTRODUCTION

This motion concerns two distinct issues. First, Ocwen's failure to preserve electronically stored information ("ESI") or maintain access to REALServicing; rendering it "unable" to produce all relevant email correspondence responsive to a search of terms specific to Todd's loan ("Email Correspondence"), or a payment reconciliation history with last payment change date column or last payment change date data from REALServicing ("Payment Reconciliation History"). This failure to preserve, and the alleged decommissioning of REALServicing by Altisource Solutions, Inc. ("AltiSource") - a company closely related to Ocwen, occurred after the initiation of these proceedings and the commencement of discovery.

Second, in response to Todd's efforts to obtain a Payment Reconciliation History, Ocwen produced a document purporting to contain "the same data" in a different format. However, as supported by the analysis and affidavit of forensic account Bernard J. Patterson, the document contains demonstrably false information contradicted by other loan data produced by Ocwen during the course of these proceedings. Todd contends Ocwen knew the document contained demonstrably false information yet produced it so to conceal evidence of its prior knowledge of the servicing errors identified in the operative Complaint.

**RELATIONSHIP BETWEEN OCWEN AND ALTISOURCE**

Ocwen is a wholly owned subsidiary of Ocwen Financial Corporation. Until recently, Ocwen's system of record for the management of borrower loans was REALServicing, and its related subsystems. REALServicing is owned by Altisource. Prior to August 2009, Altisource operated as Ocwen Solutions, a wholly owned division of Ocwen Financial Corporation. On August 10, 2009, Altisource was spun off into a standalone publicly traded company. Initially, William C. Erbey, founder of Ocwen Financial Corporation, was appointed Chairman of Altisource while retaining his position as Executive Chairman of Ocwen. Mr. Erbey served in these positions until he was forced to resign sometime around January of 2015. William B. Shepro, Altisource's current Chairman and CEO, started with Ocwen in 1997 and was the President of Ocwen Solutions until it effectively became AltiSource. In addition to Mr. Shepro, many other AltiSource employees are former Ocwen employees. The two companies maintain a high percentage of common ownership.[1] Ocwen is or was until very recently AltiSource's largest customer.

[1] For instance, in or around February of 2017, William C. Erbey owned 16.1% of Ocwen Financial Corporation and 32.56% of AltiSource.

Beginning in August of 2009, Ocwen contracted with Altisource for the continued use of the REALServicing platform and its subsystems via an Intellectual Property Agreement ("IP Agreement"). The IP Agreement defined the "licensed software" as: "RealServicing, RealTrans, RealResolution, RealPortal, RealDoc, RealSynergy and any other software developed after the date hereof licensed from Altisource to Ocwen that is integral to Ocwen's operations."

In September of 2018, Ocwen Financial Corporation announced its intent to acquire PHH Mortgage Corporation ("PHH"). The acquisition was completed on October 4, 2018 and resulted in the merger of Ocwen into PHH. As part of this transaction, Ocwen would begin to utilize the Black Knight LoanSphere MSP servicing platform.

In a February 2019 filing with the Securities and Exchange Commission,[2] AltiSource included a copy of a binding term sheet ("Term Sheet") detailing its rights and responsibilities with respect to Ocwen going forward. *See*, Exhibit A. The Term Sheet created without limitation the following duties:

> 3) Altisource will reasonably cooperate with Ocwen in moving loans off of the REALServicing Technology. Beginning on the REALServicing Termination Date and thereafter, Ocwen will be permitted only to access the data stored within REALServicing as provided herein and will not be permitted to add, delete, modify or otherwise change data contained therein; however **Ocwen will be permitted to query, view, read, and extract REALServicing system data, reporting and tools (to the extent consistent with access rights in effect as of the date of this Binding Term Sheet and without manipulating or changing any data) (the "REALServicing Limited Access").**

https://www.sec.gov/Archives/edgar/data/873860/000162828019006084/a20190331ex101.htm

(Emphasis added).

On June 10, 2019, nearly four months after the commencement of these proceedings, Ocwen announced the completion of the final phase of its loan transfer process from

[2] The Court may take judicial notice of documents in the public record. *See, e.g.*, *Radaszewski v. Maram*, 383 F.3d 599, 600 (7th Cir. 2004).

REALServicing to the Black Knight LoanSphere MSP platform. https://www.globenewswire.com/news-release/2019/06/10/1866553/0/en/Ocwen-Financial-Announces-Updates-on-Key-Business-Initiatives.html

**CHRONOLOGY OF RELEVANT EVENTS AND REPRESENTATIONS**

1. Todd directed Notices of Error to Ocwen on or about (i) July 24, 2018; (ii) November 8, 2018; (iii) December 10, 2018; and (iv) January 29, 2019, identifying errors relative to the servicing of his loan.

2. On February 18, 2019, Todd initiated these proceedings by filing his Complaint and Demand for Jury Trial ("Complaint"). [Doc. 1] The Complaint was immediately served upon Ocwen and contained allegations of misapplied payments, poor record keeping, and the failure to adequately investigate errors.

3. On February 22, 2019 Altisource and Ocwen entered the Term Sheet granting Ocwen with limited access to REALServicing and/or REALServicing data for five years after all loans were deboarded.

4. On May 16, 2019, Todd served Requests for the Production of Documents upon Ocwen. Included were requests for emails and servicing records from Ocwen's system of record, i.e., REALServicing.

5. As stated above, on June 10, 2019, Ocwen announced the completion of the final phase of its loan transfer process and transition from REALServicing to the Black Knight LoanSphere MSP platform ("MSP").

6. On June 25, 2019, Ocwen responded to Todd's First Requests for the Production of Documents and produced a payment reconciliation history from REALServicing without a last payment change date column or data. *See*, Exhibit B.

7. On October 10, 2019, the Court commenced a telephonic Discovery Conference to discuss discovery items in dispute including without limitation email correspondence and other ESI. Neither during the call nor at any previous time did Ocwen provide any indication it no longer had access to certain ESI, REALServicing generally, or any email correspondence predating Jan. 1, 2017.

8. On October 30, 2019, the Court commenced another telephonic Discovery Conference. Again, neither during the call nor at any previous time did Ocwen provide any indication it no longer had access to certain ESI, REALServicing generally, or email correspondence predating Jan. 1, 2017.

9. On November 7, 2019, the Court commenced another telephonic Discovery Conference. For a third time, neither during the call nor at any previous time did Ocwen provide any indication it no longer had access to certain ESI, REALServicing generally, or email correspondence predating Jan. 1, 2016. In fact, during the Discovery Conference, counsel for Ocwen offered to "start the process of seeing the steps that would need to be taken to complete an email search for those terms, in terms of how it can be done and the costs associated with it." *See*, Exhibit C.

10. On December 11, 2019, the Court commenced another telephonic Discovery Conference to discuss items including without limitation the Payment Reconciliation History. Now for the fourth time, neither during the call nor at any previous time did Ocwen provide any indication it no longer had access to certain ESI in native formation or REALServicing generally. In fact, during the Discovery Conference, counsel for Ocwen represented, "there has been multiple communications with Ocwen, technical teams were involved, there has probably been, I would estimate, about five people internally working on this issue." *See*, Exhibit D.

11. In response to questions from the Court about whether the last payment date change data is available, counsel for Ocwen represented, "***it is available***, it just may not be able to be reproduced in the exact same format that, I guess, was represented in the Saccameno case. It does not appear we can produce it in that format, ***but the data itself it appears we can produce.***" *See*, Exhibit E.

12. On December 18, 2019, Ocwen produced a payment reconciliation history with a last payment change date column purporting to contain the same data as if pulled from REALServicing. *See*, Exhibit F.

13. On December 19, 2019, the Court commenced another telephonic Discovery Conference. During the call, Ocwen represented it had "***since produced the data that would appear in the column that they had requested in a different formation***…" See, Exhibit G. Counsel for Todd immediately challenged the veracity of the document.

14. Thereafter, Todd submitted the document to forensic accountant and certified fraud examiner Bernard J. Patterson for review and to compare the data contained therein with other data contained in the pay histories previously provided by Ocwen from REALServicing.

15. In reviewing the pay histories provided by Ocwen from REALServicing, Mr. Patterson identified 87 distinct transactions where Ocwen had later reversed it. Mr. Patterson compared those 87 distinct transactions to the data contained in the payment reconciliation history produced by Ocwen on December 18, 2019. Mr. Patterson analysis and declaration concludes none of the 87 transactions in the payment reconciliation history produced by Ocwen on December 18, 2019 matched the data previously provided by Ocwen from REALServicing. *See*, Exhibit H.

16. Mr. Patterson's analysis and declaration also concludes the payment reconciliation history produced by Ocwen on December 18, 2019 contains other major discrepancies:

a. 34 of the 87 transactions analyzed from the payment reconciliation history produced on December 18, 2019 had different transaction dates than the REALServicing data.

b. 300 transactions were present in the payment reconciliation history produced on December 18, 2019 that was not present in the REALServicing data.

c. The last change dates reflected in the payment reconciliation history produced by Ocwen on December 18, 2019 conflict significantly with the REALServicing data.

17. On December 30, 2019, based entirely upon Ocwen's representation it no longer had access to or control of email correspondence predating January 1, 2017, and that Todd needed to go to AltiSource for them, Todd served a Non-Party Subpoena and Request for the Production of Documents upon AltiSource.

18. On January 29, 2020, counsel for Ocwen emailed the undersigned to inform them they were "now [also] representing Altisource…"

19. On or about February 6, 2020, Ocwen and/or Altisource stated that RealServicing had been completely decommissioned and these parties do not have access to any of the relevant data. Alternatively, retrieving the data would be too costly.

20. On February 10, 2020, the Court commenced an in person Discovery Conference. At the conclusion of the Discovery Conference, the Court instructed counsel for AltiSource and Ocwen to obtain an answer to the following questions: 1) Who has the loan data or information

(i.e., Payment Reconciliation History) from RealServicing from January 1, 2015 to the present?; and, 2) Who has possession of Ocwen emails from January 1, 2015 to the present?

21. On February 14, 2020, Ocwen produced a statement responsive to the Court's directive and questions. *See,* Exhibit I. In response to the question of who has possession of Ocwen emails from January 1, 2015 to the present, counsel for Ocwen and AltiSource provided the following (largely non responsive) answer:

> Altisource does not have any Ocwen emails on its Outlook Exchange server. There may be certain Ocwen emails **prior to June 11, 2017** on back-up tapes maintained by Iron Mountain to the extent that Altisource and Ocwen emails were jointly stored on back-up tapes. However, Ocwen's emails belong to Ocwen, not Altisource, and Altisource does not have the legal or contractual right to produce emails belonging solely and exclusively to Ocwen. Altisource denies it has any obligation to recall, restore, and search back-up tapes for Ocwen's emails. Even if it did, the time, effort, and cost to do so is significant. It likely would cost tens of thousands of dollars, and potentially much more based on the open-ended search that Plaintiff's counsel is currently requesting. The Court should not impose this significant burden on non-party Altisource to determine if the back-up tapes contain emails responsive to Plaintiff's counsel's request. This is especially true when weighed against the marginal benefit of such emails (to the extent they even exist)."

21. On March 9, 2020, Ocwen produced an additional document purporting to be the Payment Reconciliation History without explanation about how it was obtained. The document contains entirely different information than the previous payment reconciliation history produced on December 18, 2019.

## LEGAL STANDARD

Although the phrase does not appear in Fed. R. Civ. P. 37(e), courts have borrowed the Fed. R. Civ. P. 34 control standard to impose sanctions on parties who failed to preserve relevant ESI. These courts have found: (1) a party's duty to preserve extends to all documents and ESI under its control, *even when the ESI resides with a nonparty*; and, (2) courts may sanction a party for failing to ensure that the nonparty preserves relevant ESI. *See, e.g., Haskins v. First Am. Title Ins. Co.*, 2012 WL 5183908 (D.N.J. Oct. 18, 2012) (finding that an insurer was required to direct

a nonparty to preserve documents in its possession when the insurer had a contractual right of access to the documents); *In re NTL, Inc. Sec. Litig*., 244 F.R.D. 179, 195-96 (S.D.N.Y. 2007) (finding that because the defendant had control under Fed. R. Civ. P. 34(a), it had a duty to preserve ESI possessed by a nonparty affiliate); *Goodman v. Praxair Servs*., Inc. 632 F. Supp. 2d 494, 515 (D. Md. 2009) (noting that the concept of control under Fed. R. Civ. P. 34 "provides the closest analogy to control in connection with a spoliation issue"). In particular, litigants are expected to preserve "unique, relevant evidence that might be useful to an adversary" or "is reasonably likely to be requested during discovery." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. Oct. 22, 2003); see also *Marten Transp. Ltd. v. Plattform Adver., Inc*., 2016 U.S. Dist. LEXIS 15098 at *5, 10 (D. Kan. Feb. 8, 2016).

Courts in the Seventh Circuit apply the "legal right" standard to determine whether a party controls ESI outside of its possession and custody. *Chaveriate v. Williams Pipe Line Co*., 11 F. 3d. 1420, 1426 (7th Cir. 1993). Even if ESI is in the possession of a third party, a party's duty to preserve still extends to that ESI when it reasonably anticipates litigation. *In re NTL, Inc. Sec. Litig.,* 244 F.R.D. 179, 195-197 (S.D.N.Y. 2007) (finding the defendant had a duty to preserve documents and ESI even though the majority of these materials were in a non-party's possession).

## ARGUMENT

### I. Ocwen Should Be Sanctioned For Breaching Its Duty to Preserve ESI Under FRCP 37(e).

As stated above, Rule 37(e) of the Federal Rules of Civil Procedure imposed upon Ocwen a duty to take reasonable steps to preserve electronically stored information ("ESI") in its control once it knew or should have known that litigation was imminent. Fed. R. Civ. P. 37(e). To make this determination, following a finding of requisite control, the Court must ask whether:

(a) a duty to preserve the ESI existed; (b) a party failed to preserve the ESI; (c) the loss of the ESI unduly prejudices the party seeking it; and, (d) whether the ESI can be restored or replaced by additional discovery. Fed. R. Civ. P. 37(e); 2015 Amendment Advisory Committee Notes. *Schmalz v. Vill. of N. Riverside*, No. 13 C 8012, 2018 WL 1704109, at *3 (N.D. Ill. Mar. 23, 2018). If the foregoing are answered in the affirmative, the Court may order measures no greater than necessary to cure the prejudice. If the foregoing are answered in the affirmative, upon a finding [Ocwen] failed to preserve the ESI in bad faith or with intent to deprive [Todd] of the informations use in litigation, the Court may instruct the jury that it may or must presume the information was unfavorable to [Ocwen]. Fed. R. Civ. P. 37(e)(2).

A. <u>The Email Correspondence and Payment Reconciliation History Were [or Remain in] Ocwen's Control</u>**.**

Todd contends that at all relevant times, Ocwen controlled (or even continues to control) the ESI at issue despite it now being outside its custody and, as such, had a duty to take reasonable steps to preserve ESI in anticipation of litigation. Courts in the Seventh Circuit apply the "legal right" standard to answer whether a party controls ESI outside of its possession and custody. *Thermal Design, Inc. v. Am. Soc'y of Heating, Refrigerating, & Air-Conditioning Engineers, Inc*., 755 F.3d 832, 838-39 (7th Cir. 2014). This determination primarily asks whether a party has a legal right to access documents in the possession or custody of a third party based on (1) a contractual relationship or (2) the nature of their relationship. *In re Subpoena Duces Tecum to Ingeteam*, 2011 WL 3608407 (E.D. Wisc. 2011); *In re Uranium Antitrust Lit*., 480 F. Supp. 1138, 1145-53 (N.D. Ill. 1979). In the circumstances at bar, Todd contends that Ocwen maintained control over the sought-after ESI by virtue of *both* a contractual relationship between Altisource and Ocwen in the form of the Term Sheet *and* via the nature of their relationship.

i. *Legal Right Based On Contractual Relationship.*

First, turning to the issue of whether Ocwen maintained control over the ESI by virtue of the Term Sheet, this Court has found similar contractual obligations to sufficiently establish a legal right to sought after information. *Williams v. Angie's List, Inc.*, 2017 WL 1318419 (S.D. Ind. April 10, 2017). In *Williams*, the plaintiffs alleged Angie's List instructed them to underreport their overtime hours on their computerized time records using a service called TimeTracker.  To prove their claims under the Fair Labor Standards Act, plaintiffs sought background data automatically recorded while they were working from home on Salesforce, a sales platform used by Angie's List.

In opposition to the plaintiff's motion to compel the production of additional background data, Angie's List claimed the background data was outside of its "possession, custody, or control." Specifically, Angie's List argued the background data was in possession of Salesforce and that it had no greater rights to obtain the background data than any other person.  However, in granting the plaintiffs' motion to compel, finding the presence of control over the data at issue, the court in *Williams* found the record before it to adequately demonstrate "Angie's List and Salesforce ha[d] a longstanding contractual relationship and that the background data [was] recorded 'for' Angie's List as part of the ordinary course of their business relationship." Id. at *7-8. In support, the court noted that though end users such as Angie's List "ordinarily" do not access such data, the weight of evidence clearly demonstrated it could if it asked Salesforce for it. Thus, the court in *Williams* reasoned the "[p]laintiffs had met their burden of demonstrating that Angie's List had a legal right to obtain the background data...the fact  that Salesforce specifically logs this data for Angie's List in the ordinary course of their business relationship, and Angie's List's demonstrated ability to retrieve the background data."

Here, the close relationship between Ocwen and AltiSource, and the Term Sheet, sufficiently demonstrates that Ocwen has a legal right, and/or the ability to easily obtain, the Payment Reconciliation History and Email Correspondence.

ii. *Legal Right Based On Nature of Relationship Between Party and Nonparty In Possession.*

Todd also contends Ocwen had (or still has) control over the ESI at issue due to the unique relationship it has with AltiSource. *See, e.g., Rosie D. v. Romne*y, 256 F. Supp. 2d 115, 119 (D. Mass. 2003); *McKesson Corp v. Islamic Republic of Iran*, 185 F.R.D. 70 (D.D.C. 1999). *McBryar v. International Union of United Automobile Aerospace & Agricultural Implement Workers of America*, 160 F.R.D. 691, 694 (S.D.Ind.1993) (A principal-agent relationship or "ownership is not required; if a party possesses or has custody of a document or thing belonging to another person, the party must produce it.") (citing 8 Wright & Miller § 2210, p. 623–24); *Henderson v. Zurn Indus., Inc*., 131 F.R.D. 560, 567 (S.D.Ind.1990); *Afros S.P.A. v. Krauss–Maffei Corp*., 113 F.R.D. 127, 129 (D.Del.1986) ("The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be a close coordination between them.") In fact, the relationship between Ocwen and AltiSource is very much akin to two subsidiaries wholly owned by the same parent company. This is because they once were just that, and still maintain a high percentage of common ownership.

B. Ocwen Failed To Preserve The ESI Despite Having Knowledge Of Imminent Litigation.

Ocwen was obligated to preserve the Email Correspondence and Payment Reconciliation History, if not access to REALServicing in its entirety, as soon as it had reason to believe litigation was imminent. Here, the duty to preserve existed no later than February 19, 2019. *See*

*eg. McIntosh v. United States*, 2016 WL 1274585, at *32 (S.D.N.Y. March. 31, 2016)(finding a party's duty to preserve is triggered, at the latest, on service of the complaint.) However, the long history of disputes made by Todd to Ocwen, including numerous Notices of Error sent to Ocwen on attorney letterhead, and the pendency of other litigation involving similar allegations, supports a finding Ocwen's duty to preserve was triggered much sooner. *See eg., Phillip M. Adams & Assocs*., L.L.C. v. Dell, Inc., 621 F. Supp. 2d 1173, 1190-91 (D. Utah 2009) (finding the defendant's duty to preserve was triggered five to six years before the complaint was filed because they were aware of disputes between similarly situated industry actors over the same floppy disc controller errors); *See also, Crown Battery*, 185 F. Supp. 3d at 998099 (finding the defendant golf cart manufacturer's duty to preserve arose months before litigation started when its business relationship with the plaintiff soured and the defendant took $2.3 million worth of batteries without paying for them).

C. <u>The Loss of the Email Correspondence and Payment Reconciliation History Unduly Prejudices Todd</u>.

A determination about prejudice falls squarely within the Court's discretion and is to be based upon the nature of the lost data and its importance to the issues in dispute. Here, Todd contends the Email Correspondence and Payment Reconciliation History are probative of Ocwen's: (1) prior knowledge of servicing errors; 2) attempts to alter the payment history of Todd's loan previous to asserting no errors had occurred; 3) failure to make timely corrections; 4) failure to properly reconcile Todd's loan after the bankruptcy discharge; and/or 5) Ocwen's efforts to make corrections only after the commencement of litigation. This evidence is critical to demonstrating full picture of unfairness and deception under ICFA, a willful violation of the FCRA, and to detailing the intentional nature of Ocwen's violations of the FDCPA.

    D. Ocwen Acted In Bad Faith, With Intent To Deprive, When It Failed To Take Reasonable Steps to Preserve the Email Correspondence and Payment Reconciliation History

Todd contends Ocwen has not only failed to take reasonable steps to preserve the ESI at issue, but has done so in bad faith with the intent to deprive him of the information's use in litigation. *See* Fed. R. Civ. P. 37(e)(2). *Marrocco v. General Motors Corp.,* 966 F.2d 220, 224 (7th Cir. 1992)("Sanctions are proper upon a finding of willfulness, bad faith, or fault on the part of the noncomplying litigant.); *Melendez v. Illinois Bell Tel. Co*., 79 F.3d 661, 671 (7th Cir. 1996). There is ample evidence Ocwen's actions here fall into this category. First, any remotely reasonable litigation hold would have preserved the ESI at issue and/or access to REALServicing generally. Second, Ocwen's long period of silence on this issue during various discovery conferences, and its ongoing shell game about whether the data exists and who has it, are representative of its bad faith. *See, eg., O'Berry v. Turner*, No. 7:15-CV-00064-HL, 2016 WL 1700403, at *4 (M.D. Ga. Apr. 27, 2016)(finding bad faith where defendant engaged in "irresponsible and shiftless behavior" including the failure to contact plaintiff about the status or availability documents for an extended time period despite numerous requests for the documents by plaintiff's counsel); *Internmatch, Inc. v. Nxtbigthing, LLC*, No. 14-CV-05438-JST, 2016 WL 491483, at *11 (N.D. Cal. Feb. 8, 2016), *appeal dismissed* (June 10, 2016)(finding evidence was "willfully spoliated" in bad faith after finding that defendants undertook "extraordinary measures" to mislead opposing counsel, including providing an unbelievable assertion that the ESI was lost due to a power surge.) Third, Ocwen has undeniably preserved or maintained access to some ESI and data, apparently just not ESI that may be evidence of its bad acts. Fourth, Ocwen is aware of the effect the Payment Reconciliation History had on the jury in *Saccameno.*

Fifth, Ocwen's failure to preserve the ESI is seemingly in violation of various CFPB regulations governing mortgage servicing record retention requirements:

12 CFR 1024.38(c) (Reg. X) imposes a mandatory legal obligation on mortgage servicers with respect to record retention:

> (c) Standard requirements—
>
> (1) Record retention. A servicer *shall retain* records that document actions taken with respect to a borrower's mortgage loan account until one year after the date a mortgage loan is discharged or servicing of a mortgage loan is transferred by the servicer to a transferee servicer.
>
> (2) Servicing file. A servicer shall maintain the following documents and data on each mortgage loan account serviced by the servicer in a manner that facilitates compiling such documents and data into a servicing file within five days:
>
>> (i) A schedule of all transactions credited or debited to the mortgage loan account, including any escrow account as defined in § 1024.17(b) and any suspense account; ….
>>
>> (iv) To the extent applicable, a report of the data fields relating to the borrower's mortgage loan account created by the servicer's electronic systems in connection with servicing practices; ….
>
> 12 C.F.R. § 1024.38(c)(1)-(2)(i) & (iv), emphasis supplied.

The CFPB's official interpretation of subpart 38(c) is also relevant:

> 38(c)(1) Record retention.
>
> 1. Methods of retaining records. Retaining records that document actions taken with respect to a borrower's mortgage loan account does not necessarily mean actual paper copies of documents. *The records may be retained by any method that reproduces the records accurately (including computer programs) and that ensures that the servicer can easily access the records (including a contractual right to access records possessed by another entity).* (Emphasis supplied)
>
> 12 C.F.R. § Pt. 1024, Supp. I

These regulations and interpretations impose on Ocwen the legal duty to (1) retain "a schedule of all transactions credited or debited to the mortgage loan account" including (2) a "report of its data fields," created by REALServicing, (3) "*by any method that reproduces the records accurately (including computer programs) and that ensures that the servicer can easily access the records (including a contractual right to access records possessed by another entity)* (4) until one year after the date a mortgage loan is discharged or servicing of a mortgage loan is transferred by the servicer to a transferee servicer.

E. The Information Contained In the Emails and Payment Reconciliation History Cannot Be Restored or Replaced Through Additional Discovery.

Ocwen contends it no longer has the ability to access or obtain the Email Correspondence or Payment Reconciliation History, they are in the possession of AltiSource. In turn, AltiSource contends it may or may not have the ability to obtain the Email Correspondence or Payment Reconciliation History, but in any event it would be too costly to attempt to retrieve it:

> Consistent with these provisions, the REALServicing platform was decommissioned last year following the data migration to MSP, and the platform no longer exists. Access to some REALServicing data may be available on back-up tapes; however, the cost to recall and restore such tapes, along with the cost to rebuild the platform that would allow Altisource to upload, search, and review the data would be significant. The Court should not impose this significant burden on non-party Altisource to determine if the back-up tapes contain data from RealServicing regarding Plaintiff's mortgage loan. This is even more true considering the data from REALServicing has been transferred to MSP and the data that Plaintiff's counsel is requesting has already been provided to him.

Preliminarily, this response is another example of the ongoing shell game and evasiveness utilized by Ocwen. The Court asked a simple question, and despite this being an issue for months and the aid of "five technicians", the best Ocwen can do is "some REALServicing data ***may*** be available" but it would be too expensive to access. Either the data exists or it does not. Regardless, the foregoing clearly demonstrates Ocwen has failed to maintain

ready access to the ESI and any costs inherent to now obtaining it would be the natural consequence of that failure.

## II. Ocwen Should Be Sanctioned For Unnecessarily Multiplying These Proceedings, Making Material Misrepresentations, And For Producing Falsified Evidence.

A district court has inherent power to sanction a party who "has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Salmeron v. Enterprise Recovery Systems, Inc.*, 579 F.3d 787, 793 (7th Cir. 2009); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 48–49, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Greviskes v. Universities Research Ass'n*, 417 F.3d 752, 758–59 (7th Cir. 2005). Todd asks the Court to use its inherent power to sanction Ocwen for unnecessarily multiplying these proceedings, making material representations to the Court, and producing falsified evidence.

As demonstrated by the chronology above and attached exhibits, Ocwen has engaged in a course of conduct which has unnecessarily multiplied these proceedings. This conduct includes the failure to provide clear answers to very simple questions and a pattern of taking contradictory positions. Instead of confronting its alleged lack of access to REALServicing from the start, it responded with a whole host of unsubstantiated objections. Once countless hours were expended working through those objections, and multiple Discover Conferences were conducted, Ocwen conveniently notified the Court and Todd it could not provide Email Correspondence before Jan. 1, 2016. If left unaddressed, Ocwen will undoubtedly continue on this path, even argue the time Todd and the Court have expended seeking resolution of this issue was somehow unwarranted. This is best demonstrated by Ocwen's production of *another* document purporting to be the Payment Reconciliation History the day of this filing, without explanation of how it was obtained after all this time, and despite its repeated representation it could not be.

With respect to the document produced by Ocwen on December 18, 2019, represented as a payment reconciliation history containing the same data as would be reflected in the sought after Payment Reconciliation History, it is demonstrably false and assuredly created for purposes of litigation. This constitutes a fraud upon the Court. *Hazel–Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 245–46, 250, 64 S.Ct. 997, 1001, 1003, 88 L.Ed. 1250 (1944) (deliberately planned scheme to present fraudulent evidence constitutes fraud upon the court), *overruled on other grounds; Standard Oil Co. of Cal. v. United States*, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976). This allegation is supported by the analysis and declaration of forensic accountant Bernard Patterson. Should the Court conclude the same, it must hold Ocwen in contempt and enter sanctions including without limitation the fees and costs incurred by Todd in responding to it. *Aida Eng'g, Inc. v. Red Stag, Inc.*, 110 F.R.D. 650, 651 (E.D. Wis. 1986).

**Conclusion**

In closing, Todd respectfully requests Ocwen be sanctioned for failing to preserve ESI in the form of the Payment Reconciliation History and Email Correspondence, for its production of a demonstrably false document, and for unnecessarily multiplying these proceedings.

**WHEREFORE**, Plaintiff Roger Todd respectfully requests this Court grant this Motion for Sanctions enter the following sanctions and relief against Defendant Ocwen Loan Servicing, LLC:

a. Set this matter for an Evidentiary Hearing on April 29, 2020;

b. Order a Representative of Ocwen Loan Servicing, LLC. and a Representative of AltiSource to appear at said Evidentiary Hearing;

c. Enter an Order requiring Ocwen to bear the cost of retaining a Third Party ESI Agent of Todd's choice to access the sought after data, and reimburse AltiSource for any costs inherent to the same;

d. Granting Todd leave to file its petition in support of Attorney Fees and Costs attributable to the pursuit of the Payment Reconciliation History and Email Correspondence as well as the preparation of the instant Motion; and

e. Granting any further relief this Honorable Court deems just and proper.

Respectfully submitted,

/s/ *Travis W. Cohron*
Travis W. Cohron, No. 29562-30
**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
tcohron@clarkquinnlaw.com
***Counsel for the Plaintiff***

*/s/ Nick Wooten*
Nicholas H. Wooten, No. ASB-1870-o77n
**NICK WOOTEN, LLC**
5125 Burnt Pine Drive
Conway, Arkansas 72034
nick@nickwooten.com
***Counsel for the Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

David M. Schultz
Joseph D. Kern
**HINSHAW & CULBERTSON**
dshultz@hinshawlaw.com
dkern@hinshawlaw.com
***Attorneys for Ocwen Loan Servicing, Inc.***

*/s/ Travis W. Cohron*
Travis W. Cohron, No. 29562-30

**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204