**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Terre Haute Division**

| | | | |
|---|---|---|---|
| ROGER TODD, | ) | | |
| | ) | | |
| *Plaintiff*, | ) | | |
| | ) | | |
| v. | ) | Case No. | 2:19-cv-85-JMS-DLP |
| | ) | | |
| OCWEN LOAN SERVICING, LLC, and | ) | | |
| DEUTSCHE BANK NATIONAL TRUST CO., as | ) | | |
| Trustee for NovaStar Mortgage Funding Trust, | ) | | |
| Series 2007-1, | ) | | |
| | ) | | |
| *Defendants*. | ) | | |

## EXHIBIT A TO NOTICE OF RULE 30(B)(6) DEPOSITION OF OCWEN

Pursuant to Rule 30(B)(6) of the Federal Rules of Trial Procedure, the individual(s) designated to testify on each of the topics listed must be prepared to testify about information known or reasonably available to Ocwen as an organization. Preparation should include:

a) Reviewing materials, exhibits, evidence, documents and other sources of information relevant to each specific topic;

b) Obtaining information from employees or others with personal knowledge on each specific topic; and

c) Being ready and able to testify as to Ocwen's positions and conclusions regarding each specific topic.

## DEFINITIONS FOR PURPOSES OF RULE 30(B)(6) DEPOSITION

1. "Loan" means collectively the note and mortgage alleged in paragraph 3 of *Plaintiff's First Amended Complaint and Demand for Jury Trial*.

2. "Bankruptcy Case" means the bankruptcy case filed by Todd pursuant to Chapter 13 of the United States Bankruptcy Code on March 4, 2011, in the United States Bankruptcy Court for the Southern District of Indiana, Case No. 11-80256-JJG-13.

3. "Deutsche Bank" means the Defendant, Deutsche Bank National Trust Co., as Trustee for NovaStar Mortgage Funding Trust, series 2007-1.

4. "Life of Loan History" means "Exhibit C" attached to *Plaintiff's Second Amended Complaint and Demand for Jury Trial*.

## TOPICS FOR 30(B)(6) DEPOSITION

### Topics Related to the Corporate Representative and their Preparations to Testify

1. The corporate representative's identity, background, experience, and qualifications related to mortgage servicing.

2. The corporate representative's history of testimony on behalf of Ocwen including a discussion of the number of times that the representative has given testimony in a deposition or trial in the two years preceding the deposition.

3. A discussion of the records kept regarding the testimony provided by the corporate representative during the representative's work on behalf of Ocwen. This includes a discussion of each time the representative has provided an affidavit, appeared as a witness, or was deposed in a litigated matter.

4. A discussion of the investigation undertaken by the corporate representative related to the topics on which the representative will testify. This includes a discussion of all personnel and records consulted by the representative in their preparations to give testimony.

**Topics Related to the Specific Servicing Actions Taken by Ocwen on Todd's Loan**

5. The facts and circumstances related to the matters alleged in *Plaintiff's Second Amended Complaint and Jury Demand*.

6. The facts and information specifically related to understanding the meaning and implications of each item of information in each document produced by Ocwen to Todd in response to any request for production served by Todd on Ocwen.

7. The facts and circumstances specifically related to the filing of the *Response to Notice of Final Cure Payment* on May 13, 2016, in the Bankruptcy Case, including: (a) the identity of the Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating, reconciling, preparing, drafting, verifying, approving or filing it; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, preparing, drafting or filing it; (c) Ocwen's position and explanation as to whether and why the *Response to Notice of Final Cure Payment* was or was not accurate, correct or justified; and (d) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

8. The facts and circumstances specifically related to the filing the *Addendum To Response to Notice of Final Cure Payment* on May 13, 2016, in the Bankruptcy Case, including: (a) the identity of the Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating, reconciling, preparing, drafting, verifying, approving or filing it; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors,

vendors or representatives in regard to investigating, preparing, drafting or filing it; (c)
Ocwen's position and explanation as to whether and why the *Addendum To Response to
Notice of Final Cure Payment* was or was not accurate, correct or justified; and (d) the
identity of all documents, persons and other sources of information upon which any answers
in response to questions for this topic are based.

9.  The facts and circumstances specifically related to each fee, expense and/or charge assessed
    against the Loan either during or after the Bankruptcy Case as shown in the Life of Loan
    History, including:  (a) the nature of each fee, expense and/or charge; (b) the identity of all
    Ocwen employees, agents, subcontractors, vendors or representatives directly involved with
    deciding or assessing each fee, expense and/or charge; (c) the details about the actual
    processes, programs, procedures, safeguards and/or quality control checks followed by
    Ocwen's management, employees, agents, subcontractors, vendors or representatives in
    regard to deciding or assessing each fee, expense and/or charge; (d) the identity of all persons
    or entities providing the service/s underlying each fee, expense and/or charge; (e) Ocwen's
    position and explanation as to whether and why each fee, expense and/or charge was or was
    not accurate, correct or justified; (f) whether Ocwen actually paid the whole amount of each
    fee, expense and/or charge to the person or entity providing the service for it; (g) whether
    Ocwen later received a refund of any portion of any fee, expense and/or charge; and (h) the
    identity of all invoices, memorandum, documents, persons and other sources of information
    upon which any answers in response to questions for this topic are based.

10. The facts and circumstances specifically related to Ocwen increasing the principal balance of
    the Loan in the amount of $4,343.35 on January 4, 2017, including: (a) the identity of the
    Ocwen employees, agents, subcontractors, vendors or representatives directly involved with

investigating, deciding, creating or maintaining the balance increase; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, determining, creating or maintaining the balance increase; (c) Ocwen's position and explanation as to whether and why the balance increase was or was not accurate, correct or justified; and (d) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

11. The facts and circumstances specifically related to Ocwen's compliance with the bankruptcy discharge injunction in this case.

12. The facts and circumstances specifically related to the raising and lowering of any flags on Todd's account related to the filing of bankruptcy or the discharge in bankruptcy.

13. The facts and circumstances regarding any transactions related to escrow including any debits or credits, adjustments, or changes, to the escrow account of Todd during the time that Ocwen serviced the loan.

14. The facts and circumstances specifically related to each and every credit dispute investigation performed by Ocwen with respect to the Loan upon receipt of the same from Equifax, Trans Union, or Experian,  including: (a) the identity of the Ocwen employees, agents, subcontractors, vendors or representatives directly involved with processing, investigating, responding to, or correcting, any credit reporting information disputed by Todd; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, responding to, or correcting disputes about credit reporting information received from credit reporting agencies; (c) Ocwen's position and

explanation as to whether and why each investigation and response was sufficient, correct, or justified; and (d) the identity of all documents, persons, and other sources of information upon which any answers in response to questions for this topic are based.

15. The facts and circumstances related specifically to Ocwen's response to Todd's communications to Ocwen about the Loan, which response is identified in paragraph 188 of *Plaintiff's Second Amended Complaint and Demand for Jury Trial*, including:  (a) the identity of all Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating, preparing, drafting or making the response; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, preparing, drafting or making the response; (c) the specific steps taken to reasonably investigate and/or correct the claimed errors described in Todd's communication to which Ocwen responded; (d) Ocwen's position and explanation as to whether and why the response was or was correct, accurate or adequate; and (e) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

16. The facts and circumstances related specifically to Ocwen's response to Todd's communications to Ocwen about the Loan, which response is identified in paragraphs 195 and 196 of *Plaintiff's Second Amended Complaint and Demand for Jury Trial*, including:  (a) the identity of all Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating, preparing, drafting or making the response; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or

representatives in regard to investigating, preparing, drafting or making the response; (c) the specific steps taken to reasonably investigate and/or correct the claimed errors described in Todd's communication to which Ocwen responded; (d) Ocwen's position and explanation as to whether and why the response was or was correct, accurate or adequate; and (e) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

17. The facts and circumstances related specifically to Ocwen's response to Todd's NOE No. 1, which response is identified in paragraphs 216 and 221 of *Plaintiff's Second Amended Complaint and Demand for Jury Trial*, including:  (a) the identity of all Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating, preparing, drafting or making the response; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, preparing, drafting or making the response; (c) the specific steps taken to reasonably investigate and/or correct the claimed errors identified in NOE No. 1; (d) Ocwen's position and explanation as to whether and why the response was or was not correct, accurate or adequate; and (e) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

18. The facts and circumstances related specifically to Ocwen's response to Todd's NOE No. 2, which response is identified in paragraphs 229 and 239 of *Plaintiff's Second Amended Complaint and Demand for Jury Trial*, including:  (a) the identity of all Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating, preparing, drafting or making the response; (b) the details about the actual processes,

programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, preparing, drafting or making the response; (c) the specific steps taken to reasonably investigate and/or correct the claimed errors identified in NOE No. 2; (d) Ocwen's position and explanation as to whether and why the response was or was not correct, accurate or adequate; and (e) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

19. The facts and circumstances related specifically to Ocwen's response to Todd's NOE No. 3, which response is identified in paragraphs 248 and 258 of *Plaintiff's Second Amended Complaint and Demand for Jury Trial*, including: (a) the identity of all Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating, preparing, drafting or making the response; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, preparing, drafting or making the response; (c) the specific steps taken to reasonably investigate and/or correct the claimed errors identified in NOE No. 3; (d) Ocwen's position and explanation as to whether and why the response was or was not correct, accurate or adequate; and (e) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

20. The facts and circumstances related specifically to any responses by Ocwen to Todd's NOE No. 4, which NOE No. 4 is identified in paragraphs 260 of *Plaintiff's Second Amended Complaint and Demand for Jury Trial*, including: (a) the identity of all Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating,

preparing, drafting or making any responses; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, preparing, drafting or making any responses; (c) the specific steps taken to reasonably investigate and/or correct the claimed errors identified in NOE No. 4; (d) Ocwen's position and explanation as to whether and why any responses to NOE No. 4 were or were not correct, accurate or adequate; and (e) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

21. The facts and circumstances related specifically to any responses by Ocwen to the correspondence sent to Ocwen on behalf of Todd, dated February 26, 2019, and entitled Fifth Notice of Error Pursuant to Section 1024.35 of Regulation X ("NOE No. 5"), including:  (a) the identity of all Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating, preparing, drafting or making any responses; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, preparing, drafting or making any responses; (c) the specific steps taken to reasonably investigate and/or correct the claimed errors identified in NOE No. 5; (d) Ocwen's position and explanation as to whether and why any responses to NOE No. 5 were or were not correct, accurate or adequate; and (e) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

22. The facts and circumstances related specifically to any responses by Ocwen to the correspondence sent to Ocwen on behalf of Todd, dated March 4, 2019, and titled Sixth Notice of Error Pursuant to Section 1024.35 of Regulation X ("NOE No. 6"), including:  (a) the identity of all Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating, preparing, drafting or making any responses; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, preparing, drafting or making any responses; (c) the specific steps taken to reasonably investigate and/or correct the claimed errors identified in NOE No. 6; (d) Ocwen's position and explanation as to whether and why any responses to NOE No. 6 were or were not correct, accurate or adequate; and (e) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

23. The facts and circumstances specifically related to each change made by Ocwen to the Payment Reconciliation for the Loan from March 4, 2011 through current, including: (a) the identity of the Ocwen employees, agents, subcontractors, vendors or representatives directly involved with investigating, deciding, requesting or creating each change; (b) the details about the actual processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents, subcontractors, vendors or representatives in regard to investigating, determining, requesting, approving or creating each change; (c) Ocwen's position and explanation as to why each change was made; (d) Ocwen's position and explanation as to why each change was made on the date stated as the "last change date"; (e) Ocwen's position and explanation as to whether and why each change was

or was not accurate, correct or justified; and (f) the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

### Topics Related to Ocwen's Company-Wide Training, Policies and Procedures and Use of Vendors related to Compliance with Applicable Laws

24. The facts and circumstances specifically related to all servicing manuals, memoranda, notes, polices, and employee training materials for reviewing, analyzing, and responding to Notices of Errors pursuant to 12 C.F.R. §1024.35 and/or responding to any other correspondence from a borrower regarding errors or potential errors with their loans, including the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

25. The facts and circumstances specifically related to all contracts and vendor policies that Ocwen has with any outside entity or vendor that Ocwen utilizes for the mailing of any notices related to the Loan, including without limitation for mailing acknowledgments of, or responses to, Notices of Error pursuant to 12 C.F.R. § 1024.35, and the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

26. The facts and circumstances specifically related to all policies or directives of Ocwen regarding treatment of loans and mortgage accounts of debtors involved in a Chapter 13 bankruptcy, including any post-petition payment application policies and directives, the processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents or representatives in regard to handling and management of loans included in a Chapter 13 bankruptcy, the identity of persons most

knowledgeable about the processes, programs, procedures, safeguards and/or quality control checks followed by Ocwen's management, employees, agents or representatives in regard to handling and management of loans included in a Chapter 13 bankruptcy, and the identity of all documents, persons and other sources of information upon which any answers in response to questions for this topic are based.

27. The facts and circumstances specifically related to all contracts and vendor policies that Ocwen has with any outside entity or vendor that Ocwen utilizes for the purpose of providing any service, support or assistance to Ocwen related to Ocwen's servicing of any loan where a consumer has filed bankruptcy.

28. The facts and circumstances specifically related to all policies, procedures, or directives of Ocwen regarding the handling, servicing, accounting, and adjustment of escrow accounts of any consumer, including the escrow accounts of consumers in bankruptcy.

29. A discussion of Ocwen's implementation and utilization of Banko and LexisNexis services to monitor bankruptcy filings related to Ocwen's servicing portfolio.

30. The facts and circumstances specifically related to all contracts and vendor policies that Ocwen has with any outside entity or vendor that Ocwen utilizes for the purpose of providing any service, support or assistance to Ocwen related to Ocwen's handling of the escrow account of any mortgage loan account serviced by Ocwen.

31. The facts and circumstances specifically related to all policies, procedures, or directives of Ocwen regarding the processing of any consumer credit reporting dispute received by Ocwen.

32. A discussion of Ocwen's policies and procedures for the raising and lowering of flags related to consumer disputes related to credit bureau reporting.

33. A discussion of Ocwen's policies and procedures for the raising and lowering of flags related to either: (i) a consumer's filing of a bankruptcy petition; or (ii) a consumer's ongoing bankruptcy case; or (iii) a consumer's bankruptcy case receiving an order of discharge.

34. A full discussion of Stage5, i.e., what is it, who is responsible for it, what does it do, what is its purpose, how is it utilized, what data or information does it contain, who has access to it, what data is provided to it, what data or services does it provide to Ocwen and how does it provide either data or services to Ocwen.

35. A full discussion of iCaseWorks, what is it, who is responsible for it, what does it do, what is its purpose, how is it utilized, what data or information does it contain, who has access to it, what data is provided to it, what data or services does it provide to Ocwen and how does it provide either data or services to Ocwen.

36. A full discussion of Project Lightyear, what is it, who is responsible for it, what does it do, what is its purpose, how is it utilized, what data or information does it contain, who has access to it, what data is provided to it, what data or services does it provide to Ocwen and how does it provide either data or services to Ocwen.

37. A full discussion of Equator, what is it, who is responsible for it, what does it do, what is its purpose, how is it utilized, what data or information does it contain, who has access to it, what data is provided to it.

38. A full discussion of Kofax, what is it, who is responsible for it, what does it do, what is its purpose, how is it utilized, what data or information does it contain, who has access to it, what data is provided to it, what data or services does it provide to Ocwen and how does it provide either data or services to Ocwen.

39. A full discussion of RealServicing Next Generation, what is it, who is responsible for it, what does it do, what is its purpose, how is it utilized. Was it ever implemented, if so, when was it implemented, how did it differ from RealServicing, who was responsible for its development, was it tested to determine if it shared the same or similar issues to RealServicing, what data or information does it contain, who has access to it, what data is provided to it, what data or services does it provide to Ocwen and how does it provide either data or services to Ocwen.

**Topics Related to Ocwen's Notice and Knowledge of Systemic Issues with RealServicing**

40. The facts and circumstances specifically related to any operational and system deficiencies of Ocwen's REALServicing record system, including specifically:

   i.   Operational and system deficiencies related to Ocwen's legal obligations for servicing mortgage loan accounts for borrowers who filed Chapter 13 bankruptcy cases including proper application of pre and post-petition payments, accounting for trustee payments, charges and fees added to loans because of RealServicing's programming, handling of escrow accounts in bankruptcy, raising and lowering of bankruptcy flags, compliance with Rule 3002.1 (Notice of Final Cure), compliance with the automatic stay and the discharge injunction, reconciliation of accounts that have completed a Chapter 13 bankruptcy, indiscriminate raising and lowering of the bankruptcy discharge flag by Ocwen employees, lack of control over the raising and lowering of bankruptcy discharge flag by Ocwen employees, inability to track the raising and lowering of bankruptcy discharge flag on loans where the consumer received a chapter 13 discharge.

14

    ii.    operational and system deficiencies related to RESPA compliance.

   iii.    operational and systemic deficiencies related to payment processing.

   iv.    operational and systemic deficiencies related to FDCPA compliance.

    v.    operational and systemic deficiencies related to the proper application of mortgage payments received from consumers, including a discussion of suspense accounts.

   vi.    operational and systemic deficiencies related to the handling of escrow accounts.

  vii.    operational and systemic deficiencies related to consumer credit reporting.

 viii.    operational and systemic deficiencies related to data integrity.

   ix.    operational and systemic deficiencies related to the accuracy of communications mailed to consumers, including the dates of communications and the contents of communications.

    x.    operational and systemic deficiencies related to the handling of consumer disputes and complaints.

41. Ocwen's September 1, 2011 *Agreement on Mortgage Servicing Practices* with the New York State Department of Financial Services as amended by the parties on December 15, 2011. This includes a discussion of the complete scope of this agreement including its applicability to Ocwen's servicing practices as to all loans serviced by Ocwen and the servicing practices that Ocwen agreed to implement.

42. The facts and circumstances specifically related to or addressed by the Consent Order Pursuant to New York Banking Law § 44 in *In the Matter of Ocwen Financial Corporation, Ocwen Loan Servicing, LLC*. (Dec. 5, 2012).

43. The facts and circumstances specifically related to or addressed by the Consent Order Pursuant to New York Banking Law § 44 in *In the Matter of Ocwen Financial Corporation, Ocwen Loan Servicing, LLC*. (Dec. 22, 2014).

44. The facts and circumstances specifically related to or addressed by the Consent Judgment in the United State District Court for the District of Columbia in *Consumer Fin. Prot. Bureau, et al. v. Ocwen Fin. Corp., et al.,* Case No. 13-cv -2025 (RMC)(D.D.C.) entered of record in February of 2014. This discussion shall include a discussion of the mortgage servicing practices agreed to by Ocwen and attached to the consent judgment as Exhibit A thereto.

45. The facts and circumstances specifically related to or addressed by the Settlement Agreement and Consent Order in *In Re: Ocwen Financial Corporation and Ocwen Loan Servicing, LLC*., Case No. C-13-1153.

46. A complete discussion of the documents identified by Ocwen as the Risk Convergence Reports ("RCRs") produced with Bates Label number RCR000l-001259. This discussion shall be limited to the topics identified by the parties during their collaborative review of these documents for relevance. Within this subset of topics, Todd will take testimony concerning: (i) the identity of every person or persons who identified each issue, (ii) the severity of each issue as determined by Ocwen, (iii) the identity and employment position of the person or persons responsible for addressing each issue, (iv) the distribution of the RCRs within Ocwen, (v) the involvement of executives and senior management with the RCRs including whether any executives or senior management received the RCRs or were assigned to address any issue or issues identified in the RCRs, (vi) the number of consumer mortgage loan accounts affected by every issue identified; (vii) the number of consumers Ocwen believed were harmed as a result of any issue identified in the RCRs, (viii) the number of

consumers Ocwen believed were potentially subject to harm as a result of any issue identified in the RCRs; (ix) The types of potential harm and actual harm Ocwen believed could result from every issue identified in the RCRs, (x) What actions Ocwen took to remediate any harms identified as resulting from any issues in the RCRs; (xi) The length of time every issue identified in the RCRs existed before a corrective action was implemented that actually resolved the issue; (xii) a discussion of any references to vendors, software, hardware, systems, processes, procedures, training, identification, remediation, or control referenced within any of the topics identified in the RCRs; (xiii) a discussion of the identity and roles of every person identified in the RCRs; (xiv) a discussion of change reports; (xv) a discussion of control reports; (xvi) a discussion of how Ocwen utilized the RCRs internally to drive improvements to RealServicing; (xvii) a discussion of any regular meetings or discussions of the contents of the RCRs, including the participants and the purpose of the meetings or discussions; (xviii) a discussion of manual processes and exception reports; (xix) whether the RCRs were ever shared with any regulators, and, if yes, the identity of any regulators who had access to the RCRs; (xx) a discussion of Altisource's role in resolving any of the issues identified in the RCRs; (xxi) a discussion of whether Ocwen had the capacity to make any corrections or changes needed without the assistance and involvement of Altisource; (xxii) a discussion of Ocwen's view of each identified topic as to whether Ocwen considered the issue a possible violation of any law, regulation, consent decree or judgment, or servicing standard set forth in the National Mortgage Servicing Standards (NMS); (xxiii) a discussion of whether Ocwen ever analyzed the costs of making changes to its operations or technology to correct any issue identified in the RCRs. If yes, a discussion of who was responsible for such analysis, how that analysis was shared within the company, and any decisions made

after considering that analysis; any other fact or data contained in or related to the RCRs not specifically referenced herein but having relevance to the case at issue.

47. A complete discussion of the Monitor's Compliance Reports ("MCRs") produced in this matter including:

    i.   A discussion of each discrete issue the monitor brought to Ocwen's attention that bears upon any of the facts or claims in this case.

    ii.   The information provided to the monitor by Ocwen.

    iii.   The positions taken by Ocwen to the Monitor with respect to any of the issues identified.

    iv.   Any documents provided by Ocwen to the Monitor that were made an exhibit to any MCR.

    v.   A discussion of the process of creating the Monitor's report, i.e., the Monitor's submission of a draft to Ocwen, Ocwen's response to the Monitor's draft, the Monitor's final draft and any submissions made in response by Ocwen.

    vi.   A discussion of the relationship between Ocwen and Altisource as discussed by the Monitor.

    vii.   A discussion of the stock owned and roles in Altisource of certain Ocwen executives.

    viii.   A discussion of Ocwen's dependencies on Altisource, as identified by the Monitor.

    ix.   Ocwen's actions taken in response to issues identified by the monitor.

    x.   Whether, in Ocwen's opinion, the issues identified by the monitor were ever resolved. If yes, in what time frame and what manner were the issues resolved.

    xi.   A discussion of the number of consumers harmed and potentially harmed by each issue identified by the Monitor.

xii.    A discussion of whether Ocwen undertook any analysis of the financial impact of any change to its operations or its technology necessary to resolve any issue identified by the Monitor. If yes, a discussion of a discussion of who was responsible for such analysis, how that analysis was shared within the company, and any decisions made after considering that analysis.

xiii.   A discussion of the costs associated with the transfer of Ocwen's servicing from RealServicing to the Black Knight / LPS system.

xiv.    A discussion, by way of follow-up, of any other facts or matters that arise from the questions and answers on these sub-topics.

48. A discussion of the allegations in the CFPB's complaint against Ocwen filed in April of 2017.

49. A discussion of the Cease and Desist Orders entered by various states nearly simultaneously with the CFPB's filing of its 2017 lawsuit against Ocwen.

50. A discussion of the Ocwen executives who had knowledge of the issues raised in the RCRs and the MCRs including any involvement with or responsibility for remediating any issue identified.

51. A discussion of the Compliance Committee formed by Ocwen's Board of Directors to include a discussion of meetings held, information considered, decisions made, records kept, and actions taken by the Committee.

52. A discussion of any changes made to Ocwen's credit reporting policies, procedures, staffing or training, or any functionalities within Ocwen's servicing platform, that occurred as a result of the jury verdict in *David M. Daugherty v. Ocwen Loan Servicing, LLC* (No. 5:14-CV-24506)*,* or were attributable in any way to the results of the *Daugherty* verdict.

53. A discussion of any changes made to Ocwen's servicing platform, policies, procedures, staffing, or training with respect to mortgage servicing generally, responding to RFIs and NOEs sent pursuant to RESPA, notice of cure response, bankruptcy processes or management, or bankruptcy discharge compliance, or bankruptcy flag control, arising from or attributable to the verdict entered in *Saccameno v. Ocwen Loan Servicing, LLC, No. 1:14-cv-08461 (N.D. Ill.).*

**<u>Topics Related to the Use of RealServicing, its Decommission, Ocwen's Utilization of Acquired Legacy Systems, and Ocwen's Transfer of Data to BlackKnight</u>**

54. The facts and circumstances specifically related to Ocwen's use of the REALServicing platform including without limitation the history of the platform, Ocwen's relationship with Altisource, Ocwen's duties with respect to any deficiencies identified with REALServicing, the costs of curing any deficiencies, the costs of adopting a new servicing platform, the control of REALServicing as of the date of this deposition, access to data and records from REALServicing.

55. Ocwen's policies, procedures, and past historical conduct with respect to the retention and operation of legacy mortgage servicing platforms acquired by Ocwen over the previous 15 years, including during Ocwen's explosive growth noted in its 2011 Agreement with NYDFS.

56. The facts and circumstances specifically related to the processes or audits utilized by Ocwen in transferring loan data from its REALServicing platform to its new platform licensed by BlackKnight including without limitation the identity of any third parties used in these processes and measures taken to ensure data integrity.

57. A discussion of the mechanical process of transferring data from REALServicing to BlackKnight including a full discussion of any actions taken to ensure the accuracy of the data points transferred from REALServicing to BlackKnight.